1  *Lynne M. Kizis, Pro Hac Vice Application To Be Filed*
     lkizis@wilentz.com
2  Kevin P. Roddy, CA State Bar No. 128283
     kroddy@wilentz.com
3  WILENTZ, GOLDMAN & SPITZER, P.A.
   90 Woodbridge Center Drive, Suite 900
4  Woodbridge, New Jersey 07095
   Tel: (732) 855-6402
5
6  Kimberly Beck, *Pro Hac Vice Application To Be Filed*
     kim@becklawcenter.com
7  BECK LAW CENTER
   201 E. 5th Street, Suite 1900
8  Cincinnati, Ohio
   Tel: (888) 434-2912
9  *Attorneys for Plaintiff*

10 Shehnaz M. Bhujwala, CA State Bar No. 223484
     bhujwala@boucher.la
11 BOUCHER LLP
   21600 Oxnard Street, Suite 600
12 Woodland Hills, California 91367-4903
   Tel: (818) 340-5400
13 *Local Counsel for Plaintiff*

14

15          **UNITED STATES DISTRICT COURT**
          **SOUTHERN DISTRICT OF CALIFORNIA**

16 RICHARD PARKER, an individual    :   Case No. **'24CV0916 CAB DDL**
                                     :
17              Plaintiff,           :   **COMPLAINT FOR DAMAGES**
                                     :   **AND DEMAND FOR JURY**
18 v.                                :   **TRIAL**
                                     :
19 MERCK & CO., INC., a New Jersey   :
   Corporation; MERCK SHARP & DOHME  :   **1. STRICT LIABILITY –**
20 CORP. a New Jersey Corporation;   :      **FAILURE TO WARN**
   ORGANON & CO., a Delaware         :   **2. NEGLIGENCE**
21 Corporation; ORGANON LLC, a       :   **3. NEGLIGENT**
   Delaware Limited Liability Company; and  :   **MISREPRESENTATION**
22 DOES 1-10, Inclusive,             :
                Defendants.          :
23                                   :

24

25                                   -1-
   #14459257.1

Plaintiff RICHARD PARKER, an individual, (hereinafter collectively "Plaintiff"), allege the following facts and claims for relief against Defendants MERCK & CO., INC. a New Jersey Corporation, MERCK SHARP & DOHME CORP., a New Jersey Corporation, (collectively referred to as "Merck Defendants" or "Merck"), Organon & Co., a Delaware Corporation, and Organon LLC, a Delaware Limited Liability Company (collectively referred to as "Organon Defendants" or "Organon") and DOES 1 through 10, inclusive, (all collectively referred to herein as "Defendants") and requests a trial by jury of all issues and causes of action so triable:

## INTRODUCTION

1.      Plaintiff has developed neuropsychiatric injuries as a result of ingesting Defendants' prescription pharmaceutical product, Singulair®, indicated for: a) prophylactic and chronic treatment of asthma; b) acute prevention of exercise- induced bronchoconstriction (EIB); and c) relief of symptoms of allergic rhinitis.

2.      Merck Defendants knew or should have known of the risks of neuropsychiatric injuries prior to the time they began selling Singulair® in 1998. In 1996, Defendant Merck & Co., Inc. filed a patent application for montelukast, the active ingredient in Singulair®, acknowledging montelukast's possible effects on cerebral spasm. Further, montelukast has been tested extensively starting prior

-2-

#14459257.1

to 1998, and continuing through today. Many of these studies have demonstrated a

correlation—and some show causation—between Singulair® usage and the

development of neuropsychiatric events. Merck Defendants have ignored these

studies.

3.     Originally, the Singulair® label contained no warnings regarding

neuropsychiatric events. Over the past 24 years Merck Defendants have slowly and

belatedly added grossly insufficient warnings regarding neuropsychiatric events to

the product label. Finally, on March 4, 2020, the Food & Drug Administration

(FDA) required Merck Defendants to add a Black Box Warning, the strongest type

of warning, to Singulair®'s label, regarding neuropsychiatric events. FDA also

required a new Medication Guide.

4.     The new Black Box warning provides "serious neuropsychiatric

events have been reported in patients taking Singulair®." These include:

> agitation, aggressive behavior or hostility, anxiousness, depression,
> disorientation, disturbance in attention, dream abnormalities,
> dysphagia (stuttering), hallucinations, insomnia, irritability, memory
> impairment, obsessive-compulsive symptoms, restlessness,
> somnambulism, suicidal thoughts and behavior (including suicide),
> tic, and tremor...
>
> Psychiatric disorders: agitation including aggressive behavior or
> hostility, anxiousness, depression, disorientation, dream
> abnormalities, hallucinations, insomnia, irritability, restlessness,
> somnambulism, suicidal thinking and behavior (including suicide),

-3-

#14459257.1

tremor [see Warnings and Precautions (5.4)].[1]

The new warning goes on to state "the benefits of Singulair® may not outweigh the risks...".

5.      Merck Defendants also modified the drug labeling Section 5.1 to disclose some neuropsychiatric events that were reported after Singulair® discontinuation as well as acknowledge montelukast, the active ingredient in Singulair®, distribution into the brain in rats. In addition, Merck Defendants modified Section 12.3 to remove the word 'minimal' from the description of montelukast distribution into the brain.

6.      In its March 4, 2020, press release FDA noted that "many patients and health care professionals are not fully aware of these risks." Further, by requiring the addition of the Black Box warning, the FDA "aims to make sure patients and medical providers have the information available to make informed treatment decisions."

## PARTIES

7.      Plaintiff is a competent individual over the age of 18. Plaintiff is a citizen and resident of San Diego County, California. At all times relevant herein,

---

[1] Merck Sharp & Dohme Corp., a subsidiary of Merck & Co., Inc., "Full Prescribing Information: Singulair® (montelukast sodium) Tablets, Chewable Tablets, and Oral Granules [US Patent No. 5,565,473]," Reference ID:
3106826 (Whitehouse Station, NJ: Merck & Co., Inc., 1998, revised Mar. 2012): 3-4, § 5.4: Neuropsychiatric Events; 6-7, §6.2: Post-Marketing Experience.  Accessed at
https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/021409s036lbl.pdf.

-4-

#14459257.1

Plaintiff was a citizen and residents of California. At all relevant times herein, Plaintiff was prescribed Singulair® in California. Plaintiff ingested Singulair® in California and sustained injuries therefrom in California.

8. Plaintiff Richard Parker was prescribed Singulair from 2018 to 2020. His prescriptions were filled with brand and/or generic Singulair. He used Singulair as prescribed. As a direct and proximate result of ingesting Singulair®, Plaintiff Richard Parker suffered neuropsychiatric injury including suicidality, depression, and a suicide attempt.

9. Plaintiff became symptomatic while using Singulair®.

10. Had Plaintiff or the prescribers known that Singulair® could cause Plaintiff to suffer neuropsychiatric events, the prescriber would not have prescribed Singulair® and Plaintiff would not have ingested Singulair®. Plaintiff has incurred medical expenses and will continue to incur expenses in connection with medical treatment as a result of these injuries, which were caused by Defendants' conduct with respect to Singulair®'s design, labeling, manufacture, marketing, and sale. Plaintiff has endured and will continue to endure pain, suffering, mental anguish, trauma, and loss of enjoyment of life as a result of these injuries, have suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

11. On information and belief, Merck Defendants are, and at all relevant

-5-

#14459257.1

times herein were, multi-national pharmaceutical corporations organized under the laws of New Jersey, with their principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033, and doing business in California. On information and belief, Merck Sharp & Dohme Corp. is, and at all relevant times was, registered with the California Secretary of State to do business in California.

12. Merck Defendants had exclusivity with respect to Singulair® and were the exclusive manufacturers, distributors, and sellers of Singulair® from 1998 to mid-2012. Merck Defendants have maintained control of brand name Singulair® at least into 2020 and possibly still maintain control.

13. On information and belief, the Merck Defendants "spun off" Singulair to their subsidiary, Organon & Co., sometime after the FDA ordered Merck to add the Black Box warning to Singulair's label. On information and belief, Organon & Co. is, and at all relevant times herein was, a corporation organized under the laws of Delaware, with a principal place of business at 30 Hudson Street, Floor 33, Jersey City, New Jersey 07302, and doing business in California. On information and belief, Organon LLC is a subsidiary of Organon & Co. that distributed Singulair to Californians, including Plaintiff. On information and belief, Organon LLC is, and at all relevant times herein was, a Delaware limited liability company with a principal place of business at 30 Hudson Street, Floor 33, Jersey City, New Jersey 07302. On information and belief, Organon & Co. and Organon LLC

-6-

("Organon") are, and at all relevant times were, registered with the California Secretary of State to do business in California.

