ALEXANDER G. CALFO, SBN 152891
acalfo@kslaw.com
SUSAN V. VARGAS, SBN 177972
svargas@kslaw.com
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone:+1 213 443 4355
Facsimile:+1 213 443 4310

Attorneys for Defendants
MERCK & CO., INC.; MERCK SHARP
& DOHME CORP.[1]; ORGANON & CO.;
and ORGANON LLC

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD PARKER, an individual, | Case No. 3:24-cv-00916-CAB-MSB |
| Plaintiff, | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE OR LIMIT THE OPINION TESTIMONY OF DAVID HEALY** |
| vs. | |
| MERCK & CO., INC., a New Jersey Corporation; MERCK SHARP & DOHME CORP., a New Jersey Corporation; ORGANON & CO., a Delaware Corporation; ORGANON LLC, a Delaware Limited Liability Company; and DOES 1-10, Inclusive, | **Hearing Date:** **July 1, 2024** **Hearing Time:** **10:30 a.m.** **Courtroom:** **12A** |
| Defendants. | Action Filed: May 23, 2024 Trial Date: None Set |

---

[1]Merck Sharp & Dohme Corp. is now known as Merck Sharp & Dohme LLC.

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................1

II.  FACTUAL BACKGROUND.......................................................................3

    A.  Plaintiff's Use of Montelukast and Alleged Neuropsychiatric Conditions...................................................................................3

    B.  The Alleged Relationship Between Montelukast and Neuropsychiatric Events. .......................................................................6

III.  LEGAL STANDARD ............................................................................7

IV.  DR. HEALY'S SPECIFIC CAUSATION OPINION...................................9

V.  ARGUMENT ...................................................................................... 10

    A.  Dr. Healy's Opinions Should Be Excluded As Litigation-Driven..... 10

    B.  Dr. Healy Is Unqualified to Opine on the Efficacy of Singulair or the Cause of Plaintiff's Lipomas. ............................................... 12

    C.  Without a Reliable Basis to "Rule In" Montelukast as a Potential Cause of Plaintiff's Alleged Injuries, Dr. Healy's Differential Diagnosis Is Unreliable. ...................................................... 13

    D.  Dr. Healy Failed to "Rule Out" Alternative Causes of Plaintiff's Alleged Injuries. .................................................................. 18

        1.  Dr. Healy's Differential Diagnosis Lacks the Scientific Objectivity Expected of an Expert in His Field. .................. 19

        2.  Dr. Healy's Reliance on an Alleged Temporal Relationship Between Plaintiff's Montelukast Use and Neuropsychiatric Issues is Unreliable............................................................ 20

        3.  Dr. Healy Did Not Consider or Properly "Rule Out" Alternative Causes of Plaintiff's Alleged Injuries. ............... 21

VI.  CONCLUSION.................................................................................. 25

Case No. 3:24-cv-00916-CAB-MSB

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE OR LIMIT THE OPINION TESTIMONY OF DAVID HEALY

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alivecor, Inc. v. Apple, Inc.*,
  No. 21-cv-03958, 2024 WL 591864 (N.D. Cal. Feb. 13, 2024)......................8, 9

*In re C.R. Bard, Inc.*,
  948 F. Supp. 2d 589 (S.D. W.Va. 2013).............................................................18

*Casey v. Ohio Med. Prods.*,
  877 F. Supp. 1380 (N.D. Cal. 1995) ................................................................17

*Clausen v. M/V New Carissa*,
  339 F.3d 1049 (9th Cir. 2003) ....................................... 14, 16, 18, 25

*Cloud v. Pfizer Inc.*,
  198 F. Supp. 2d 1118 (D. Ariz. 2001) ..............................................................17

*Coblin v. Depuy Orthopaedics, Inc.*,
  No. 3:22-cv-00075, 2024 WL 1588752 (E.D. Ky. Apr. 11, 2024) ...................19

*Cty. Of Maricopa v. Off. Depot Inc.*,
  No. CV-14-01372, 2019 WL 5066808 (D. Ariz. Oct. 9, 2019) ........................13

*Daniels-Feasel v. Forest Pharms., Inc.*,
  No. 17-cv-4188, 2021 WL 4037820 (S.D.N.Y. Sept. 3, 2021) *aff'd*,
  No. 22-146, 2023 WL 4837521 (2d Cir. July 28, 2023) .............................15, 16

*Daubert v. Merrell Dow Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) .....................................................................10, 11

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)...............................................................................8, 19

*In re Denture Cream Prods. Liab. Litig.*,
  795 F. Supp. 2d 1345 (S.D. Fla. 2011) .............................................................18

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) .............................................................................8

*Evans v. Matrixx Initiatives, Inc.*,
   No. 3:07-cv-357-J-34JRK, 2009 WL 2914252 (M.D. Fla. Feb. 18,
   2009) ................................................................................................................18

*Farris v. Intel Corp.*,
   493 F. Supp. 2d 1174 (D.N.M. 2007) ..............................................................23

*Fitzgerald v. Smith & Nephew, Inc.*,
   11 F. App'x 335 (4th Cir. 2001) ................................................................22, 23

*Hendrix ex rel. G.P. v. Evenflo Co.*,
   609 F.3d 1183 (11th Cir. 2010) ......................................................................16

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)...........................................................................................8

*In re Hanford Nuclear Reservation Litig.*,
   292 F.3d 1124 (9th Cir. 2002) .........................................................................14

*Hardeman v. Monsanto Co.*,
   997 F.3d 941 (9th Cir. 2021) .............................................................................8

*Hasler v. U.S.*,
   718 F.2d 202 (6th Cir.1983) ......................................................................20, 21

*Hickman v. Sofamor-Danek Grp., Inc.*,
   No. C95-01095, 1999 WL 606690 (N.D. Cal. Feb. 17, 1999) ..........................13

*Jones v. Novartis Pharms. Corp.*,
   235 F. Supp. 3d 1244 (N.D. Ala. 2017).............................................................18

*Kilpatrick v. Breg, Inc.*,
   613 F.3d 1329 (11th Cir. 2010) .................................................................13, 14

*In re Lipitor III*,
   892 F.3d at 645.................................................................... 14, 20, 25

*Lopez v. Wyeth-Ayerst Labs., Inc.*,
   139 F.3d 905 (9th Cir. 1998) ...........................................................................17

*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005) ........................................................ 14, 16, 17

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE
OR LIMIT THE OPINION TESTIMONY OF DAVID HEALY

*In re Mirena IUD Prods. Liab. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016) ...............................................................18

*Morin v. U.S.*,
    244 F. App'x 142 (9th Cir. 2007) ...................................................................18

*Muzzey v. Kerr–McGee Chem. Corp.*,
    921 F. Supp. 511 (N.D. Ill. 1996) ..............................................................11, 12

*Nat'l Bank of Commerce (of El Dorado, Ark.) v. Dow Chem. Co.*,
    965 F. Supp. 1490 (E.D. Ark. 1996), *aff'd*, 133 F.3d 1132 (8th Cir.
    1998) .................................................................................................................11

*Nelson v. Matrixx Initiatives*,
    592 F. App'x 591 (9th Cir. 2015) ...................................................................19

*In re Novatel Wireless Sec. Litig.*,
    846 F. Supp. 2d 1104 (S.D. Cal. 2012)..........................................................11

*Oxnard Manor LP v. Hallmark Specialty Ins. Co.*,
    No. 2:23-cv-01322, 2024 WL 1579012 (C.D. Cal. Apr. 2, 2024) ...........8, 19, 20

*Persian Gulf Inc. v. BP West Coast Prods. LLC*,
    632 F. Supp. 3d 1108 (S.D. Cal. 2022)............................................................8

*In re Roundup Prods. Liab. Litig.*,
    390 F.Supp.3d 1102 (N.D. Cal. 2018)............................................................15

*Schmaltz v. Norfolk & W. Ry. Co.*,
    878 F. Supp. 1119 (N.D. Ill. 1995).................................................................21

*Sprafka v. Med. Device Bus. Servs., Inc.*,
    No. 22-331, 2024 WL 1269226 (D. Minn. Mar. 26, 2024)...............................11