14.     On information and belief, subject to discovery regarding the relationship of the Merck Defendants to Organon, either Merck Defendants or Organon may be liable for injuries caused by Singulair after FDA directed a black box warning to be added to Singulair before it was added and physicians, pharmacists and patients were appropriately notified.

15.     Plaintiff are informed and believe, and thereon allege that, at all relevant times, the Merck Defendants and after transfer of the Singulair NDAs to it, Organon, conducts and at all relevant times conducted substantial, continuous business in California.

16.     The Merck defendants manufactured, marketed and sold millions of Singulair pills, including the actual Singulair pills that Plaintiff used in California during and prior to 2012.

17.     Since 2012, the Merck defendants have continued to manufacture, market, and sell Singulair in California at least into 2020 and either the Merck Defendants or Organon did so after 2020.

18.     On information and belief, Merck Defendants and/or Organon may have subsequently manufactured, marketed and sold the actual Singulair pills used by Plaintiff in California.

-7-

#14459257.1

19.     Merck defendants engaged in an extensive campaign to educate physicians in California about the alleged benefits of Singulair, and further misrepresented the safety of Singulair to physicians in California during this campaign.

20.     Merck Defendants engaged in extensive Direct-to-Consumer advertising in California including print ads in magazines sold in California as well as television advertising on television channels airing in California.

21.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1 through 10 and therefore sue these defendants by such fictitious names pursuant to California Code of Civil Procedure section 474. Plaintiff is informed and beliefs, and upon such information and belief, alleges, that each of the defendants designated as a Doe are legally responsible in some manner for the events and happenings and caused damages, as alleged herein. Plaintiff will seek leave of the Court to amend this Complaint to show the true names and capacities of the defendants, designated as Does, when the same has been ascertained.

22.     Plaintiff is informed and believes, and on that basis allege, that at all times mentioned herein, there existed a unity of interest and ownership among Defendants and each of them, such that any individuality and separateness between Defendants, and each of them, ceased to exist. Defendants and each of them, were

-8-

#14459257.1

the successors-in-interest and/or alter egos of the other Defendants, and each of them, in that they purchased, controlled, dominated and operated each other without any separate identity, observation of formalities, or other manner of division. To continue maintaining the façade of a separate and individual existence between and among Defendants, and each of them, would allow Defendants to perpetrate a fraud and an injustice.

23. Plaintiff is informed and believes, and on that basis allege, that at all times mentioned herein, Defendants and each of them were the agents, representatives and/or employees of each and every other Defendant. In doing the things hereinafter alleged, Defendants and each of them, were acting within the course and scope of said alternative personality, capacity, identity, agency, representation and/or employment and were within the scope of their authority, whether actual or apparent. Plaintiff is informed and believes, and on that basis allege, that at all times mentioned herein, Defendants and each of them were the trustees, partners, servants, joint venturers, shareholders, contractors, and/or employees of each and every other Defendant, and the acts and omissions herein alleged were done by them, acting individually, through such capacity and within the scope of their authority, and with the permission and consent of each and every other Defendant and that said conduct was thereafter ratified by each and every other Defendant, and that each of them is jointly and severally liable to Plaintiff.

-9-

## JURISDICTION AND VENUE

24.     Venue is proper in this Court because Plaintiff is a citizen and resident of San Diego County, California, and during and prior to 2012, Plaintiff purchased and used Merck Defendants' Singulair in San Diego County, California that caused Plaintiff's injuries in that county. Further on information and belief, Defendants made misrepresentations regarding the safety of Singulair to physicians in San Diego County, California.

25.     The United States District Court for the Southern District of California has jurisdiction over all Defendants because, based on information and belief, each is a corporation and/or entity and/or person organized under the laws of having its principal place of business in the State of California, a foreign corporation or association authorized to do business in California and registered with the California Secretary of State, or that has sufficient minimum contacts in California, is a citizen of California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

26.     Further, Defendants have each purposefully availed themselves of the benefits and protections of the laws within the State of California. Collectively, Defendants conduct substantial, continuous, and systemic business in California

-10-

#14459257.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

and have had sufficient contact with California such that the exercise of jurisdiction would be consistent with the traditional notions of fair play and substantial justice.

## FACTUAL ALLEGATIONS

**A.    Merck's Discovery of Montelukast**

27.    Merck Defendants discovered the anti-asthmatic properties of montelukast, the active ingredient in Singulair® and were granted U.S. Patent No. 5,565,473 on October 15, 1996, which expired on August 3, 2012. FDA first approved Singulair® for clinical use in 1998.

28.    Singulair® has become a ubiquitous monotherapy treatment as an alternative to, and as an add-on therapy to inhaled corticosteroids (ICS) such as fluticasone. Approximately 9.3 million patients received a dispensed montelukast prescription from U.S. outpatient pharmacies in 2018, with 2.3 million of these being children younger than 17 years.[2]

29.    Singulair® (montelukast) is a leukotriene receptor antagonist that binds with high affinity and selectivity to the cysteinyl leukotriene receptor -1 (CysLTR1) in order to prevent this receptor from interacting with leukotrienes,

---

[2] U.S. Food and Drug Administration, Drug Safety Communications, FDA requires Boxed Warning about serious mental health side effects for asthma and allergy drug montelukast (Singulair®); advises restricting use for allergic rhinitis: Risks may include suicidal thoughts or actions," 3-4-2020 FDA Drug Safety Communication (Mar. 4, 2020) (citing IQVIA Total Patient TrackerTM. Year 2018. Data extracted June 2019). Accessed at https://www.fda.gov/media/135840/download.

#14459257.1

which are inflammatory mediators. Such binding consequently assists in inhibiting many of the physiological actions elicited by CysLTs at the receptor which could have facilitated asthma or allergic rhinitis. As an example, montelukast modulates expression of CysLTR1 and CysLTR2 in airway eosinophilic (i.e., high count of white blood cells) inflammation of OVA-induced asthmatic mice because the drug functions in bodies as a CysLT1 receptor antagonist.[3]

30.     Cysteinyl leukotrienes (CysLT) are eicosanoids (i.e., signaling molecules) that are released by various types of cells, including mast cells and eosinophils, both of which are implicated in allergy and anaphylaxis as well as the immune system. When these CysLT bind to their corresponding CysLT receptors (e.g., CysLT binding to CysLT1R), they may act to up- or down-regulate the receptor and its coordinating effect. For example, CysLT1 binding to CysLT1 receptors found on smooth muscle cells in respiratory airways simulates specific cell activities that then facilitate the underlying pathophysiology of asthma and allergic rhinitis.

31.     Facilitating conditions for asthma include CysLT-mediated airway bronchoconstriction, vascular permeability, occluding mucous secretion, and

---

[3] Zhang YJ, Zhang L, Wang SB, Shen HH, Wei EQ. Montelukast modulates lung CysLT(1) receptor expression and eosinophilic inflammation in asthmatic mice. Acta Pharmacol Sin. 2004;25(10):1341-1346 (Finding that montelukast inhibited the up-regulation of the CysLT1 receptor in airway eosinophilic inflammation of ovalbumin- induced (i.e., egg whites) asthmatic mice.

-12-

eosinophil recruitment. In allergic rhinitis, nasal mucosa release CysLTs when exposed to allergens like pollen during both early- and late-phase reactions and then participate in eliciting the prototypical symptoms of allergic rhinitis like a congested nose and congested airway. Simply put, if allergens (e.g., dust and pollen) are the gasoline and CysLTs are the gas pedal that drive the asthma and allergies engine, Singulair® hits the brakes.

**B.** **Singulair Crosses the Blood-Brain-Barrier and Causes Neuropsychiatric Events.**

        **a.** **Introduction to the Blood-Brain-Barrier**

        32.    Montelukast crosses the blood-brain barrier (BBB), which is a semi-permeable (i.e., partial porous) membrane of endothelial cells (blood and lymphatic vessel lining) that is highly selective in preventing solutes in circulating blood from non-selectively entering the extracellular fluid (e.g., cerebrospinal fluid) and thereby interacting with neurons in the central nervous system (CNS). The CNS influences activity within all of the parts of the body and is constituted primarily by the brain and spinal cord. Neurons function to communicate with other cells via connections called synapses. Neurons are like telephones in that they receive signals and synapses are similar to telephone lines that carry signals.