*U.S. v. Chang*,
    207 F.3d 1169 (9th Cir. 2000) .......................................................................13

*U.S. v. W.R. Grace*,
    504 F.3d 745 (9th Cir. 2007) ...........................................................................8

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*,
    424 F. Supp. 3d 781 (N.D. Cal. 2020).............................................................11

- iv -      Case No. 3:24-cv-00916-CAB-MSB

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE
OR LIMIT THE OPINION TESTIMONY OF DAVID HEALY

*Whisnant v. U.S.*,
    274 F. App'x 536 (9th Cir. 2008) .......................................................................19

*Whiting v. Bos. Edison Co.*,
    891 F. Supp. 12 (D. Mass. 1995) .......................................................................13

*Wilson v. Woods*,
    163 F.3d 935 (5th Cir. 1999) .............................................................................12

*Zaragoza v. Cnty. of Riverside*,
    No. 5:20-cv-01381, 2024 WL 663235 (C.D. Cal. Jan. 18, 2024) .......................9

*In re Zostavax (Zoster Vaccine Live) Prod. Liab. Litig.*,
    No. 18-md-02848, 2023 WL 6626581 (E.D. Pa. Oct. 11, 2023).......................17

**Other Authorities**

Federal Rule of Evidence 401 .................................................................................1, 25

Federal Rule of Evidence 403 .................................................................................1, 25

Federal Rule of Evidence 702 .......................................................................... *passim*

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE
OR LIMIT THE OPINION TESTIMONY OF DAVID HEALY

1    Defendants Merck & Co., Inc., Merck Sharp & Dohme Corp., Organon & Co.,
2    and Organon LLC (collectively, "Defendants"), pursuant to Federal Rules of Evidence
3    401, 403, and 702, file this memorandum in support of their motion to exclude the
4    opinions of Dr. David Healy.

5    ## I.    INTRODUCTION

6    Plaintiff Richard Parker alleges that his use "from 2018 to 2020" of montelukast,
7    the generic alternative to Defendants' FDA-approved asthma and allergy medication
8    SINGULAIR® ("Singulair"), caused him "neuropsychiatric injury including suicidality,
9    depression, and a suicide attempt." Compl. ¶ 8 (Dkt. No. 1). But Plaintiff ignores
10   numerous other more likely causes of his claimed injuries, including his significant
11   history of substance abuse and trauma. Plaintiff retained a litigation expert from Wales,
12   Dr. David Healy, to opine on specific causation, but Dr. Healy's opinions are
13   inadmissible.

14   Dr. Healy opines that Plaintiff's use of montelukast caused him to experience
15   "escalating anxiety, suicidality, escalating pain, neuropsychiatric episodes that were
16   misdiagnosed, significant insomnia, memory problems and significant and problematic
17   lipomas." Ex. A, Healy Rpt. at 24. Dr. Healy opines that Plaintiff suffers from these
18   alleged injuries and that montelukast is to blame based on self-interested information
19   provided by Plaintiff during two hours of litigation-driven interviews conducted over
20   Zoom—despite admitting that he "assum[ed] that [Plaintiff] didn't always tell the truth."
21   Ex. B, Healy (*Parker*) Dep. at 207:8-9. Dr. Healy's approach is untenable given that he
22   did not corroborate Plaintiff's self-serving statements, via review of medical records,
23   communications with treating physicians, or otherwise; did not perform any objective
24   psychological testing; and dismissed statements in Plaintiff's medical records that
25   contradicted what Plaintiff claimed during his interviews. Moreover, he did not identify
26   a single epidemiologic study or scientific basis to suggest even a hypothesis that
27   montelukast could, in fact, cause neuropsychiatric effects—much less data to support
28   his opinion that those problems can persist years after the medicine is stopped. Dr.

Healy's speculative, litigation-driven opinions must be excluded because he is unqualified to opine beyond the realm of psychiatry and all of his opinions lack supporting scientific data, are not the product of reliable methods, and do not meet the established standards in Federal Rule of Evidence 702 ("FRE 702").

*First,* Dr. Healy offers a purely litigation-driven opinion. Prior to his involvement in this litigation, Dr. Healy had never researched the potential risks of montelukast and has still not reviewed the relevant scientific literature. He also had never seen a patient who he believed had experienced an adverse reaction from montelukast. Instead, in the absence of any objective data, Dr. Healy reached his causation opinion, which he admits might be "wrong," using information drawn from two brief video interviews of Plaintiff.

*Second,* Dr. Healy opines on the efficacy of montelukast in treating asthma and the cause of Plaintiff's alleged lipomas (fatty lumps between the skin and muscle tissue). Dr. Healy is unqualified to offer these opinions.

*Third*, Dr. Healy's differential diagnosis is not based on accepted methodology. He failed to rule in montelukast as a potential cause of Plaintiff's alleged injures via reliable and scientific means. Instead, Dr. Healy improperly assumed general causation based on anecdotal evidence, primarily consisting of interviews with three litigants, including Plaintiff. By putting the cart before the horse and opining on specific causation without a reliable basis for first ruling in montelukast, Dr. Healy undertook his differential diagnosis in a manner that is invalid and unreliable.

*Fourth*, even if Dr. Healy had a scientific basis for ruling in montelukast (he did not), his differential diagnosis still fails. He failed to consider or provide a medically sound basis for ruling out alternative causes of Plaintiff's alleged neuropsychiatric conditions. By his own admission, Dr. Healy simply made a judgment call, i.e., *ipse dixit*, to reach his opinions. Such subjective and unsupported opinions must be excluded.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff's Use of Montelukast and Alleged Neuropsychiatric Conditions.

Plaintiff has struggled with severe asthma since childhood. Ex. C, C. Parker Dep. at 15:6-9. At times, his asthma symptoms were so severe that Plaintiff sought treatment in the emergency room. *See* Ex. D, R. Parker Dep. at 77:14-17. These symptoms "affected [Plaintiff] quite a bit" throughout his life: he missed out on athletic opportunities and felt limited, terrified, and ostracized by peers. *Id.* at 83:5-84:7. Over the years, Plaintiff tried to control his asthma with various treatments, including nebulizers, nasal sprays, and various prescription medications, including steroids. *Id.* at 34:15-35:4; 71:15-20. On January 5, 2016, following a trip to the emergency room where he was described as "exceedingly anxious" and "very panicky," Plaintiff was prescribed montelukast by Dr. Glenn Thiel. Ex. E, 1/2/2016 Hodgson record; Ex. F, 1/5/2016 Thiel record; Ex. G, Western Sierra Pharmacy records. He continued to take montelukast, as prescribed by at least four other healthcare providers, intermittently until October 2021. *See, e.g.,* Ex. G, Western Sierra Pharmacy records; Ex. H, Dokimos East Pharmacy records; Ex. I, Rite Aid records. During this time, Plaintiff's physicians reported an improvement in his asthma symptoms with montelukast. *See* Ex. J, 10/13/2017 Reddy record (noting Plaintiff's symptoms were "much improved compared to previous visit" and that Plaintiff requested a montelukast refill); Ex. K, 4/4/2018 Reddy record (stating Plaintiff's "asthma is much more stable than previously" when compliant with montelukast); Ex. L, 12/20/2019 Reddy record (stating Plaintiff's nasal symptoms were controlled on montelukast).

Five months after stopping montelukast, Plaintiff filed this lawsuit, alleging that his use of montelukast[2] caused depression, suicidality, and a suicide attempt. While

---

[2] While Plaintiff alleged montelukast use from 2018 to 2020, his medical and pharmacy records show he was prescribed montelukast from January 2016 to October 2021.

Plaintiff now attributes these conditions to his asthma medication, Plaintiff's use of montelukast is only a small part of his medical and psychiatric history.