        33.    The function of the BBB is to protect the brain from circulating pathogens and thereby render blood borne brain infections rare. No antibodies,

-13-

1    only certain antibiotics, and exceedingly few drugs in general may pass the BBB

2    and thereby have an impact on the CNS.

3        34.    The clinical significance of the BBB is due to its difficulty as a drug

4    target to overcome. Difficulty may be attributed to its 100% exclusion of large-

5    molecule neurotherapeutics and 98% exclusion of all small-molecule drugs (e.g.,

6    anti-depressants like Prozac, anxiolytics like Xanax).[4]  In terms of size and rough

7    complexity, if a small-molecule drug like aspirin (21 Daltons) were a bicycle (~ 20

8    lbs), a large-molecule drug or small biologic like human growth hormone (~3,000

9    Daltons) would be a Toyota Prius (~ 3,000 lbs), and a large biologic like

10   immunoglobulin G antibody (~ 25,000 Daltons) would be an F-16 fighter jet (~

11   25,000 lbs without fuel).[5]

12       35.    Small molecules are considered anything less than 900 Daltons. A

13   molecular weight of 400 Daltons or less increases a drug's chances of penetrating

14   the CNS.9 Montelukast weighs 608.18 Daltons.

---

[4] See, e.g., Pardridge, William M. "The Blood-Brain Barrier and Neurotherapeutics." NeuroRx. 2005 Jan; 2(1): 1- Doi: 10.1602/neurorx.2.1.1; Pardridge. "The Blood-Brain Barrier: Bottleneck in Brain Drug Development." NeuroRx. 2005 Jan; 2(1): 3—14. Doi: 10.1602/neurorx.2..3
[5] Deepak Gupta et al. "A CMO Perspective on Quality Challenges for Biopharmaceuticals," BioProcess Int'l (Oct. 1, 2013, 9:00 AM), accessed at http://www.bioprocessintl.com/manufacturing/antibody-non-antibody/a-cmo-perspective-on-quality-challenges-for-biopharmaceuticals-347335; *See also*, McNally, Eugene J., and Jayne E. Hastedt. "Development of Drug Products: Similarities and Differences Between Protein Biologics and Small Synthetic Molecules." In Protein Formulation and Delivery, 2nd ed. Edited by Eugene J. McNally and Jayne E. Hastedt. Drugs and the Pharmaceutical Sciences, Vol. 175 (Boca Raton, FL: CRC Press Taylor & Francis Group, 2008): 327-333, 328-329.

-14-

#14459257.1

36.     Additionally, molecules with less than 8 hydrogen bonds have an increased likelihood of penetrating the BBB. These are weak intermolecular (i.e., between molecules) bonds between a lone pair electron "donor" and an electron "acceptor." If the "acceptor" is the team, the lone pair "donor" is the person who is getting picked last. Montelukast has 4 hydrogen bond acceptors and 2 hydrogen bond donors. Rendering the drug capable of having only 6 hydrogen bonds. Because of this, montelukast has an inherent increased likelihood of penetrating the BBB.

37.     In order to deliver neurotherapeutic drugs to the brain to treat illnesses such as depression, schizophrenia, and obsessive-compulsive disorder, they must be able to cross the BBB. More lipid soluble or lipophilicity molecules are better able to penetrate the CNS.[6] Montelukast has been proven more lipid soluble than its sister class drug, Zafirlukast. In other words, because montelukast "likes" dissolving in fats or oils more than zafirlukast, montelukast is better able to cross the BBB.[7]

38.     Because montelukast crosses the BBB, it exerts a systemic effect upon

---

[6] E.g., Pardridge, William M., "Drug transport across the blood-brain barrier," J Cereb Blood Flow Metab. 2012 Nov; 32(11): 1959–1972. Published online 2012 Aug 29. doi: 10.1038/jcbfm.2012.126

[7] See Mougey, Edward B.; Hua Feng; Mario Castro, Charles G. Irvin, and John J. Lima, "Absorption of Montelukastis Transporter Mediated: a Common Varient of OATP2B1 is Associated with Reduced Plasma concentrations and Poor Response," [Author manuscript; available in PMC 2010 Feb 1] Pharmacogenet Genomics, 2009 Feb; 19(2): 129–138. doi: 10.1097/FPC.0b013e32831bd98c.

-15-

1  the CNS that results in, among other things, adverse neuropsychiatric events.

**b.      Singulair Crosses the Blood-Brain-Barrier**

39.      Montelukast crosses the BBB and thereby accumulates in the central

nervous system (CNS), which is constituted by the brain and spinal cord. This drug

accumulation occurs with both oral and intravenous doses, and in both humans and

animals:

> Most importantly, **in a human subject taking 10 mg per day
> montelukast, that is, the approved dose to treat asthma, we
> detected [oral] montelukast in the serum and in the CSF** in a
> similar concentration as in the rats (Supplementary  Fig. 1a),
> suggesting that the standard 10 mg per day dose in humans is
> sufficient to reach a therapeutic dose in the CSF. In addition, a re-
> analysis of the original CNS pharmacology data of
> montelukast27indicates a significant BBB penetrance of the drug
> (Supplementary Fig. 1b). **These data clearly demonstrate that
> orally administered montelukast does cross the BBB in a
> therapeutic dose**, and that age-dependent differential BBB integrity
> does not affect the capacity of montelukast to enter the brain...
>
> Remarkably, montelukast serum levels [following intravenous drug
> administrations in rats] were almost identical to the maximum plasma
> concentrations in humans after oral administration of the clinical dose
> of 10 mg montelukast daily... illustrating that the animals were treated
> with montelukast in a dose that pharmacologically resembles the one
> that is approved for its use in humans.[8]

40.      Studies show that expression of the CysLTR1 (including that bound

with montelukast) is not limited to the lungs. Instead, it occurs in different cells in

---

[8] Marschallinger, J., Schäffner, I., Klein, B. et al. Structural and functional rejuvenation of the
aged brain by an approved anti-asthmatic drug. Nat Commun 6, 8466 (2015), 4, 10.
https://doi.org/10.1038/ncomms9466. (Emphases added).

-16-

the brain, including microvascular endothelial cells—components of the blood brain barrier. Pre- clinical studies of human and animal model tissue implicate CysLTR1 antagonists (e.g., Singulair®/montelukast, Onon/pranlukast, and Accolate/zafirlukast) as exerting effects upon traumatic brain injuries (TBI), ischemic brain injuries (e.g., stroke, TIA), cold-induced brain injuries, multiple sclerosis, auto-immune encephalomyelitis, Alzheimer's disease, and Parkinson's disease.[9] Activation of CysLTR1 is associated in animals with facilitating pathogen entry into the brain by disrupting the Blood Brain Barrier (BBB).[10] Among these pathogens are HIV-1 and Escherichia coli-mediated meningitis.[11] Furthermore, "[i]t has been demonstrated that [Singulair®] could increase the proliferation of neuronal precursor cells in vitro through the receptors CysLT1R and GPR17 [(G protein-coupled receptor 17)]."[12] Accordingly, although "expression of the CysLT1R in the normal human brain is very low/non- existent," montelukast

---

[9] Ghosh A, Chen F, Thakur A, Hong H (2016). "Cysteinyl Leukotrienes and Their Receptors: Emerging Therapeutic Targets in Central Nervous System Disorders". CNS Neuroscience & Therapeutics. 22 (12): 943 -951. doi:10.1111/cns.12596. PMC 6492851. PMID 27542570.

[10] Bertin J, Jalaguier P, Barat C, et al. Exposure of human astrocytes to leukotriene C4 promotes a CX3CL1/fractalkine- mediated transmigration of HIV-1-infected CD4 + T cells across an in vitro blood–brain barrier model. Virology 2014;454–455:128–138.

[11] Zhu L, Maruvada R, Sapirstein A, et al. Arachidonic acid metabolism regulates Escherichia coli penetration of the blood-brain barrier. Infect Immun 2010;78:4302–4310.