Plaintiff has an extensive substance abuse history, including prescription pain medications, marijuana, heroin, cocaine, psilocybin, and methamphetamine. Although his uncle traced Plaintiff's substance use back to between 2003 and 2010, Ex. M, S. Pappin Dep. at 52:21-23, Plaintiff has claimed that his drug abuse began in early 2016, after a snowboarding accident. Ex. N, 4/6/2017 Cessna record. After that accident, physicians prescribed strong painkillers, including Percocet. Ex. O, 6/1/2016 Anthony record. Shortly thereafter, Plaintiff began abusing his pain medication, leading to a June 17, 2016 hospital visit, where Plaintiff was described as "very sedated," could "barely stay awake," and "clearly taking his medication to lethargy, not affect." Ex. P, 6/17/2016 Morikado record. And Plaintiff's family reported that "he [wa]s overusing his medication." *Id.* After learning that he had obtained 110 oxycodone and 40 Valium tablets in the last three weeks, Plaintiff's physician gave his family a list of rehab facility referrals. *Id.* Ten days later, Plaintiff was arrested for attempting to drown his father in a swimming pool and was brought to the hospital in restraints, where he tested positive for four benzodiazepines and THC, a psychoactive cannabinoid found in marijuana. Ex. Q, 6/27/2016 UCSD record. Plaintiff admitted to several physicians that he had used "meth" that day and was "unsure what drugs he ha[d] been doing." *Id.* Plaintiff's family reported that he was withdrawing from pain medication and smoked marijuana. *Id.* During this visit, Plaintiff also reported that his drug abuse had caused significant disruption in his life, including ending an engagement due to his "chasing drugs." *Id.*

Plaintiff did not fill any prescriptions for Percocet or oxycodone in 2017. *See* Exs. G-I, Pharmacy Records. Notably, during this period, while he continued to take montelukast, Plaintiff's physicians reported that he exhibited "normal mood and affect." Ex. R, 6/29/2017 Raizadeh record; Ex. S, 8/3/2017 Raizadeh record. In April 2017, Plaintiff began seeing a therapist, with whom he discussed concerns about "religious trauma syndrome" arising out of his relationship with his parents along with past misuse

1  of pain medications, marijuana, and heroin. Ex. N, 4/6/2017 Cessna record. During these
2  visits, Plaintiff described his family home as a "house of fear," and reported
3  experiencing "persistent fear/shame" with his family. Ex. T, 5/22/2017 Cessna record.

4      Plaintiff resumed using Percocet in February 2018, after experiencing neck pain,
5  and was advised by his physician to discontinue medical marijuana. Ex. U, 2/12/2018
6  Moon record. One month later, Plaintiff reported difficulty initiating sleep, anxiety,
7  depression, concentration difficulty, and "little interest in doing things (nearly every
8  day)." Ex. V, 3/21/2018 Ochoa record.  In August 2018, despite being told not to use
9  marijuana with Percocet, Plaintiff admitted "THC use daily." Ex. W, 8/13/2018
10 Martinez record. At that time, Plaintiff was living with his parents, a "very emotionally
11 toxic place for him" because "[t]hey are extremely religious and he is not." *Id.* As he
12 continued using narcotics and marijuana, Plaintiff reported neuropsychiatric issues,
13 including "long-going depression," minor schizophrenia, and anxiety. Ex. X, 9/5/2018
14 Martinez record; Ex. Z, 11/7/2018 Martinez record. By November 2018, Plaintiff had
15 hit a "breaking point" and was under "tremendous stress" due to a recent job loss. Ex.
16 Z, 11/7/2018 Martinez record; Ex. AA, 11/9/2018 Reddy record.

17     In December 2018, Plaintiff moved in with his uncle to "start his life over again"
18 and "get away from his parents." Ex. M, S. Pappin Dep. at 13:17-23; 14:23-15:3; 96:16-
19 22. Soon after testing positive for marijuana and oxycodone, Ex. AB, 12/31/2018
20 Torrance Memorial record, Plaintiff was forcibly removed from that home because "[h]e
21 was consuming a lot of drugs that he was acquiring off the street."  Ex. M, S. Pappin
22 Dep. at 15:15-25 (confirming Plaintiff was taking Percocet and using marijuana); *id.* at
23 62:23-63:2 (stating he found "baggies" of Percocet in his home); *id.* at 90:8-23 (stating
24 Plaintiff "continuously" smoked marijuana while at his uncle's house and "emptied" 12
25 jars of medical marijuana).  A few days later, Plaintiff attempted suicide by overdose,
26 reporting "multiple events causing him to feel depressed—lost housing, lost career
27 opportunity, [and] family troubles." Ex. AC, 1/19/2019 Santa Barbara Cottage record.
28 While hospitalized, Plaintiff was diagnosed with polysubstance abuse. *Id.*  After his

discharge, Plaintiff continued using Percocet and other narcotics, Ex. I, Rite Aid records, and was hospitalized again in March 2019 for a panic attack. Ex. AD, 3/9/2019 Alvarado Medical Center record.

Plaintiff's narcotics prescriptions ceased in June 2019. *See* Exs. G-I, Pharmacy Records. A few months later, Plaintiff re-connected with his therapist, continued to explore issues relating to family and religious trauma, and planned to leave his parents' home. Ex. AE, 9/17/2019 Cessna record. Plaintiff continued taking montelukast in 2019 and 2020. He was noted in August 2020 to have "appropriate mood and affect," "normal insight," and "normal judgment." Ex. AF, 8/4/2020 Michael record.

However, in October 2020, law enforcement brought Plaintiff to the hospital, where Plaintiff told several physicians he was detoxing from "meth" and marijuana. Ex. AG, 10/2/2020 Scripps record; Ex. AH, 10/3/2020 Scripps record. Following this incident, Plaintiff was diagnosed with "cannabis induced psychosis," and told his physician that he "plan[ned] to remain sober from all substances due to his worsening psychoses while intoxicated." Ex. AI, 10/5/2020 Scripps record. Since 2020, Plaintiff's records are devoid of narcotics prescriptions and reports of neuropsychiatric issues. At the same time, from October 2020 to October 2021, records show that Plaintiff continued to take montelukast without incident. Ex. I, Rite Aid records; Ex. AJ, 7/23/2021 Raiszadeh record (noting "normal mood and affect"). Plaintiff reinitiated therapy in November 2021, with "a philosophical foundation to stand on" and a "rough outline of what [he] want[s]" and "how to accomplish [his] goals." Ex. AK, 11/1/2021 Cessna email.

## B. The Alleged Relationship Between Montelukast and Neuropsychiatric Events.

Whether Singulair, or its bioequivalent generic montelukast, can cause neuropsychiatric events is an unresolved question that has been extensively evaluated for more than 15 years by Defendants and the U.S. Food and Drug Administration

("FDA"),[3] as well as academics and other scientists. In 2021, FDA documented the existing state of knowledge of the risk of neuropsychiatric events. Ex. AL, Clarridge (2021). FDA "ha[d] continued to monitor and address reports of [neuropsychiatric] events associated with montelukast use" "[o]ver the past decade" and had "re-examine[d] the available data," including case reports and published observational studies. *Id.* at 2638-39. Because that inquiry revealed "limited new data," FDA conducted a new observational study using the Sentinel Distributed Database,"[4] which found no association between montelukast and serious neuropsychiatric adverse events, i.e., "depressive disorders, self-harm and suicides." *Id.* at 2639. Per FDA, the absence of risk for these outcomes was consistent with results from clinical trials and well-conducted observational studies. *Id.* FDA further explained that this "new available data did *not* provide additional clarity on the risk;" that "the mechanism(s) by which montelukast may cause [neuropsychiatric] events remains unclear;" and that "uncertainties surrounding the risk of [neuropsychiatric] events" remained "given the limitations of the available data." *Id.* (emphasis added). Given these "uncertainties," FDA continued to describe the alleged association between Singulair and neuropsychiatric events, as it has throughout the past decade, as a "potential safety risk," i.e., not a *known* safety risk. *Id.* at 2639, 2641.[5]

## III.   LEGAL STANDARD

FRE 702 controls the admissibility of expert testimony, providing that "[a]

---

[3]The investigations into this issue over the years are detailed in Defendants' separate summary judgment motion and accompanying statement of undisputed material facts.

[4]The Sentinel Distributed Database is "the largest multisite distributed database in the world dedicated to medical product safety" and "complements other FDA safety surveillance capabilities by allowing the FDA to proactively assess the safety of regulated medical products." *See* Ex. AM, FDA's Sentinel Initiative.