[12] Yohanna Eriksson, Martina Boström, Asa Sandelius Kaj Blennow, Henrik Zetterberg, Georg Kuhn, and Marie Kalm, The anti-asthmatic drug, montelukast, modifies the neurogenic potential in the young healthy and irradiated brain, Cell Death and Disease 9:775 (2018), 5. Doi 10.1038/s41419-018-0783-7. (citing Huber, C. et al. Inhibition of leukotriene receptors boosts neural progenitor proliferation. Cell. Physiol. Biochem. 28, 793-804 (2011). doi: 10.1159/000335793.).

-17-

blockades GPR17 and thereby "strongly elevate[s] neural stem and progenitor

proliferation."[13] In other words, montelukast affects nerve cell growth by

expressing the activity of receptors.

41.    Singulair® accumulates in the brain at a rate that is higher than its

accumulation in the lungs:

> Although montelukast was so far always considered as a drug with
> only limited CNS penetration, careful re-analysis of the original
> pharmacokinetic report on montelukast reveals that one hour after i.v.
> drug administration, a substantial amount of radioactive equivalents of
> [C14] montelukast ($\sim$1/10 of the plasma levels) had reached the brain
> (Supplementary Fig. 1b). Most remarkably, while in plasma (and most
> other organs, for example, lung and muscle) montelukast levels
> strongly decreased within 24 h, the amount of montelukast in the brain
> increased. As a consequence, **24 h after drug injection, montelukast
> levels in the brain were even higher than in plasma**
> (Supplementary Fig. 1b), suggesting the existence of an active
> transport mechanism for montelukast through the BBB.

42.    Singulair® accumulates in the brain because of its binding affinity to

a BBB transporter:

> Indeed, montelukast is taken up from the intestine into the blood
> stream by the organic anion-transporting polypeptide (OATP)2B1, a
> transporter that is expressed also by endothelial cells of brain
> capillaries. Also, **the majority (99%) of montelukast in plasma is
> bound to proteins, mainly albumin, providing a BBB transport
> mechanism as albumin has been shown to act as a carrier through
> the BBB. The potential of montelukast to enter the CNS is further
> strongly supported by our present pharmacokinetic results**

---

[13] Sansing-Foster, Veronica V., Ivone E. Kim, Dipti Kalra, Efe Eworuke, Lockwood G. Taylor, Lisa M. Harinstein, and Monica Munoz, "Neuropsychiatric Events with Use of Montelukast in Pediatric Patients," FDA Briefing Document: Pediatric Advisory Committee Meeting, (Sept. 27, 2019), p. 14, § 1.4.4. Accessed at https://www.fda.gov/media/131035/download.

-18-

**obtained from rats** (Supplementary Fig. 1a).

43.     Pre-clinical data also provide ample evidence of how montelukast enters into the

brain:

> Strikingly, montelukast was also detected in the CSF in a human
> asthma patient, who was on the approved 10 mg per day dose of
> montelukast, and levels in serum and CSF were almost identical to the
> concentrations found in rats treated with 10 mg kg−1 montelukast
> (Supplementary Fig. 1a). **Entry of montelukast into the CNS is
> further supported by the plethora of preclinical data on the effects
> of systemic montelukast treatment on brain structure and
> function**. In various animal models of neurodegenerative diseases,
> including a model of kainic acid-induced loss of memory function, an
> acute Huntington's disease model of quinolinic acid and malonic acid
> injection-induced degeneration of striatal neurons, and a β-amyloid
> injection model of Alzheimer's disease, treatment with montelukast
> attenuated behavioural deficits, which was accompanied by structural
> brain changes such as inhibition of neuroinflammation and
> reducedneuronal cell death.[14]

44.     Animal studies demonstrate that Singulair® administered orally can be found in the brain and cerebrospinal fluid (CSF) found in the subarachnoid space between the two innermost (arachnoid mater and pia mater) of three protective membranes covering the brain and spinal cord:

> The biologic mechanisms underlying the neuropsychiatric events
> associated with montelukast treatment are currently not well
> understood. However, evidence from animal studies suggests that
> montelukast could act directly on cells in the brain. Orally

---

[14] Marschallinger (2015), 10 (Emphases added); see also, Zhang WP, Hu H, Zhang L, et al. Expression of cysteinyl leukotriene receptor 1 in human traumatic brain injury and brain tumors. Neurosci Lett. 2004;363(3):247-251; LenzQF, et al., Neuroscience, 2014). Doi: 10.1016/j.neulet.2004.03.088.

#14459257.1

administered montelukast (10 mg/kg/day, 7 days) was **detectable in brain tissue and cerebrospinal fluid (CSF)** in rats, providing evidence for its **ability to cross the blood-brain barrier**.[15]

These studies' findings were cited within the FDA's Briefing Document re: Singulair®.[16] Thus, taking Singulair® results in the accumulation of its active ingredient, montelukast, in brain tissue and cerebrospinal fluid.

### c. Because Singulair® (Montelukast) Crosses the Blood-Brain-Barrier, It Can and Does Cause Neuropyschiatric Events.

45. The risk of new neuropsychiatric events is greater in pediatric patients who take Singulair®. "Children with asthma who experienced suicidality (i.e., suicidal thoughts), depression, tics, tremors, stuttering, agitation, and night terrors. A new-onset neuropsychiatric event [have] nearly twice the odds of having been prescribed montelukast in the year before their event."[20] Furthermore, "children

---

[15] Zhao R, Shi WZ, Zhang YM, et al. Montelukast, a cysteinyl leukotriene receptor-1 antagonist, attenuates chronic brain injury after focal cerebral ischemia in mice and rats. J Pharm Pharmacol. 2011;63(4):550-557; Zhang CT, Lin JR, Wu F, et al. Montelukast ameliorates streptozotocin-induced cognitive impairment and neurotoxicity in mice. Neurotoxicology. 2016;57:214-222 (Emphasis added). This study was also cited during the FDA hearings regarding Singulair®. Aladdin, Meena M., Ph.D., Health Researcher, Public Citizen's Health Research Group, "Testimony Before the FDA's Pediatric Advisory Committee and Drug Safety and Risk Management Advisory Committee – Neuropsychiatric Events with Use of Montelukast in Pediatric Patients," FDA.gov (Sept. 27, 2019). Accessed at https://www.fda.gov/media/131487/download. (quoting Food and Drug Administration. Guidance for industry: Warnings and precautions, contraindications, and boxed warning sections of labeling for human prescription drug and biological products content and format. October 2011. https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM075096.pdf. Accessed September 26, 2019).

[16] FDA Briefing Document, p. 14, § 1.4.4 (citing Volpe C, Kalra D, A. N. Pharmacovigilance Review of Neuropsychiatric and Churg-Strauss Syndrome (Feb. 21, 2014); Kalra D, Gatti J, T P. Pediatric Postmarketing Pharmacovigilance and Drug Utilization Review of Montelukast (September 2, 2014)).

-20-

prescribed montelukast for asthma management had nearly twice the odds of

neuropsychiatric events, compared with those on other asthma maintenance

medications.[17]

46. Additionally, a 2016 retrospective analysis of Individual Case Safety

Reports (ICSRs) recorded up to January 1, 2015, in the World Health

Organization's (WHO) database (VigiBase®), pulling from over 20 million reports

of global suspected adverse effects of medicines. Their findings were as follows:

> Neuropsychiatric disorders as side effects of montelukast were more
> frequently reported for children than for adults. Infants and children
> seem to be more prone to sleep disturbances, whereas adolescents
> present symptoms of depression/anxiety and psychotic reactions more
> often. Suicidal behavior and completed suicide appear to be more
> frequently reported than previously thought in practice...Practitioners
> should be aware of the risk of neuropsychiatric events associated with
> montelukast use, and should advise the patient and report new cases.[18]

Thus, the neuropsychiatric dangers posed by Singulair® are much greater

for children than for adults. Children with new onset neuropsychiatric events are

twice as likely to have taken Singulair®, and children who are taking Singulair®

are twice as likely to have neuropsychiatric events when compared with those

---

[17] Aldea Perona A, García-Sáiz M, Sanz Álvarez E. "Psychiatric Disorders and Montelukast in Children: A Disproportionality Analysis of the VigiBase (®)." Drug Saf. 2016 Jan;39(1):69-78. Doi: 10.1007/s40264-015- 0360-2. (Cited by 8 other articles) (Emphasis added); See Aladdin, Menna M. "Testimony Before the FDA's Pediatric Advisory Committee and Drug Safety and Risk Management Advisory Committee – Neuropsychiatric Events with Use of Montelukast in Pediatric Patients." Sept 27, 2019. Accessed at https://www.fda.gov/media/131487/download.
[18] Ana Aldea Perona, Mar García-Sâiz, Emilio Sanz-Álvarez. Psychiatric Disorders and Montelukast in Children: A Disproportionality Analysis of the VigiBase®. Drug Safe. (Springer, 2016: New York, NY) 39:69-78, 69; see 76. Doi:10.1007/s40264-015-0360-2. (n = 14,670 ICSRs, 2,630 neuropsychiatric events in people aged <18 years).