[5]More recently, in December 2023, FDA published findings from yet another study; the authors there "found no association between montelukast use and self-harm compared to [inhaled corticosteroid use]." Ex. AN, Apata, et al. (2023).

witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise," if that opinion is both relevant and reliable.  FRE 702; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (noting FRE 702 criteria can be distilled to two overarching considerations: "reliability and relevance").  "[T]he trial court must act as a 'gatekeeper' to exclude junk science that does not meet [FRE] 702's reliability standards." *Ellis*, 657 F.3d at 982 (internal citations omitted). As to relevance, the Court must look to whether the evidence "fits" the issues to be decided, because "[e]xpert testimony which does not relate to any issue in the case is not relevant." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). For reliability, FRE 702 requires that the proffered testimony is based on "sufficient facts and data," must be "the product of reliable principles and methods," and must "reflect[] a reliable application of the principles and methods to the facts of the case." FRE 702(b)-(d). Thus, the focus is not only on the expert's methodology, but also the expert's fact or data predicate and the expert's application of the methodology to the data. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *U.S. v. W.R. Grace*, 504 F.3d 745, 762 (9th Cir. 2007).   "[A]ny step that renders [the expert's] analysis unreliable…renders the expert's testimony inadmissible." *Persian Gulf Inc. v. BP West Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1164-65 (S.D. Cal. 2022) (internal citations and punctuation omitted); *accord Hardeman v. Monsanto Co.*, 997 F.3d 941, 962 (9th Cir. 2021) ("expert evidence is inadmissible where the analysis is the result of a faulty methodology or theory") (internal citation and punctuation omitted).

Finally, expert witnesses, "whether basing testimony upon professional studies or personal experience," must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Oxnard Manor LP v. Hallmark Specialty Ins. Co.*, No. 2:23-cv-01322, 2024 WL 1579012, at *2 (C.D. Cal. Apr. 2, 2024) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Expert testimony "connected to existing data only by the ipse dixit of the expert" must not be admitted. *Alivecor, Inc. v. Apple, Inc.*, No. 21-cv-03958, 2024 WL 591864, at *4

1  (N.D. Cal. Feb. 13, 2024) (quoting *Joiner*, 522 U.S. at 146).

2      "The party seeking admission of the expert witness carries the burden of proving

3  admissibility by a preponderance of the evidence." *Zaragoza v. Cnty. of Riverside*, No.

4  5:20-cv-01381, 2024 WL 663235 at *2 (C.D. Cal. Jan. 18, 2024) (internal citations and

5  punctuation omitted); *see* FRE 702. Plaintiff's failure to meet this heavy burden on any

6  aspect of admissibility warrants exclusion of the proffered expert testimony.

7  **IV.    DR. HEALY'S SPECIFIC CAUSATION OPINION**

8      Dr. Healy is a retired United Kingdom psychiatrist, never licensed in the United

9  States, who stopped seeing patients almost two years ago. Ex. AO, Healy (*McLaughlin*)

10  Dep. at 70:14-17, 148:10-16, 205:3-6, 238:17-239:2; Ex. AP, Healy *(Bueno)* Dep. at

11  95:12-15. He does not have training, education, or experience in pulmonology, allergy,

12  or immunology, fields relevant to Singulair. Ex. AP, Healy (*Bueno*) Dep. at 110:16-

13  111:8, 111:22-112:7.   Nor does Dr. Healy have any prior research experience with

14  Singulair: he has not conducted any scientific studies to evaluate the medicine or

15  otherwise published data or given presentations on its potential risks. Ex. AO, Healy

16  (*McLaughlin*) Dep. at 77:21-78:4, 101:23-102:3, 122:3–12, 123:6–10, 124:12–17.

17  Further, Dr. Healy has no clinical experience with Singulair: he does not prescribe

18  Singulair and never diagnosed or treated a patient who allegedly experienced adverse

19  effects from the drug. *Id.* at 138:9–14, 142:14–18; Ex. AP, Healy (*Bueno*) Dep. at 113:5-

20  8.  Rather, the only "patients" he has seen who claim adverse events from Singulair are

21  claimants in litigation. Ex. AO, Healy (*McLaughlin*) Dep. at 139:1–6, 142:8–13.

22      Despite his lack of experience, Dr. Healy claims he can opine to a reasonable

23  degree of medical certainty that Plaintiff's use of montelukast "caused him to [have]

24  escalating anxiety, suicidality, escalating pain, neuropsychiatric episodes that were

25  misdiagnosed, significant insomnia, memory problems and significant and problematic

26  lipomas." Ex. A, Healy Rpt. at 24. Dr. Healy also opines that Plaintiff experienced

27  "enduring problems linked to his exposure to Singulair," including memory problems

28  and "alterations in cognitive processing." *Id.* at 1, 24.

# V. ARGUMENT

## A. Dr. Healy's Opinions Should Be Excluded As Litigation-Driven.

A "very significant" factor for evaluating the reliability of expert testimony is "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc.* (*"Daubert II"*), 43 F.3d 1311, 1317 (9th Cir. 1995). Dr. Healy's opinions, unquestionably, were developed "expressly for the purpose of testifying." *Id.* Prior to his involvement in this litigation, Dr. Healy had no experience with Singulair or montelukast. *Supra* Section IV. Nor has he ever expressed these opinions outside of litigation.

Not only had Dr. Healy never researched the potential risks of montelukast before this litigation, he still has not reviewed the relevant scientific literature. Without a reliable basis to formulate an opinion and lacking objective data (*see infra* Section V.B), Dr. Healy tried to substantiate his pre-supposed causation opinion with information from a few hours of virtual interviews with Plaintiff and two other plaintiffs[6]:

> Q: It is Dr. Healy's opinion that interviewing three litigants is the best data [of general causation]; is that fair?
>
> A: Yes.

Ex. B, Healy (*Parker*) Dep. at 248:18-22; Ex. AP, Healy (*Bueno*) Dep. at 36:3-7 ("But my view…was cases like this are stronger evidence for general causation than anything else that there is in this case"); Ex. AO, Healy (*McLaughlin*) Dep. at 144:20-145:3 ("If you got a specific case where there's a strong argument that the drug has caused a problem, that's the best evidence we have that the drug can cause the problem. So from that point of view, it's a general causation view, but it's about a specific case."). Yet, even after finalizing his opinions and report, Dr. Healy candidly admitted at deposition

---

[6]One plaintiff, Richard McLaughlin, voluntarily dismissed his claims with prejudice.

1 that he was still in the "early stage" of assessing the information and was making a

2 "judgment call" that could be "wrong".

3 Q: So this judgment call that you are making in regard to Mr. McLaughlin, Mr.
Bueno and Mr. Parker, that is your judgment call based upon your
4 understanding of the particular factual situations, correct?

5 A: Yes. And the fact that having interviewed three of them, I *began to see* what
*appear* to be commonalities. *I may be wrong*. I'm at an *early stage of trying*
6 *to process all this*, but *I'm beginning to feel* that there are common features.

7 Ex. AO, Healy (*McLaughlin*) Dep. at 220:10-22 (emphases added). This is the antithesis

8 of an opinion developed "independent of the litigation." *See Daubert II*, 43 F.3d at 1317.

9      When an expert's "testimony is not based on 'pre-litigation' research or if the

10 expert's research has not been subjected to peer review, then the expert must explain

11 precisely how he went about reaching his conclusions and point to some objective

12 source, a learned treatise, the policy statement of a professional association, a published

13 article in a reputable scientific journal or the like, to show that he has followed the

14 scientific method, as it is practiced by (at least) a recognized minority of scientists in his

15 field." *In re Novatel Wireless Sec. Litig.,* 846 F. Supp. 2d 1104, 1107 (S.D. Cal. 2012)

16 (citing *Daubert II*, 43 F.3d at 1318–19). Dr. Healy has not offered *any* objective source

17 to support his opinion, instead making clear that his opinions are "hunches" developed

18 from litigation observations. *See* Ex. AP, Healy (*Bueno*) Dep. at 173:12-174:21. The

19 Court should exclude Dr. Healy's opinion on this basis. *See In re Viagra (Sildenafil*

20 *Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*, 424 F. Supp. 3d 781, 797 (N.D. Cal.