-21-

taking other drugs (e.g., inhaled corticosteroids). This is significant because inhaled corticosteroids are known to have "severe adverse psychological effects including psychosis"[19] which can also "manifest in cognitive disorders, behavioral changes, and frank psychiatric disease."[20]

47.     The risk of neuropsychiatric events associated with taking Singulair® are greater than those associated with taking ICS (e.g., albuterol). "In the real-life setting, children initiated on montelukast experience a notable risk of neuropsychiatric ADRs leading to drug cessation, that is significantly higher than that associated with [inhaled corticosteroids] ICS."[21]

48.     Suicidality (i.e., suicidal thoughts) and suicide are a very real risk of taking Singulair®. "Suicidal behavior and completed suicide appear to be more frequently reported than previously thought in practice...Practitioners should be aware of the risk of neuropsychiatric events associate with montelukast use and should advise the patient and report new cases." (n = 14,670 Individual Case

---

[19] Glockler-Lauf SD, Finkelstein Y, Zhu JQ, Feldman LY, To T. "Montelukast and Neuropsychiatric Events in Children with Asthma: A Nested Case-Control Study. Journal of Pediatrics. 2019;209:176-182.e4. doi: 10.1016/j.jpeds.2019.02.009. (n = 898 NAE, 3,497 matched controls, p = 0.01).

[20] Linda B. Drozdowicz and J. Michael Bostwick, "[Review:] Psychiatric Adverse Effects of Pediatric Corticosteroid Use," Mayo Clin Proc. June 2014: 817—834. Doi: http://dx.doi.org/10.1016/j.mayocp.2014.01.010.

[21] Benard B, Bastien V, Vinet B, Yang R, Krajinovic M, Ducharma FM. "Neuropsychiatric adverse drug reactions in children initiated on montelukast in real-life practice." Eur Respir J. 2017 Aug 17;50(2). Doi: 10.1183/13993003.00148¬2017. Print 2017 Aug. (n = 12; ci = 95%) (Cited by 5 other articles) (Emphasis added).

#14459257.1

Safety Reports for montelukast).[21] Additional studies have found,

> "[M]ontelukast is associated with neuropsychiatric adverse drug reactions such as depression and aggression [and nightmares in children]."[27] Additionally, "[adverse drug reactions in published case reports] included agitation, anxiety, depression, sleep disturbance, hallucinations, **suicidal thinking and suicidality, tremor**, drowsiness, neuropathies, and seizures." Further, immune system, induction of hypersensitivity reactions, and hepatobiliary/pancreatic/uropoietic disorders "**are characterized by severe prognosis (i.e., neurological deficit and fatal hepatotoxicity**.[22]

49.      Singulair® causes a decrease in neuronal proliferation (nerve growth) in the hippocampal neurogenic zone (part of the brain largely involved in things from short-term memory to long-term memory, and spatial memory). Montelukast can cause "**negative effects both acutely and after 2 weeks of daily administration of montelukast.**"[23] In short, giving Singulair® to healthy children can delay their nerve growth in the part of the brain that is most important to short-term memory, long-term memory, and spatial memory. Furthermore, alterations in the hippocampus have been linked to a variety of cognitive pathologies such as anxiety, depression, addiction and neurodegenerative diseases such as Parkinson's.[24]

**C.      Defendants Knew the Risks of Neuropsychiatric Events but Failed**

---

[22] Calapai G, Casciaro M, Miroddi M, Calapai F, Navarra M, Gangemi S. "Montelukast-induced adverse drug reactions: a review of case reports in the literature." Pharmacology. 2014;94(1-2):60-70. Doi: 10.1159/000366164.(Emphasis added).

[23] Id at 6.

[24] See 5. Sapolsky R. M., "Glucocorticoids and hippocampal atrophy in neuropsychiatric disorders," Arch Gen Psychiatry. 2000;57:925–935. Doi: 10.1001/archpsyc.57.10.925.

#14459257.1

**to Warn Prescribers, Parents or Patients of the Risks, and Even Misrepresented the Safety of Singulair.**

50.     When Singulair was originally approved by the FDA, it had no warnings regarding neuropsychiatric events.

51.     Merck knew that Singulair crosses the blood-brain-barrier from pre-clinical trials, conducted prior to original approval.

52.     Specifically, Merck Defendants misled the FDA with purpose and intent in its original New Drug Application (NDA) 20.829 and 20.830 which were used to obtain FDA approval for Singulair®5mg intravenous dosing. The footnotes to Table 4 of said NDAs state "only trace amounts were detected in the brain" and "radioactivity in all tissues declined with time, and the remaining radioactive equivalents in tissues were very low at 24 hour post dose". However, Table 4 in fact demonstrates the amount of radiolabeled drug in the brain increased over time and when looked at as a ratio of brain:plasma, 0.041:0.142, the 24 hour interval the level in the brain is 3.46 times or 346% greater than in the plasma. Furthermore, from 1 hour post administration to the 24 hour interval the radioactive level of drug in the plasma decreased by 96.64%, whereas the radioactive level of drug in the brain increased by 21.36% if you are just looking at volume in each specific tissue and not a ratio of brain: plasma. Despite this data being statistically significant, Merck Defendants neglected to study the effects on the brain in clinical trials and

-24-

#14459257.1

1   misled the FDA in the way they reported their data.[25]

2       53.     Two years before it was permitted to sell Singulair® in the United

3   States, Defendant Merck obtained a patent for montelukast. In the patent

4   application, **Defendant Merck claimed that montelukast is "useful in treating**

5   **...cerebral spasm,**"[26] admitting that at least by 1996, Merck Defendants knew

6   montelukast could affect the brain. Nonetheless, the Singulair® label from the day

7   Merck Defendants began sales in 1998 contained no warning of Singulair®'s

8   possible effect on the brain, let alone neuropsychiatric events.

9       54.     Two and a half years after approval, on August 2, 2001, the "Post-

10  Marketing Experience" section of Singulair's label was changed to state that

11  "dream abnormalities and hallucinations, drowsiness, irritability, agitation

12  including aggressive behavior, restlessness [and] insomnia" have been observed.

13      55.     This label change should have occurred earlier through the Changes

14  Being Effected ("CBE") Process. Merck had Newly Acquired Information

15  ("NAI"), which would have permitted Merck to make this label change under the

16  CBE.

17      56.     Specifically, Merck should have conducted new analysis of clinical

---

[25] Merck, "Table 4: Radioactive Equivalents (ug/g or ug/ml) of 114C|Montelukast in the Tissues of Rats Receiving 5 mg/kg i.v. (Mean ± SD; n=3) [Sponsors Table 17 Ref. G-1 Vol. 29 pp. G-65]" [brackets original], NDA 20.829 and 20.830, 13.
[26] U.S. Patent No. 5,565,473.

-25-

and preclinical testing data. The NAI would have been derived from the new analysis.

57. On June 23, 2004, the term "insomnia" was changed to "trouble sleeping." Merck made this change using the "Changes Being Effected" process.

58. Just five days after Merck changed "insomnia" to "trouble sleeping," Merck overhauled Singulair's label using CBE.

59. "Psychomotor hyperactivity" was added to the overdose section of the label on June 27, 2005.

60. The 2005 revision should have been made earlier through the CBE process through reanalysis of existing preclinical and clinical data.

61. Through the CBE process, Merck added the term "suicide" and replaced "psychomotor hyperactivity" with the "anxiousness" in the "Post-Marketing Experience" subsection of the Package Insert and the "Less Common Side Effects" section of the patient package insert.

62. The NAI information that enabled Merck to add the term "suicide" on information and belief, would have also enabled Merck to add the term "suicidality," which should have been added and explained.