21 2020) (excluding expert's "unduly results-driven" analysis).[7]

22

23 [7]*See also Sprafka v. Med. Device Bus. Servs., Inc.,* No. 22-331, 2024 WL 1269226, at
*3 (D. Minn. Mar. 26, 2024) (stating "courts have discounted the reliability of experts
24 who formed their opinions only within the context of litigation" and excluding expert's
opinions that were "not based on independent research" and "developed…expressly for
25 the purpose of litigation") (internal citation and punctuation omitted); *Nat'l Bank of
Commerce (of El Dorado, Ark.) v. Dow Chem. Co*., 965 F. Supp. 1490, 1516–17 (E.D.
26 Ark. 1996) (finding expert's testimony unreliable where expert was professional witness
whose "advocacy [wa]s based on suspicion and conjecture and litigation animus rather
27 than science"), *aff'd*, 133 F.3d 1132 (8th Cir. 1998); *Muzzey v. Kerr–McGee Chem.*

28

**B.      Dr. Healy Is Unqualified to Opine on the Efficacy of Singulair or the Cause of Plaintiff's Lipomas.**

FRE 702 requires, as a threshold matter, that an expert be qualified by "knowledge, skill, experience, training or education." *See Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir. 1999) ("A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject") (internal citation omitted).   Dr. Healy strays far afield of his qualifications in at least two instances.

Dr. Healy opines on the efficacy of Singulair, stating that montelukast did not help Plaintiff's asthma or allergies. Ex. A, Healy Rpt. at 24; *see also* Ex. B, Healy (*Parker*) Dep. at 132:22-133:17 ("it appears that in lots of cases [Singulair is] not efficacious"). But Dr. Healy is unqualified to offer this opinion. He is not a pulmonologist, allergist, or immunologist, and he lacks a degree or specialized training in these fields. Ex. AP, Healy (*Bueno*) Dep. at 110:16-111:8; 111:22-112:7. He did not treat patients for asthma or allergic rhinitis. *Id.* at 110:19-23.  Because does not treat these conditions, Dr. Healy does not prescribe montelukast. *Id.* at 113:5-8. Further, he has never authored any peer-reviewed publications or given any speeches, presentations, or lectures about montelukast. Ex. AO, Healy (*McLaughlin*) Dep. at 77:21-78:4; 121:22-122:12; 123:6-10. Given Dr. Healy's lack of experience with montelukast or with treating asthma or allergies, he does not possess the requisite knowledge, skill, experience, training, or education to opine on whether montelukast is effective in general or specific to Plaintiff.

Reaching beyond his expertise again, Dr. Healy claims that montelukast caused Plaintiff's alleged lipomas. *See* Ex. A, Healy Rpt. at 24; Ex. B, Healy (*Parker*) Dep. at 187:8-12. Lipomas are "common subcutaneous tumor[s] composed of adipose (fat) cells, often encapsulated by a thin layer of fibrous tissue." Ex. AR, Charifa, et al. (2022)

---

*Corp.*, 921 F. Supp. 511, 519 (N.D. Ill. 1996) (holding methodology unreliable where expert witnesses "developed their opinions expressly for purposes of testifying") (internal citation and punctuation omitted).

While the etiology of lipomas is unclear, with some studies showing a genetic link,[8] there is no scientific evidence linking montelukast to lipomas. Dr. Healy is unqualified to offer any opinions about Plaintiff's alleged lipomas. The physicians who might diagnose or treat lipomas could include lipidologists, endocrinologists, or dermatologists. Dr. Healy is none of these and has no training in these specialties. Ex. B, Healy (*Parker*) Dep. at 40:9-41:2; Ex. AQ, Healy CV.

"Just as a lawyer is not by general education and experience qualified to give an expert opinion on every subject of the law, so too a scientist or medical doctor is not presumed to have expert knowledge about every conceivable scientific principle or disease." *Whiting v. Bos. Edison Co*., 891 F. Supp. 12, 24 (D. Mass. 1995). Thus, whatever general qualifications Dr. Healy may have in psychiatry, he lacks the specific qualifications necessary to address the efficacy of Singulair and montelukast or Plaintiff's purported lipomas. *See, e.g., U.S. v. Chang,* 207 F.3d 1169, 1172-73 (9th Cir. 2000) (expert not qualified to testify as to authenticity of foreign security instrument despite "practical experience in international finance"); *Cty. Of Maricopa v. Off. Depot Inc.,* No. CV-14-01372, 2019 WL 5066808, at *21 (D. Ariz. Oct. 9, 2019) (citing cases where experts "lacked experience with the specific subject matter at issue"); *Hickman v. Sofamor-Danek Grp., Inc*., No. C95-01095, 1999 WL 606690, at *8 (N.D. Cal. Feb. 17, 1999) (doctors unqualified to testify plaintiff's pain was caused by spinal surgery despite experience in pain management generally). The Court should preclude Dr. Healy from offering these opinions for which he is unqualified.

**C.** **Without a Reliable Basis to "Rule In" Montelukast as a Potential Cause of Plaintiff's Alleged Injuries, Dr. Healy's Differential Diagnosis Is Unreliable.**

A differential diagnosis "is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is

---

[8] *See id.*

isolated." *Kilpatrick v. Breg, Inc.,* 613 F.3d 1329, 1336 n.7 (11th Cir. 2010) (internal citation and punctuation omitted). Although differential diagnosis may be an appropriate methodology to establish specific causation, an expert employing the methodology must nevertheless do so reliably under FRE 702: "A rose by another name may smell as sweet—but simply calling an analysis a differential diagnosis doesn't make it so." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II)* ("*In re Lipitor III*"), 892 F.3d 624, 643 (4th Cir. 2018) (internal citation omitted); *see also McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1253 (11th Cir. 2005) ("[A]n expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on a patient.").

A properly conducted differential diagnosis "involves a process of compiling, or ruling in, a comprehensive list of possible causes that are generally capable of causing the illness or disease at issue, and then systematically and scientifically ruling out specific causes until a final, suspected cause remains." *Kilpatrick*, 613 F.3d at 1342; *see Clausen v. M/V New Carissa,* 339 F.3d 1049, 1057 (9th Cir. 2003) ("[T]he first step in the diagnostic process is to compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration."). Thus, Dr. Healy was required, first, to reliably "rul[e] in" all potential causes of Plaintiff's alleged injuries, and only then could he begin the process of "systematically and scientifically" evaluating and "ruling out" alternative causes. *See Kilpatrick*, 613 F.3d at 1342.

Dr. Healy skipped the first step. To "rule in" montelukast as a possible cause of Plaintiff's injuries, Dr. Healy must first demonstrate, using a reliable and generally accepted scientific methodology, that montelukast "is capable of causing a particular injury or condition in the general population," i.e., general causation. *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002) (internal punctuation omitted). Dr. Healy, however, lacks any general causation opinion that would serve as a basis to "rule in" montelukast. First, he disclaimed any reliance on the opinions of

Plaintiff's general causation expert, Dr. Qato.[9]  Ex. B, Healy (*Parker*) Dep. at 52:24-53:4 ("Q: [I]s it fair to say you did not rely on anything from [Dr. Qato] in forming your opinions in Mr. Parker's case before you prepared your report? A: Yes, it's fair to say that…."); *see also* Ex. AO, Healy (*McLaughlin*) Dep. at 132:11-15 ("Q: So in regard to your specific causation reports [including Parker], am I correct that you are not relying on any report by Dr. Qato? A: Yes, you're correct.").  Moreover, he conceded that his report is not "dealing…with matters of general causation."  Ex. A, Healy Rpt. at 3.  This concession is not surprising given Dr. Healy's further admissions that he did not review—as one must to opine on general causation—any controlled epidemiological studies, scientific data, or medical literature to determine whether montelukast is capable of causing any neuropsychiatric problem in any person.[10]

---

[9]Even were he to rely on Dr. Qato, Dr. Healy would find no support for his opinion. Rather, Dr. Healy's general causation *ipse dixit* is belied by Dr. Qato, who testified that "[t]here isn't sufficient evidence to make th[e] conclusion" that montelukast can cause cognitive processing problems, i.e., the thrust of Plaintiff's problems according to Dr. Healy.  Ex. AS, Qato Dep. at 317:23-318:8.  This casts further doubt on the propriety of ruling in montelukast here.  Similarly, Dr. Qato's report is devoid of support for Dr. Healy's contention that the effects of montelukast can last years after stopping the drug.