63. This should have triggered Merck to engage in reanalysis of the data already submitted to the FDA or conduct additional tests to determine the extent of the dangers of neuropsychiatric injuries. Upon information and belief, Merck did

-26-

#14459257.1

not conduct a reanalysis or additional testing.

64.     When Merck added the terms "suicide" and "anxiousness" through the CBE, Merck should have made the warnings regarding those injuries stronger.

65.     On August 19, 2009, FDA approved revisions to the PRECAUTIONS and ADVERSE REACTIONS sections of the label.

66.     These revisions should have been made earlier and when made should have been more pronounced based on information Merck knew or should have known from reanalysis of preclinical and clinical trials.

67.     These revisions should have been more strongly worded based on the increasing body of publicly available scientific literature regarding montelukast.

68.     These revisions should have been more strongly worded based on post-marketing surveillance information available to the Merck Defendants.

69.     Merck used the CBE to add the term "disorientation" to the "Warnings, Precautions and Adverse Events" section of the label on April 14, 2010.

70.     Again, using CBE Merck added the term "tic" to the "Post-Marketing Experience" and "Neuropsychiatric Events" sections of the Prescribing Information. On the same date, using the CBE, Merck added "uncontrolled muscle movements" to the Patient Information Leaflet.

71.     These revisions should have been more strongly worded, more

-27-

pronounced, and should have been made sooner based on all the "newly acquired information" available to Merck, including but not limited to reanalysis of clinical and preclinical studies, publicly available articles, and post-marketing information.

72. In June 2018, through CBE, Merck added the term "obsessive-compulsive symptoms" to several sections of the label.

73. On information and belief, using the CBE process, Merck should have strengthened all of the neuropsychiatric warnings, including those involving obsessive-compulsive symptoms prior to that time.

74. "Dysphemia (stuttering)" was added to the Singulair label on February 13, 2019, through CBE.

75. In November 2017, several patient advisory groups petitioned the FDA to strengthen Singulair's warnings with regard to neuropsychiatric events.

76. On September 27, 2019, the Pediatric Advisory Committee and the Drug Safety and Risk Management Advisory Committee of the FDA held a hearing to discuss the patient advisory groups' requests.

77. Following that hearing, the FDA required the Merck defendants to add a black box warning to the Singulair label.

78. Merck Defendants and/or Organon revised the label to include the black box warning.

79. These revisions should have been made much sooner based on

-28-

#14459257.1

adverse event and other post-marketing information as well as reanalsysis of existing studies and scientific literature.

80.     All of these revisions should have been made earlier and when made should have been more pronounced and should have included stronger language based on information Merck knew or should have known from reanalysis of preclinical and clinical trials.

81.     All of these revisions should have been made earlier and when made should have been more pronounced and should have included stronger language based on information Merck knew or should have known from the increasing body of publicly available articles regarding montelukast.

82.     All of these revisions should have been made earlier and when made should have been more pronounced and should have included stronger language based on information Merck knew or should have known from post-marketing surveillance information available to the Merck Defendants.

83.     For example, by 2015, over a quarter of the adverse events reported to the FDA included neuropsychiatric adverse events, including serious adverse events, such as homicidal and suicidal ideation, psychosis, and hallucinations, totaling thousands of such reports and over 25% of the total adverse events reported. Furthermore, the United States General Accounting Office has testified before Congress that, "Experts believe that FDA's [Adverse Event Reporting

-29-

System (AERS) system [only] includes a n estimated 1 to 10 percent of adverse reactions."

84.     Indeed, every year since Singulair®'s launch in 1998, neuropsychiatric adverse event reports involving children two months to 17 years of age have been filed with the FDA in connection with Singulair®. In 1998 alone, 10 neuropsychiatric adverse events involving children were reported. In 1999, an additional 83 adverse events were reported. Sixty-six more children using Singulair® suffered neuropsychiatric adverse events in 2000. By 2020, a total of 3,135 children suffered such events, as reported to the FDA, including242 children under 24 months of age. Furthermore, the United States General Accounting Office has testified before Congress that, "Experts believe that FDA's [Adverse Event Reporting System (AERS) system [only] includes a n estimated 1 to 10 percent of adverse reactions."[27]

85.     Plaintiff would not have used Singulair if they knew the risks of neuropsychiatric events.

**D.     The NDA Holder (aka "Brand") is Responsible for Label Revisions. The ANDA Holders (aka "Generics") Must Make the**

---

[27] Janet Heinrich (Assoc. Dir. Health Fin. And Pub. Health Issues, Health and Human Serv. Div.), "Adverse Drug Events: Substantial Problem but Magnitude Uncertain [GAO/T-HEHS-00-53]," Testimony: Before the Committee on Health, Education, Labor, and Pensions, U.S. Senate (United States General Accounting Office: Tues Feb. 1, 2000), 6. Accessed at https://www.gao.gov/new.items/he00053t.pdf.

#14459257.1

**Label on Generic Drugs Substantially the Same as the Brand. [28]**

86.     In August 2012, Merck's United States patent expired for Singulair. Immediately thereafter, the FDA approved a number of generic forms of Singulair for sale in the United States. Notwithstanding the availability of generic forms of Singulair Merck has continued to manufacture, distribute, and market Singulair in its brand-named form throughout the United States, including in California.

87.     As the brand-name manufacturer of Singulair, Defendants had and have a duty to maintain the accuracy and adequacy of the label for Singulair for as long as the drug is on the market. As the brand-name manufacturer of Singulair, Defendants were not only in the best position to warn of Singulair's harmful effects, but were also the only manufacturers with the unilateral authority under federal law to issue such a warning.

88.     Generic manufacturers for the bioequivalent of Singulair have only the duty to ensure their labels for generic bioequivalent to Singulair are the same as the label used by the brand name manufacturer, here, Defendants. Indeed, such sameness is required. As such, Defendants exercised complete control over the contents of the generic drug label attached to any generic Singulair Plaintiff may have used.

---

[28] "Defendants" in this section refer to the Merck Defendants at least until 2020, and thereafter if the Merck Defendants continued to hold the NDA. If the NDA was transferred to Organon in 2020, these allegations apply to the Merck Defendants up to the time of transfer and to Organon thereafter.

#14459257.1

89.     As a result, Defendants knew that any deficiencies in the label for Singulair would be perpetuated in the label of its generic bioequivalent. Accordingly, it is foreseeable that the warnings included or omitted on the brand-name drug label would influence dispensing of the generic drug.

90.     As the brand name manufacturer of Singulair, Defendants had and have a duty to update its warning label "as soon as there is a reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." 21 C.F.R. § 201.80(e).

91.     As the brand name manufacturer of Singulair, Defendants could have, at any time, unilaterally updated the Singulair label without waiting for FDA preapproval in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction" under the "changes being effected" regulation. 21 C.F.R. § 314.70(c)(6)(iii)(A). As the brand name manufacturer of Singulair, a part of Defendants' business was to give information about Singulair to the public and medical community upon which the safety of patients like Plaintiff, depend.

92.     Insurance is available to a brand name manufacturer, like Defendants, to insure against liability arising from their failure to adequate warn of the risks associated with Singulair/Montelukast that Defendants knew or reasonably should have known.

-32-

# TOLLING STATUTES OF LIMITATIONS

## Discovery-Rule Tolling

93.     Within the period of any applicable statute of limitations, Plaintiff could not have discovered through the exercise of reasonable diligence that Singulair® caused a significantly increased risk of adverse neuropsychiatric events.

94.     Plaintiff did not discover, and did not know of, facts that would have caused a reasonable person to suspect that his injuries were caused by Defendants' concealment and suppression of the fact that individuals who ingested Singulair® were at significantly increased risk of developing neuropsychiatric events.

95.     Plaintiff could not have reasonably discovered the true extent of Defendants' deception or suppression about Singulair®'s safety until the FDA required the Boxed Warning about the serious mental health side effects for Singulair® and the advisement on the restriction of use of Singulair®.

96.     For these reasons, all applicable statutes of limitations have been tolled by operation of the discovery rule.

## A.     Estoppel

97.     Defendants were under a continuous duty to adequately disclose to and inform Plaintiff of the risk of developing neuropsychiatric events with Singulair®.

#14459257.1

98.     Defendants knowingly, affirmatively, and actively concealed, suppressed, ignored, or recklessly disregarded the true risks of developing neuropsychiatric events associated with Singulair® and never updated the drug's label to adequately disclose this risk.