[10]"Epidemiology is the field of public health and medicine that studies the incidence, distribution, and etiology of disease in human populations… [It] is central to the general causation inquiry, and where such evidence exists, it must be addressed by the experts." "Epidemiology studies examine whether an association exists between an agent like [Singulair] and an outcome like [neuropsychiatric events]. Whether that agent *causes* the outcome, however, cannot be proven by epidemiological studies alone; an evaluation of causation requires epidemiologists to exercise judgment about the import of those studies and to consider them in context. *In re Roundup Prods. Liab. Litig.*, 390 F.Supp.3d 1102, 1116 (N.D. Cal. 2018) (internal citations and punctuation omitted). Once epidemiologists have concluded from the studies that there is an association between an agent and an outcome, they often assess causation through a framework called the Bradford Hill criteria." *Id.; Daniels-Feasel v. Forest Pharms., Inc.,* No. 17-cv-4188, 2021 WL 4037820, at *17 (S.D.N.Y. Sept. 3, 2021) *aff'd*, No. 22-146, 2023 WL 4837521, at *4 (2d Cir. July 28, 2023) (expert's claim that "she was not providing a general causation analysis, and so did not have to conduct a thorough review of the available epidemiological evidence or a Bradford Hill analysis, does not justify her

Q: Did you, Doctor, conduct what you would consider a thorough review of the literature to evaluate the potential risks associated with montelukast?

A: I haven't been doing general causation. If I get asked to do general causation, then there will be an approach that I'll take towards the issues. The reports I've been doing have been about specific cases, and they haven't appeared, to me, to require general a review of the literature.

Ex. AO, Healy (*McLaughlin*) Dep. at 143:23-144:11; *see id.* at 212:3-10 ("Q: But for each of these three cases, McLaughlin, Bueno and Parker, you did not cite to any controlled or epidemiologic data indicating that montelukast increased the risk for any of the problems purportedly experienced, correct? A: That's correct."); *see also id.* at 145:13-18, 209:23-210:14, 238:10-14, 360:20-23.

By punting the issue of general causation, Dr. Healy effectively admitted that he had no basis by which to reliably "rule in" montelukast as a possible cause of Plaintiff's alleged injuries. Dr. Healy's failure to clear the first hurdle of a properly conducted differential diagnosis is fatal to his opinions and warrants exclusion. *See Clausen,* 339 F.3d at 1057-58 ("Expert testimony that rules in a potential cause that is not so capable is unreliable") (internal citations omitted).[11]

Despite this fatal flaw, Dr. Healy nevertheless moved forward with his differential diagnosis by inventing his own litigation-driven method for general causation, based on *ipse dixit*. Citing no authority, Dr. Healy claimed general causation by interviewing self-interested litigants who maintain montelukast caused their problems and extrapolating backwards to conclude that montelukast must, therefore, be generally capable of causing

_____

proffer of an incomplete, selective, misleading, and ultimately unreliable opinion").

[11] *See also Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1197–98 (11th Cir. 2010) ("The district court identified errors in [expert]'s differential etiology analysis at [] the rule in…step[]. Specifically, the district court determined that [expert] fail[ed] to show how, by scientifically valid methodology, traumatic brain injury could ever be a possible cause of autism in anyone.") (third alteration in original) (citations and internal quotation marks omitted); *McClain*, 401 F.3d at 1253 ("Expert testimony that rules in a potential cause that is *not* so capable is unreliable…. It is important to realize that a fundamental assumption underlying [differential diagnosis] is that the final, suspected 'cause'…must actually be capable of causing the injury.") (citation and punctuation omitted).

neuropsychiatric conditions. *See* Section V.A, *supra.* This type of circular reasoning and backwards approach—going from the (unsubstantiated) specific to the general—finds no support in science, medicine, law, or otherwise. *See McClain*, 401 F.3d at 1253 ("a differential diagnosis generally may not serve as a reliable basis for an expert opinion on causation" absent "a reliable explanation of…general causation").

In short, Dr. Healy posits that anecdotal information (limited in scope and from a biased narrator), i.e., a case report, trumps controlled, scientific data. It does not. Even combining Plaintiff's self-interested report with adverse event reports received by FDA does not make Dr. Healy's "methodology" reliable. Dr. Healy admits that adverse event reports do not establish causation between the outcome and the therapy. Ex. AO, Healy (*McLaughlin*) Dep. at 83:22-84:4. And courts agree, routinely holding that adverse event or case reports (whether one or many) are not evidence of and cannot prove general causation. *See, e.g., Lopez v. Wyeth-Ayerst Labs., Inc.*, 139 F.3d 905, *1 (9th Cir. 1998) (finding "anecdotal reports…cannot support a finding of causation") (internal citation omitted); *In re Zostavax (Zoster Vaccine Live) Prod. Liab. Litig.*, No. 18-md-02848, 2023 WL 6626581, at *5 (E.D. Pa. Oct. 11, 2023) ("Case reports and adverse event reports are 'universally recognized as insufficient and unreliable evidence of causation' in the absence of other reliable evidence.") (citation omitted); *Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380, 1385-86 (N.D. Cal. 1995) (excluding expert opinion based on case reports because "case reports are not reliable scientific evidence of causation"). In fact, Dr. Healy's causation opinions have previously been excluded as unreliable based, in part, on his reliance on adverse event reports. *See, e.g., Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1126 (D. Ariz. 2001) ("Dr. Healy's reliance on case reports is not an accepted methodology to determine causation.").

Dr. Healy lacks a reliable basis for ruling in montelukast as a potential cause of Plaintiff's neuropsychiatric injuries and, thus, his supposed differential diagnosis ends there. Similarly, Dr. Healy does not even attempt to rule in montelukast as a potential cause of Plaintiff's alleged lipomas, nor could he. Because Dr. Healy's specific

1 causation opinion does not reflect a reliable application of the differential diagnosis

2 methodology, his opinions and testimony must be excluded in their entirety. *See, e.g.*,

3 *Morin v. U.S.,* 244 F. App'x 142, 143-44 (9th Cir. 2007) (affirming exclusion of expert's

4 testimony where he "did not conduct any independent research to support his conclusion

5 that jet fuel and jet engine exhaust were generally capable of causing [Plaintiff's alleged

6 injury], nor did the studies he cited provide sufficient support for that principle").[12]

7  **D.  Dr. Healy Failed to "Rule Out" Alternative Causes of Plaintiff's**

8     **Alleged Injuries.**

9  To perform a differential diagnosis properly, "[a]fter the expert rules in all of the

10 potential hypotheses that might explain a patient's symptoms, he or she must then

11 engage in a process of elimination, eliminating hypotheses on the basis of a continuing

12 examination of the evidence so as to reach a conclusion as to the most likely cause of

13 the findings in that particular case." *Clausen,* 339 F.3d at 1058. The expert must "provide

14 reasons for rejecting alternative hypotheses using scientific methods and procedures and

15 the elimination of those hypotheses must be founded on more than subjective beliefs or

16 unsupported speculation." *Id.* (internal citations and punctuation omitted). A district

17 court may exclude expert evidence if the expert fails to explain why an alternative cause

18

19 [12]*See also Jones v. Novartis Pharms. Corp.*, 235 F. Supp. 3d 1244, 1275-77 (N.D. Ala.

20 2017) (noting "differential diagnosis is flawed if it presumes the existence of general

21 causation" and excluding as unreliable specific causation opinion where general causation had not been established); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp.