99.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## B.     Continuing Tort

100.    The continuing tort doctrine applies when there is a repeated or continuous injury and the tort is not completed until the last injury is inflicted or the wrongdoing ceases. In cases of continuing torts, the statutes of limitations do not begin to run until the date of the last tortious act.

101.    Plaintiff used Singulair® over extended periods. Each time Plaintiff ingested Singulair®, it constituted a continuing tort.

102.    The time period associated with Plaintiff's statute of limitations did not begin to run until, at the earliest, Plaintiff's last use of Singulair®.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**STRICT LIABILITY - FAILURE TO WARN**

**(Against Merck Defendants, Organon and DOES 1-10, Inclusive)**

103.    Plaintiff incorporate by reference each preceding and succeeding

-34-

paragraph as though set forth fully at length herein.

104.  "Defendants" in this cause of action refers to Merck while it held the NDA and if it did so, to Organon during the period it held the NDA.

105.  Defendants tested, developed, designed, labeled, manufactured, marketed, sold, distributed, advertised, and promoted Singulair® during the periods set forth above.

106.  At all times relevant, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure Singulair® did not cause users and consumers to suffer from unreasonable and dangerous risks.

107.  At all times relevant, Defendants had a continuing duty to warn Plaintiff and Plaintiff's prescribers of the dangers associated with Singulair® use.

108.  At all times relevant, Defendants could have provided adequate warnings or instructions regarding the full and complete risks of Singulair® and its active ingredient montelukast because Defendants knew or should have known of the unreasonable risks of harm associated with the use of Singulair® and montelukast. Such warnings could have been adequately disclosed in circumstances not limited to Singulair®'s labeling.

109.  At all times relevant, Defendants failed to investigate, study, test, or

-35-

promote the safety or to minimize the dangers to users and consumers of Singulair® and to those who would foreseeably prescribe, use, or be harmed by Singulair®, including Plaintiff.

110.   Despite the fact that Defendants knew or should have known that Singulair® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with its use. The dangerous propensities of Singulair® and its active ingredient, montelukast, as described above were either known to Defendants or scientifically knowable to Defendants through appropriate research and testing by known methods at the time Defendants distributed, supplied, or sold Singulair® and not adequately known to prescribing healthcare providers and end users and consumers, such as Plaintiff.

111.   Defendants knew or should have known that Singulair® created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn prescribing healthcare providers and consumers, i.e., the reasonably foreseeable users, of the risks of ingesting Singulair®. Upon information and belief, Defendants wrongfully concealed or suppressed information concerning the dangerous nature of Singulair® and its active ingredient, montelukast, and further made false and/or misleading statements concerning the safety of Singulair® and montelukast.

112.   Singulair® is and at all times was defective and not reasonably fit,

-36-

#14459257.1

suitable, or safe for its intended purpose because Defendants designed Singulair®
in a defective manner and failed to give adequate warnings or instructions at the
time Singulair® left Defendants' control and after.

113.   Defendants failed to provide adequate warnings of the dangers
regarding the fact that Singulair® caused an increased risk of adverse
neuropsychiatric events in individuals who ingested Singulair®.

114.   Defendants failed to provide adequate warnings of the dangers
regarding the fact that Singulair® ingestion increased the risk suffering from
neuropsychiatric events, including but not limited to (a) agitation, aggressive
behavior, or hostility; (b) attention problems; (c) bad or vivid dreams; (d)
depression; (e) disorientation or confusion; (f) feeling anxious; (g) hallucinations
(seeing or hearing things that are not really there); (h) irritability; (i) memory
problems; (j) obsessive-compulsive symptoms; (k) restlessness; (l) somnambulance
(sleepwalking); (m) stuttering; (n) suicidal thoughts (suicidality) and actions; (o)
tremor or shakiness; (p) trouble sleeping; and (q) uncontrolled muscle movements
(tics).

115.   Singulair®'s failure-to-warn defects existed at the time Singulair®
left Defendants' control.

116.   Defendants distributed Singulair® without sufficient warnings to
notify Plaintiff's prescribers or Plaintiff of the dangers inherent in ingesting

-37-

Singulair®.

117. Defendants knew or should have known that most physicians who prescribed Singulair® did not know or fully appreciate the seriousness of the risks associated with Singulair® or montelukast.

118. Plaintiff ingested Singulair® for an approved purpose and experienced neuropsychiatric events as a result of his Singulair® use.

119. Defendants knew or should have known that the minimal warnings disseminated with Singulair® were inadequate, failed to communicate adequate information on the dangers and safe use of Singulair®, and failed to communicate warnings and instructions that were appropriate and adequate to render the product safe for its ordinary, intended, and reasonably foreseeable uses.

120. Had Plaintiff or Plaintiff's physicians known of the defects in Singulair®, Plaintiff would have been prescribed and would have ingested a safer alternative to Singulair® that would not have exposed him to increased risks of suffering neuropsychiatric events.

121. Plaintiff ingested Singulair® without knowledge of its dangerous characteristics.

122. Plaintiff's injuries, harms, losses, and damages were directly and proximately caused by Singulair®, including the lack, insufficiency, or adequacy of warning of Singulair®'s unreasonable dangers as set forth above while Plaintiff

-38-

#14459257.1

used Singulair® in a reasonably foreseeable manner for which recovery is sought.

123.    Defendants had a duty to properly warn Plaintiff and Plaintiff's physicians of the risks of Singulair® during the time when Plaintiff's prescriptions were being filled with Defendants' Singulair®. Defendants' breach of this duty proximately caused the injuries described herein.

124.    Defendants' misrepresentations proximately caused Plaintiff's injuries.

125.    Defendants are therefore strictly liable for the damages caused to Plaintiff.

126.    Defendants' conduct, as described above, is also oppressive and malicious. Defendants regularly risked the health and lives of consumers and users of Singulair®, including Plaintiff, with knowledge of Singulair®'s dangers. Defendants have made conscious decisions not to voluntarily sell Singulair without re-design, re-labeling, adequately warning, or adequately informing physicians and the public, including Plaintiff of the increased risk of developing neuropsychiatric events when ingesting Singulair®. Defendants are guilty of oppression, in that their conscious disregard for Plaintiff's rights subjected Plaintiff to cruel and unjust hardship of suffering neuropsychiatric injury, as described above. Further, Defendants are guilty of malice because their despicable conduct was willful or done with conscious disregard of the rights and safety of consumers, including

#14459257.1

Plaintiff. Defendants' misconduct therefore warrants an award of exemplary damages.

## SECOND CAUSE OF ACTION

## NEGLIGENCE

## (Against Merck Defendants, Organon and DOES 1-10, Inclusive)

127.   Plaintiff incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

128.   "Defendants" in this cause of action refers to Merck while it held the NDA and if it did so, to Organon during the period it held the NDA.

129.   At all times relevant, Defendants had a duty to exercise reasonable care in the design, research, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Singulair®, including the duty to take all reasonable steps necessary to promote, advertise, and/or sell a medication that was not unreasonably dangerous to consumers and users of the medication.

130.   At all times relevant, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of Singulair®. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Singulair® and appropriate, complete, adequate, and accurate warnings concerning the potential adverse effects of ingestion of Singulair® and its active ingredient, montelukast.

-40-

#14459257.1

131.   At all times relevant, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Singulair® and specifically its increased risk of neuropsychiatric events when ingested.

132.   Accordingly, at all times relevant, Defendants knew or, in the exercise of reasonable care, should have known that use of Singulair® could cause or be associated with Plaintiff's injuries, and thus, created a dangerous and unreasonable risk of injury to the users of Singulair®, including Plaintiff.

133.   Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Singulair® and their prescribing physicians and healthcare providers were unaware of or did not know or fully appreciate the seriousness and magnitude of the risks associated with use of Singulair® and montelukast.

134.   Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Singulair® in that Defendants produced a medication containing montelukast, knew or had reason to know of the defects inherent in Singulair® or had reason to know that a user's or consumer's ingestion of Singulair® created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

-41-

135.   Defendants were negligent in their promotion of Singulair® by failing to adequately disclose material risk information as part of their promotion and marketing of Singulair®, including the internet, television, and print advertisements. Nothing prevented Defendants from being honest in their promotional activities, and in fact, Defendants had a duty to disclose the truth about the risks associated with Singulair® in their promotional efforts outside of the of the context of labeling.