22 3d 396, 436 (S.D.N.Y. 2016) (holding inadmissible general causation opinion rendered

23 specific causation opinion inadmissible as well); *In re C.R. Bard, Inc.*, 948 F. Supp. 2d

589, 605 (S.D. W.Va. 2013) (excluding specific causation opinion based on unreliable

24 general causation opinion); *In re Denture Cream Prods. Liab. Litig.*, 795 F. Supp. 2d

25 1345, 1365-66 (S.D. Fla. 2011) (finding expert's differential diagnosis "not reliable as

a matter of law" because he "ruled-in and considered an etiology" without a reliable

26 general causation basis); *Evans v. Matrixx Initiatives, Inc.*, No. 3:07-cv-357-J-34JRK,

27 2009 WL 2914252, at *9 (M.D. Fla. Feb. 18, 2009) ("As a preliminary matter, the Court

notes that, without an adequate basis for establishing general causation, [experts']

28 specific causation opinions are irrelevant.") (internal citations omitted).

was ruled out. *Id.*; *see Nelson v. Matrixx Initiatives*, 592 F. App'x 591, 592 (9th Cir. 2015) (finding district court had not abused its discretion in excluding expert opinions based on differential diagnosis where expert did not consider alternate causes); *Whisnant v. U.S.*, 274 F. App'x 536, 537 (9th Cir. 2008) (same); *Coblin v. Depuy Orthopaedics, Inc.*, No. 3:22-cv-00075, 2024 WL 1588752, at *4 (E.D. Ky. Apr. 11, 2024) (excluding specific causation opinion where expert failed to "provide a reasonable explanation as to why 'he or she has concluded that [alternative cause suggested by defense] was not the sole cause") (internal citations and punctuation omitted).

### 1. Dr. Healy's Differential Diagnosis Lacks the Scientific Objectivity Expected of an Expert in His Field.

Science is meticulous, logical, and data driven.[13] But Dr. Healy's differential diagnosis and, thus, his specific causation opinion possess none of these qualities. Rather than identify specific alternative causes and explain how he ruled them out, Dr. Healy claimed to have used his "clinical experience"—albeit with no Singulair or montelukast experience—to reach "what seem[ed] like the likeliest hunch." Ex. AP, Healy (*Bueno*) Dep. at 173:12-174:21. Even Dr. Healy did not follow this scientifically shoddy methodology in practice. At deposition, he explained that "ideally," when evaluating a potential cause of a patient's symptoms, he would consult with colleagues at a clinical case conference to consider and incorporate their opinions. Ex. AO, Healy (*McLaughlin*) Dep. at 225:10-226:4. Because, according to Dr. Healy, "[s]cientific objectivity is based on consensus." *Id.* at 200:3-4; *see also id.* at 213:16-19 ("[W]hen we're being scientific about something, we're trying to come to a consensus view."). But Dr. Healy did not present Plaintiff at a clinical case conference. *Id.* at 226:5-9. And the only consensus Dr. Healy reached was with Plaintiff. *See id.* at 223:1-4. Dr. Healy's purported methodology lacks scientific objectivity and simply does not rise to the "same

---

[13] *See, e.g.,* Br. for the Am. Ass'n for the Advancement of Sci. & the Nat'l Acad. Of Sci. as *Amici Curiae* in Support of Respondent, *Daubert v. Merrell Dow. Pharm., Inc.*, 509 U.S. 579 (1993), No. 92-102, 1993 WL 13006281, at *7-9.

level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Oxnard Manor LP,* 2024 WL 1579012, at *2 (citing *Kumho Tire Co.,* 526 U.S. at 152).

### 2. Dr. Healy's Reliance on an Alleged Temporal Relationship Between Plaintiff's Montelukast Use and Neuropsychiatric Issues is Unreliable.

Dr. Healy rests his causation opinion on a purported temporal relationship between Plaintiff's use of montelukast and his alleged neuropsychiatric symptoms. *See* Ex. A, Healy Rpt. at 1 ("Before he began Singulair and since stopping it completely, he has been free from many of the problems he had while on treatment."); *id.* at 21 ("There was no prior history of comparable problems before starting Singulair, his problems began within weeks of starting, and since stopping many important features have cleared."). This is improper for two reasons.

*First*, no temporal relationship exists between Plaintiff's use of montelukast and his alleged neuropsychiatric conditions. As detailed above, Plaintiff's neuropsychiatric issues, including anxiety and panic attacks, pre-date his use of montelukast. In fact, before montelukast, Plaintiff said his life was "falling apart." Ex. B, Healy (*Parker*) Dep. at 256:4-8. Instead, Plaintiff's neuropsychiatric issues are more closely temporally tied to his substance use. *See, e.g.*, Ex. Q, 6/27/2016 UCSD record (Plaintiff attempted to drown father after smoking meth); Ex. AC, 1/19/2019 Santa Barbara Cottage record (Plaintiff attempted suicide after eviction due to "consuming a lot of drugs that he was acquiring off the street" (Ex. M, S. Pappin Dep. at 15:15-25)). In contrast, when Plaintiff ceased his substance use, but continued montelukast, his mood and affect were "normal." *See,* Ex. R, 6/29/2017 Raiszadeh record; Ex. S, 8/3/2017 Raiszadeh record.

*Second*, even if a temporal association existed (it does not), courts have held that such a temporal coincidence does not support legal causation. *See, e.g., In re Lipitor III*, 892 F.3d at 645 (affirming exclusion of specific causation expert who "focused primarily on" temporal proximity and "failed to adequately explain the basis for ruling out other contributing factors"); *Hasler v. U.S.*, 718 F.2d 202, 205-06 (6th Cir.1983) ("Without

more, [a] proximate temporal relationship will not support a finding of causation")
(reversing district court's finding that swine flu inoculation caused plaintiff's injuries
despite close temporal connection); *Schmaltz v. Norfolk & W. Ry. Co.*, 878 F. Supp.
1119, 1122 (N.D. Ill. 1995) ("It is well-settled that a causation opinion based solely on
a temporal relationship is not derived from the scientific method and is therefore
insufficient to satisfy the requirements of [Rule] 702") (internal citations omitted). Dr.
Healy's reliance on temporality to support his causation opinion is factually incorrect,
improper, and renders his opinion unreliable.

### 3. Dr. Healy Did Not Consider or Properly "Rule Out" Alternative Causes of Plaintiff's Alleged Injuries.

Dr. Healy claims to have conducted a differential diagnosis, but at every turn, he
failed to explain how he ruled out alternative causes of Plaintiff's alleged injuries.

Plaintiff's history of substance abuse is extensive and far from irrelevant. In fact,
mental health problems and substance use disorders occur together for several reasons.[14]
For example, "[c]ertain substances can cause people with an addiction to experience one
or more symptoms of a mental health problem."[15] Further, "[m]ental health and
substance use disorders share some underlying causes, including changes in brain
composition, genetic vulnerabilities, and early exposure to stress or trauma."[16] Plaintiff's
substance abuse directly overlaps with his reported neuropsychiatric symptoms.  As
detailed in Section II.A., over a period of approximately five years, there emerged a clear
pattern of neuropsychiatric problems during times when Plaintiff was documented to be
abusing drugs versus periods of "normal mood and affect" when there was no record
evidence of substance use.  Moreover, numerous physicians diagnosed Plaintiff with
substance abuse disorders as well as cannabis-induced psychosis.

---

[14]Ex. AT, Substance Abuse and Mental Health Services Administration ("SAMHSA"), *Mental Health and Substance Use Co-Occurring Disorders* (updated Apr. 24, 2023).

[15]*Id.*

[16]*Id.*

1    Yet Dr. Healy pays almost no attention to this critical aspect of Plaintiff's history.

2    While Dr. Healy acknowledged Plaintiff's Percocet and marijuana use in his report, he

3    never discussed whether he considered these alternative causes, and if so, how they were

4    excluded. Dr. Healy's report is silent on Plaintiff's use of cocaine, heroin, psilocybin,

5    and methamphetamine, despite admitting these drugs can impact mental health. *See* Ex.

6    AP, Healy (*Bueno*) Dep. at 344:6-15 (admitting cocaine can have mental effects,

7    including "loss of contact with reality"); *id.* at 349:17-20 (admitting psilocybin can cause

8    sensory distortions). Dr. Healy was unaware of (or did not ask about) Plaintiff's use of

9    these substances.[17] Ex. B, Healy (*Parker*) Dep. at 83:7-15, 259:2-8, 259:17-19. Rather

10   than provide a scientific basis for ruling out Plaintiff's substance abuse, Dr. Healy

11   simply declared it irrelevant. *Id.* at 259:20-260:6. Such a conclusory brush-off is not a

12   valid application of the differential diagnosis methodology.