136.   Defendants had and have the ability and means to investigate, study, and test their products and to provide adequate warnings, and Defendants failed to do so. Upon information and belief, Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety of Singulair® and montelukast.

137.   Defendants' negligence included:

a)      Producing, promoting, formulating, creating, developing, designing, selling, advertising, and/or distributing Singulair® without thorough and adequate pre- and post-market testing;

b)      Producing, promoting, formulating, creating, developing, designing, selling, advertising, and/or distributing Singulair® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of ingesting Singulair® and specifically its active ingredient, montelukast, and, consequently, the risk of serious harm associated with ingestion of Singulair®;

c)      Failing to undertake sufficient studies and conduct necessary tests to determine whether Singulair® was safe for its intended

-42-

use;

d)   Failing to use reasonable and prudent care in the design, research, and development of Singulair® so as to avoid the risk of serious harm associated with the ingestion of Singulair®;

e)   Failing to design Singulair® so as to ensure it was at least as safe and effective as other medications on the market treating the same and/or similar conditions;

f)   Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would prescribe and use Singulair®;

g)   Failing to adequately disclose to Plaintiff, Plaintiff's physicians, users/consumers, and the general public that use and ingestion of Singulair® presented severe risks of developing neuropsychiatric events;

h)   Failing to adequately warn Plaintiff, Plaintiff's physicians, users/consumers, and the general public that Singulair®'s risk of harm was unreasonable and that there were safer and effective alternative medications available to Plaintiff, prescribing physicians, and other consumers and Systematically suppressing or ignoring contrary evidence about the risks, incidence, and prevalence of the side effects of Singulair® and montelukast- containing medications;

i)   Representing that Singulair® was safe for its intended use when, in fact, Defendants knew or should have known that Singulair® was not safe or presented serious risks when used for its intended purpose;

j)   Declining to make or propose any changes to Singulair®'s labeling or other promotional materials that would alert consumers, physicians, and the general public of the seriousness and magnitude of the risks of ingesting Singulair® and its active ingredient, montelukast;

k)   Advertising, marketing, and recommending the use of Singulair® while concealing or failing to adequately disclose or warn of the dangers known by Defendants to be associated with

-43-

#14459257.1

or caused by the use of Singulair® and montelukast;

l)    Continuing to disseminate information to consumers and physicians that indicates or implies that Singulair® is safe for use; and

m)   Continuing the sale of Singulair® with the knowledge that it was unreasonably unsafe and dangerous.

138.   Defendants knew and/or should have known that it was foreseeable that individuals such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary and reasonable care in the manufacturing, marketing, labeling, distribution, and sale of Singulair®.

139.   Plaintiff and Plaintiff's prescribers did not know the nature and extent of the injuries that could result from the intended use of Singulair® or its active ingredient, montelukast. Absent Defendants' negligence, Plaintiff would not have developed neuropsychiatric events.

140.   As a direct and proximate result of Defendants placing Singulair® into the stream of commerce, Plaintiff suffered injuries, harms, losses, and damages.

141.   Defendants are therefore liable for Plaintiff's damages arising from Defendants' negligence.

142.   Defendants' conduct, as described above, was not only negligent but it was also oppressive and malicious. Defendants regularly risked the health and lives of consumers and users of Singulair®, including Plaintiff, with knowledge of

Singulair®'s dangers. Defendants have made conscious decisions not to voluntarily re-design, re-label, adequately warn, or adequately inform physicians and the public, including Plaintiff of the increased risk of developing neuropsychiatric events when ingesting Singulair®. Defendants are guilty of oppression, in that their conscious disregard for Plaintiff's rights subjected Plaintiff to cruel and unjust hardship of suffering neuropsychiatric injury, as described above. Further, Defendants are guilty of malice because their despicable conduct was willful or done with conscious disregard of the rights and safety of consumers, including Plaintiff. Defendants' misconduct therefore warrants an award of exemplary damages.

## THIRD CAUSE OF ACTION

## NEGLIGENCE MISREPRESENTATION

### (Against Merck Defendants, Organon and DOES 1-10, Inclusive)

143.   Plaintiff incorporate by reference each preceding and succeeding paragraphs as though set forth fully at length herein.

144.   "Defendants" in this cause of action refers to Merck while it held the NDA and if it did so, to Organon during the period it held the NDA.

145.   At all relevant times, Defendants designed, manufactured, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold, and/or otherwise placed Singulair/montelukast into the stream of commerce,

-45-

and therefore owed a duty of reasonable care to avoid causing harm to those that consumed Singulair/montelukast, such as Plaintiff.

146.    Defendants were negligent, reckless, and careless and owed a duty to Plaintiff to make accurate and truthful representations regarding Singulair/montelukast, Defendants breached their duty, thereby causing Plaintiff to suffer harm.

147.    Defendants represented to Plaintiff, his physicians, and his prescribers via the media, advertising, website, social media, packaging, and promotions, among other misrepresentations described herein that Singular/montelukast was both safe and effective; consumption of Singulair/montelukast would not result in neuropsychiatric side effects; and Singulair/montelukast was safe for their intended use when, in fact, Defendants knew or should have known the product was not safe for its intended purpose.

148.    These representations were false. Because Singulair/montelukast crosses the blood-brain-barrier, it can and does cause negative neuropsychiatric events. The side effects were so significant that the FDA required a Black Box warning on Singulair.

149.    Defendants knew or should have known these representations were false and negligently made them without regard for their truth. Defendants had a duty to accurately provide this information to Plaintiff. In concealing this

-46-

information from Plaintiff, Defendants breached their duty. Defendants also gained

financially from and as a result of their breach.

150.   Defendants intended for Plaintiff, his physicians, and his prescribers

to rely on these representations.

151.   Each of these misrepresentations were material at the time they were

made. In particular, each of the misrepresentations concerned material facts that

were essential to the analysis undertaken by Plaintiff as to whether to purchase or

consume Singulair/montelukast.

152.   Plaintiff, his physicians, and his prescriber reasonably relied on these

representations and were harmed as described herein. Plaintiff's reliance on

Defendants' representation was a substantial factor in causing Plaintiff's harms.

Had Defendants told Plaintiff the truth about the safety and composition of

Singulair/montelukast, Plaintiff would not have consumed or purchased them.

153.   Defendants' acts and omissions as described herein were committed

in reckless disregard of Plaintiff's rights, interests, and well-being to enrich

Defendants.

154.   Plaintiff was injured as a direct and proximate result of Defendants'

negligent misrepresentations regarding Singulair/montelukast as described herein.

These injuries were, or should have been, reasonably foreseeable to Defendants.

155.   Defendants are therefore liable for Plaintiff's damages arising from

-47-

Defendants' misrepresentations.

## RELIEF REQUESTED

WHEREFORE, PLAINTIFF prays for judgment against Defendants, and each of them,

as follows:

1.    Past and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial;

2.    Past and future economic and special damages according to proof at the time of trial;

3.    Loss of earnings and impaired earning capacity according to proof at the time of trial;

4.    Medical expenses, past and future, according to proof at the time of trial;

5.    Punitive or exemplary damages according to proof at the time of trial;

6.    Attorney's fees, as allowable by law;

7.    For costs of suit incurred herein;

8.    For pre-judgment interest as provided by law; and

9.    For such other and further relief as the Court may deem just and proper.

#14459257.1

1                                Respectfully submitted,

2                                BOUCHER LLP

3

                                By: /s/ Shehnaz M. Bhujwala

4    Dated:  May 10, 2024               SHEHNAZ M. BHUJWALA

5                                *Local Counsel for Plaintiff*

6                                WILENTZ, GOLDMAN & SPITZER

7

                                By: /s/ Kevin P. Roddy

8                                KEVIN P. RODDY

9                                  *Attorneys for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                                  -49-

1

## DEMAND FOR JURY TRIAL

2

PLAINTIFF hereby demand a trial by jury as to all claims and issues in this

3

action that are so triable.

4

Respectfully submitted,

5

BOUCHER LLP

6

7

By: /s/ Shehnaz M. Bhujwala

8

Dated: May 10, 2024          SHEHNAZ M. BHUJWALA

9

*Local Counsel for Plaintiff*

10

WILENTZ, GOLDMAN & SPITZER

11

By: /s/ Kevin P. Roddy

12

KEVIN P. RODDY

13

*Attorneys for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

#14459257.1