13       Plaintiff's neuropsychiatric issues pre-date his montelukast use. In January 2016,

14   prior to his first montelukast prescription, Plaintiff went to the emergency room because

15   he was "panicky," and he reported to physicians that he "always had anxiety." Ex. B,

16   Healy (*Parker*) Dep. at 211:13-17, 214:7-9, 216:6-10; Ex. E, 1/2/2016 Hodgson record.

17   Plaintiff characterized his life as falling apart and that he was without a reason to live

18   before he took montelukast. Ex. B, Healy *(Parker)* Dep. at 256:4-8. Despite his

19   awareness of these preexisting issues—and his acknowledgment that the "course of

20   [Plaintiff's] condition is crucial," *Id.* at 72:20—Dr. Healy's report is silent on all these

21   issues. The unscientific manner by which Dr. Healy supposedly "ruled out" Plaintiff's

22   preexisting neuropsychiatric history is best illustrated by his decision to omit Plaintiff's

23   suicidal thoughts from his report simply because he concluded, without explanation, that

24   it was "not relevant." *Id.* at 119:3-12. This does not pass muster for a reliable differential

25   diagnosis. *See Fitzgerald v. Smith & Nephew, Inc.*, 11 F. App'x 335, 340-41 (4th Cir.

26

---

27   [17]Dr. Healy later testified that he was aware of one hospital record that discussed
     Plaintiff's heroin and methamphetamine usage, but that "[Plaintiff] denies that. And I'm

28   inclined to believe him." Ex. B, Healy (*Parker*) Dep. at 81:16-20.

2001) (affirming exclusion of specific causation opinion where expert failed to consider plaintiff's preexisting back pain, which was similar to that claimed to be caused by the medical device at issue); *Farris v. Intel Corp.*, 493 F. Supp. 2d 1174, 1185 (D.N.M. 2007) (finding differential diagnosis unreliable where expert "did not consider that Plaintiff's present condition is simply a continuation of" preexisting condition).

Dr. Healy was similarly dismissive of Plaintiff's history of trauma. However, reactions to trauma may cause (among other things) anxiety, suicidal thinking, somatization (e.g., increased focus on and worry about body aches and pains), sleep disturbances, and memory problems.[18] By his own account, Plaintiff had a traumatic childhood and beyond due to his parents' extreme religious beliefs. Ex. T, 5/22/2017 Cessna record. He lived in a "house of fear" and was "shackle[d]" by his religious upbringing. *Id.* As he grew older, his parents' influence and control continued. Plaintiff felt "brainwashed" and believed that his "parents were trying to destroy him" by interfering with his romantic relationships. Ex. B, Healy (*Parker*) Dep. at 98:3-99:2. The trauma was so intense that Plaintiff sought professional treatment but also turned to substances to numb the feelings. Ex. AV, Cessna 5/30/2017 record. But despite the important role this trauma played in Plaintiff's life and mental health, Dr. Healy, again, simply brushed aside Plaintiff's "religious trauma syndrome" and the "trauma in [Plaintiff's] mind" as "irrelevant" to his analysis. Ex. B, Healy (*Parker*) Dep. at 34:23-35:1; 37:5-7; *id.* at 76:13-19, 79:22-23 (characterizing Plaintiff's religious trauma syndrome diagnosis as "laughable" and admitting he did not consider it as part of his differential diagnosis). This not only flies in the face of the assessments made by the mental health professional who actually treated Plaintiff, but it is at odds with Dr. Healy's admission that childhood trauma and adverse childhood experiences can be relevant to an individual's neuropsychiatric condition. *See* Ex. AO, Healy (*McLaughlin*)

---

[18]Ex. AU, Center for Substance Abuse Treatment (US). Trauma-Informed Care in Behavioral Health Services. Rockville (MD): Substance Abuse and Mental Health Services Administration (US), 2014.

Dep. at 156:22-157:19.

Dr. Healy's failures do not end there. Plaintiff has a well-documented family history of neuropsychiatric issues, including bipolar disorder, anxiety, depression, and other psychiatric illnesses. Ex. AW, 2/5/2016 Ramirez record; Ex. AX, 6/24/2016 Moon record; Ex. Y, 9/29/2017 Reddy record. Dr. Healy's report is silent on this family history, even though he acknowledged that there is an increased risk of psychiatric disorders if a patient has a family history.[19] Ex. AP, Healy (*Bueno*) Dep. at 276:9-15; Ex. B, Healy (*Parker*) Dep. at 157:20-158:12. By omitting this important family history, Dr. Healy failed to properly rule out this alternative cause. In short, Dr. Healy failed to explain why or how he ruled out a genetic predisposition, based on Plaintiff's family history of neuropsychiatric issues, as the cause of Plaintiff's alleged conditions.

Plaintiff's alleged neuropsychiatric injuries could also have been caused by myriad other factors not considered by Dr. Healy. Dr. Healy admits that the symptoms Plaintiff alleges can be experienced by individuals who have never taken montelukast:

Q. But whether it was your own patient or in the academic setting or even in other litigation cases unrelated to montelukast, you have come to learn of patients who have had insomnia, nightmares, suicidal thoughts, anxiousness, memory problems, ticks, those type of things, where montelukast wasn't taken, haven't you?

A. That's correct.

Q. And so these are common features of a number of different potential neuropsychiatric issues unrelated to a drug like montelukast?

A. Yes. And they can be triggered by other drugs also.

Ex. AP, Healy (*Bueno*) Dep. at 194:5-20. But rather than engage in a meaningful analysis of the potential causes of Plaintiff's alleged injuries, or rule these out in a scientific manner, Dr. Healy instead falls back on his "judgment" and "hunches." This is not the scientific rigor required for a properly conducted differential diagnosis.

---

[19] *See, e.g.*, Ex. AY, Mayo Clinic, *Mental Illness* (Dec. 13, 2022) ("Mental illness is more common in people whose blood relatives also have a mental illness. Certain genes may increase your risk of developing a mental illness, and your life situation may trigger it.").

1   Finally, when it comes to Plaintiff's alleged lipomas, Dr. Healy's report does not

2   contain any assessment of alternative causes. For example, Dr. Healy admitted that

3   lipomas may be inherited familial features. Ex. B, Healy (*Parker*) Dep. at 185:12-16.

4   But Dr. Healy offered no scientific explanation for how he ruled out genetics as the

5   cause of Plaintiff's alleged lipomas.

6   In sum, "[an] expert must provide reasons for rejecting alternative hypotheses

7   using scientific methods and procedures and the elimination of those hypotheses must

8   be founded on more than subjective beliefs or unsupported speculation." *Clausen*, 339

9   F.3d at 1058 (internal citations and punctuation omitted); *see also In re Lipitor III,* 892

10  F.3d at 645 (expert failed to provide a proper scientific basis for her differential

11  diagnosis by "focus[ing] almost exclusively on the fact that [plaintiff] took the drug and

12  later developed the disease, rather than explaining what led her to believe that it was a

13  substantial contributing factor as compared to other possible causes"). This Court should

14  exclude Dr. Healy's specific causation opinion because he has "utterly fail[ed]" to offer

15  any explanation as to how he ruled out alternative causes, let alone show that he did so

16  using reliable "scientific methods and procedures." *See Clausen*, 339 F.3d at 1058

17  (internal citations omitted).

18  **VI.   CONCLUSION**

19  For the foregoing reasons, Defendants respectfully request that the Court exclude

20  Dr. David Healy's specific causation opinion and testimony in its entirety pursuant to

21  Federal Rules of Evidence 401, 403, and 702.

22  Dated:  May 29, 2024              KING & SPALDING LLP

23

24                                   */s/ Susan V. Vargas*
                                     Alexander G. Calfo
25                                   Susan V. Vargas
                                     Attorneys for Defendants
26                                   MERCK & CO. INC.,
                                     MERCK SHARP & DOHME;
27                                   ORGANON & CO., and ORGANON LLC

28

- 25 -                                   Case No. 3:24-cv-00916-CAB-MSB

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE
OR LIMIT THE OPINION TESTIMONY OF DAVID HEALY