ALEXANDER G. CALFO, SBN 152891
acalfo@kslaw.com
SUSAN V. VARGAS, SBN 177972
svargas@kslaw.com
**KING & SPALDING LLP**
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone:   +1 213 443 4355
Facsimile:   +1 213 443 4310

Attorneys for Defendants
MERCK & CO., INC.; MERCK SHARP
& DOHME CORP.[1]; ORGANON & CO.;
and ORGANON LLC

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD PARKER, an individual,<br><br>                              Plaintiff,<br><br>          vs.<br><br>MERCK & CO., INC., a New Jersey Corporation; MERCK SHARP & DOHME CORP., a New Jersey Corporation; ORGANON & CO., a Delaware Corporation; ORGANON LLC, a Delaware Limited Liability Company; and DOES 1-10, Inclusive,<br><br>                              Defendants. | Case No. 3:24-cv-00916-CAB-MSB<br><br>**DEFENDANTS MERCK & CO., INC., MERCK SHARP & DOHME CORP., ORGANON & CO., AND ORGANON LLC'S MOTION TO EXCLUDE THE OPINIONS OF DIMA MAZEN QATO, MPH, PH.D.**<br><br>**Hearing:**    **July 1, 2024**<br>**Time:**    **10:30 a.m.**<br>**Courtroom:**    **12A**<br><br>Action Filed:  May 23, 2024<br>Trial Date:  None Set |

---

[1] Merck Sharp & Dohme Corp. is now known as Merck Sharp & Dohme LLC.

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    DR. QATO'S PROFESSIONAL BACKGROUND .........................................1

    A.  As a Pharmacist, Dr. Qato is Unqualified to Offer the Opinions in Her Report. ............................................................................................1

        1.   Dr. Qato Has No Specialized Training in Epidemiology..............2

        2.   Dr. Qato is not a Medical Doctor, and has No Specialized Training in The Health Conditions at Issue Here........................3

        3.   Dr. Qato Has No Experience With or Expertise Related to Montelukast. ...............................................................................3

        4.   Dr. Qato Has No Experience with FDA or FDA Regulations For Labeling of Medicines. ...........................................................3

        5.   Dr. Qato Has No Experience With or Expertise in Drug Development or the Analysis of Clinical Trial Data to Evaluate Drug Efficacy or Safety......................................................4

        6.   Dr. Qato Has Never Done an Analysis of Data From Multiple Clinical Trials and Admits She Did Not Have the Information Necessary to Conduct an Appropriate Analysis..........................4

        7.   Dr. Qato Has No Experience With or Expertise in Evaluating Animal Studies or the Biological Mechanism of Neuropsychiatric Disorders. ..........................................................5

III.   LEGAL STANDARD ........................................................................................5

IV.    ARGUMENT.....................................................................................................6

    A.  Dr. Qato's Labeling Opinions Lie Outside Her Area of Expertise, Are Untethered to a Reliable Methodology, and Do Not Fit This Case. ..........6

        1.   Dr. Qato's Labeling Opinions Lie Outside Her Area of Expertise. .................................................................................6

        2.   Dr. Qato's Labeling Opinions Are Vaguely Described and Unsupported. ............................................................................8

        3.   Dr. Qato's Labeling Opinions Do Not Fit the Facts of This Case. ...................................................................................10

    B.  Dr. Qato Does Not Employ a Reliable Methodology to Support Her Recalculation of Merck's Clinical Trial Data and, Therefore, the Recalculation Should be Excluded.............................................................12

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

        C.      Dr. Qato Is Unqualified to Opine on Biological Plausibility...................16

V.      CONCLUSION....................................................................................................20

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5
*In re Abilify*,
   299 F. Supp. 3d 1291 (N.D. Fla. 2018) .................................................................19

6

7
*In re Accutane Prods. Liab.*,
   511 F. Supp. 2d 1288 (M.D. Fla. 2007) ................................................................16

8

9
*Arcudi v. Builder Servs.*,
   673 F. Supp. 3d 9 (D. Mass. 2023) .......................................................................16

10

11
*Calisi v. Abbott Labs.*,
   2013 WL 5441355 (D. Mass. Sept. 7, 2013) .....................................................8, 12

12

13
*Christison v. Biogen Idec Inc.*,
   2016 WL 6902706 (D. Utah Aug. 5, 2016) ....................................................7, 8, 18

14

15
*Crockett v. Luitpold Pharms., Inc.*,
   2023 WL 2187641 (E.D. Pa. Feb. 23, 2023) ..........................................................7

16
*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)...........................................................................................1, 16

17

18
*In re Depakote v. Abbott Labs., Inc.*,
   No. 15-CV-702-NJR-SCW, 2017 WL 11438794 (S.D. Ill. May 24,
   2017) .....................................................................................................................11

19

20
*In re Diet Drugs*,
   2000 WL 876900 (E.D. Pa. June 20, 2000)............................................................7

21

22
*Est. of Lam v. Upjohn Co.*,
   No. CIV. A. 94-0033-H, 1995 WL 478844 (W.D. Va. Apr. 21, 1995) ..............7

23

24
*Gable v. Nat'l Broad. Co.*,
   438 F. App'x 587 (9th Cir. 2011) ...........................................................................7

25

26
*Hall v. Baxter Healthcare Corp.*,
   947 F. Supp. 1387 (D. Or. 1996) ..........................................................................11

27

28
*Henricksen v. ConocoPhillips Co.*,
   605 F. Supp. 2d 1142 (E.D. Wash. 2009)...............................................................5

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

*In re Incretin-Based Therapies*,
    524 F. Supp. 3d 1007 (S.D. Cal. 2021), *aff'd*, 2022 WL 898595 (9th
    Cir. Mar. 28, 2022) ........................................................................ 10, 11, 15, 18

*In re Lipitor*,
    145 F. Supp. 3d 573 (D.S.C. 2015)................................................................15

*LuMetta v. U.S. Robotics, Inc.*,
    824 F.2d 768 (9th Cir. 1987) .........................................................................6

*McLaughlin v. Merck & Co., Inc., et al.*
    (D. Mass. Case No. 4:22-cv-40041-MRG)....................................................2

*Milward v. Acuity Specialty Prods. Group*,
    639 F.3d 11 (1st Cir. 2011)..........................................................................16

*In re Mirena*,
    341 F. Supp. 3d 213 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir.
    2020) ............................................................................................................19

*Motus v. Pfizer Inc.*,
    196 F. Supp. 2d 984 (C.D. Cal. 2001), *aff'd*, 358 F.3d 659 (9th Cir.
    2004) .......................................................................................................10, 12

*Mullins v. Premier Nutrition Corp.*,
    178 F. Supp. 3d 867 (N.D. Cal. 2016) .........................................................19

*In re Rezulin*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) .........................................................15

*Rodman v. Otsuka Am. Pharm., Inc.*,
    564 F. Supp. 3d 879 (N.D. Cal. 2020), *aff'd*, 2021 WL 5850914 (9th
    Cir. Dec. 9, 2021).........................................................................................17

*Siharath v. Sandoz Pharms. Corp.*,
    131 F. Supp. 2d 1347 (N.D. Ga. 2001)........................................................19

*Stambolian v. Novartis Pharms. Corp.*,
    No. 12–CV–4378, 2013 WL 6345566 (C.D. Cal. Dec. 6, 2013) .........................8

*United States v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000) .......................................................................6

Case No. 3:24-cv-00916-CAB-MSB
DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.,*
    424 F. Supp. 3d 781 (N.D. Cal. 2020) ................................................................14

*In re Zofran,*
    2019 WL 5685269 (D. Mass. Nov. 1, 2019) .....................................................16

**Other Authorities**

Fed. R. Evid. 401, 403, and 703 ..............................................................................1

Fed. R. Evid. 702 ............................................................................................ *passim*

Case No. 3:24-cv-00916-CAB-MSB

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

1    Pursuant to Federal Rules of Evidence 401, 403, 702, and 703, and *Daubert v.*

2  *Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993), Defendants Merck & Co., Inc.,

3  Merck Sharp & Dohme LLC, Organon & Co., and Organon LLC (collectively,

4  "Defendants") submit this Memorandum of Points and Authorities in support of their

5  motion to exclude the opinions of Dima Mazen Qato, PharmD, MPH, Ph.D., one of

6  Plaintiff Richard Parker's ("Plaintiff") designated expert witnesses.

7                          **I.    INTRODUCTION**

8    Plaintiff claims that his use "from 2018 to 2020" of montelukast, the generic

9  alternative to Defendants' FDA-approved asthma and allergy medication

10  SINGULAIR® ("Singulair"), caused him "neuropsychiatric injury including

11  depression, anxiety, and suicidality." Compl. ¶ 8 (Dkt. No. 1).  Plaintiff alleges that

12  Defendants failed to warn his physicians of potential neuropsychiatric risks related to

13  his use of montelukast.   To support his claim, Plaintiff designated Dima Mazen Qato,

14  Ph.D. ("Dr. Qato"), a pharmacist, to opine that (1) there is a biological mechanism by

15  which montelukast can cause neuropsychiatric injuries, (2) Merck did not accurately

16  report results from its clinical trial data, and (3) Defendants did not provide adequate

17  warnings of potential risks associated with montelukast.  Dr. Qato's unsubstantiated

18  warning and biological plausibility opinions fall far outside her area of expertise and

19  do not "fit" this case, and Dr. Qato did not employ a scientifically reliable

20  methodology when criticizing Merck's analysis of its clinical trial data.  Accordingly,

21  the Court should preclude her from offering such opinions.

22                **II.    DR. QATO'S PROFESSIONAL BACKGROUND**

23  **A.  As a Pharmacist, Dr. Qato is Unqualified to Offer the Opinions in Her Report.**

24    Dr. Qato is a pharmacist with a master's degree in public health (with a

25  concentration in Human Rights and Humanitarian Assistance in Complex Emergencies

26  and Post Conflict Settings) and a Ph.D. in Health Policy and Administration.  *See* Ex.

27

28

**DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.**

1[2], Qato CV.  For the past four years, she has worked as an Associate Professor at the
University of Southern California (USC) in the School of Pharmacy and
Pharmaceutical Sciences.  *Id.*  She is not on faculty at the USC Keck School of
Medicine, and she is not a member of the Department of Public Health at the Keck
School of Medicine.  Ex. 3, Qato Dep.[3] at 103:13–104:5, 104:17-20.  At her previous
employer, University of Illinois, she was also not in the School of Medicine or the
Division of epidemiology or biostatistics at the School of Public Health.  *Id.* at 60:24–
61:14.

### 1.  Dr. Qato Has No Specialized Training in Epidemiology.

Dr. Qato does not have a Ph.D. in epidemiology (despite it being available at her
university), nor does she have a degree in biostatistics.  *Id.* at 54:6-20.  Accordingly,
she does not teach epidemiology to students seeking a degree in epidemiology, and she
has never been a part of the Division of epidemiology at USC or the University of
Illinois.  *Id.* at 61:10-14, 104:21–105:3, 110:2-5.  She does not teach biostatistics and
does not consider herself an expert in biostatistics.  *Id*. at 125:15-22.  Although she is a
self-proclaimed "pharmacoepidemiology" professor, *see* Exs. 1 and 2, her class in
pharmacoepidemiology was recently cancelled because no student signed up for the
class, and she has only taught the class one other time – to three pharmacy students.
Ex. 3, Qato Dep. at 107:24–108:20.  No student seeking a degree in epidemiology has
taken her class.  *Id.*  As pertinent here, Dr. Qato has never conducted a study or any
epidemiologic research to evaluate the safety of medicines like montelukast or whether
a medicine can cause neuropsychiatric events.  *Id.* at 323:24–324:16.[4]

---

[2] Unless otherwise stated, all exhibits referenced herein are attached to the
accompanying Declaration of Susan V. Vargas ("Vargas Decl.").

[3] Dr. Qato was deposed over two days for this case as well as a now-dismissed case in
the District of Massachusetts captioned *McLaughlin v. Merck & Co., Inc., et al.* (D.
Mass. Case No. 4:22-cv-40041-MRG).  Vargas Decl., at ¶ 5.

[4] Rather, Dr. Qato's research focuses on "drug utilization, access to medicines and

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

### 2. Dr. Qato is not a Medical Doctor, and has No Specialized Training in The Health Conditions at Issue Here.

Dr. Qato is not a medical doctor, cannot prescribe medications, and is not qualified to treat or diagnose patients. Ex. 3, Qato Dep. at 51:5-22; 52:6-23. More specifically, Dr. Qato has no experience treating patients with asthma or neuropsychiatric issues. *Id*. at 164:14-19. Dr. Qato can identify no physician who has sought her opinion concerning the treatment of asthma or psychiatric disorders. *See id*. at 151:12–152:24.

### 3. Dr. Qato Has No Experience With or Expertise Related to Montelukast.

Dr. Qato has conducted no research regarding montelukast. *Id*. at 150:7-18. She has not authored any peer-reviewed publications demonstrating an increased risk of neuropsychiatric events following the use of montelukast. *Id*. at 118:8-119:13. She has never advised any physicians about any risks associated with montelukast. *Id*. at 119:5-19; 150:19–151:11. In fact, other than the attorneys who engaged her, no one has ever sought her opinions regarding risks purportedly associated with montelukast. *Id*. at 152:19-24.

### 4. Dr. Qato Has No Experience with FDA or FDA Regulations For Labeling of Medicines.

Dr. Qato has never worked for FDA, has no experience working with, interpreting, or applying FDA regulations, and has never been involved with FDA in any capacity regarding prescription medications like Singulair, or any drug whatsoever. *Id*. at 154:9-23; 155:11–156:4. FDA has never sought her assistance

---

pharmaceutical policy both in the U.S. and globally to better understand why medications are used, or not used, and how they can and should be used in the population to promote equity, longevity and good health." Faculty, USCMann, https://mann.usc.edu/faculty/dima-m-qato-pharmd-mph-phd/ (last visited May 27, 2024).

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

regarding any issue. *Id*. at 154:20-23. No pharmaceutical company has ever sought her assistance regarding FDA regulations or FDA compliance. *Id*. at 155:23–156:22. Dr. Qato has not worked with FDA or any pharmaceutical company to draft labeling for a medicine and has never been involved in evaluating the appropriateness of FDA-approved labeling in any context other than litigation. *Id*. at 155-57; Ex. 4, Qato Dep. at 464:12–465:2.

### 5. Dr. Qato Has No Experience With or Expertise in Drug Development or the Analysis of Clinical Trial Data to Evaluate Drug Efficacy or Safety.

Dr. Qato has never been involved in any phase of the development of a pharmaceutical. Ex. 4, Qato Dep. at 464:7-11. She has never been involved in designing a clinical trial to evaluate the efficacy or safety of a medicine. Ex. 3, Qato Dep. at 153:1-22. She has never developed a statistical analysis plan to be used in evaluating data from a clinical trial much less data from multiple clinical trials. *Id*. at 153:12–154:8. Dr. Qato admittedly is not a biostatistician nor did she consult with a biostatistician in the course of evaluating the clinical trial data related to this action. *Id.* at 27:9-12; 125:15–126:2; 241:18–242:11.

### 6. Dr. Qato Has Never Done an Analysis of Data From Multiple Clinical Trials and Admits She Did Not Have the Information Necessary to Conduct an Appropriate Analysis.

Despite recognizing that it would be helpful to have, Dr. Qato admits that she never saw the Statistical Analysis Plans that Merck and FDA agreed to in order to evaluate the clinical trial data to determine whether there was evidence of a risk for neuropsychiatric events. *Id*. at 227:24–229:1. Dr. Qato concedes that she has never previously done a meta-analysis of data from multiple clinical trials. *Id*. at 232:8-11. Accordingly, the analysis that she performed to determine an Odds Ratio for the Merck trials is an analysis that she has never previously done. *Id*. at 232:12-17. She further concedes that she did not attempt to replicate the statistical methodology that FDA

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

requested Merck to employ, agreeing that she does not "know what the statistical analysis plan was" and that even if she did, she did not "have all of the data I need." *Id*. at 235:17–236:12. Because Plaintiff's counsel did not provide her with the statistical analysis plan or the necessary underlying data, she acknowledged that all she could do was provide "crude estimates." *Id*. at 235:24–236:19.

### 7.  Dr. Qato Has No Experience With or Expertise in Evaluating Animal Studies or the Biological Mechanism of Neuropsychiatric Disorders.

Dr. Qato is not a biochemist, pharmacologist, physiologist, or biostatistician. *Id*. at 68:24–69:7, 125:15-22, 158:22-24, 159:7-9. She has conducted no research, or authored any publications, related to montelukast or the blood-brain barrier. *Id.* at 161:1-4, 163:1-9.  Dr. Qato has never conducted studies or written any papers evaluating or analyzing data from animal studies. *Id*. at 160:1-24.  Neither FDA nor any pharmaceutical company has asked her to evaluate the significance of data from animal studies. *Id.* at 160:17-20.  She has never: conducted any tissue distribution studies; reviewed pharmacokinetic data related to substances and their tissue distribution, including in the brain; evaluated studies to determine whether a substance can cross the blood-brain barrier; conducted research or published anything analyzing whether a substance can cross the blood-brain barrier; or been involved in dose-range finding studies. *Id*. at 162:19–163:9; Ex. 4, Qato Dep. at 465:3-12, 485:9–486:1. Ultimately, she concedes that as part of her area of expertise she does not evaluate those types of studies.  Ex. 4, Qato Dep. at 520:9-18.

### III.   LEGAL STANDARD

"Before a witness may come 'before the jury cloaked with the mantle of an expert[]' under Rule 702, the Ninth Circuit has cautioned that 'care must be taken to assure that a proffered witness truly qualifies as an expert, and that such testimony meets the requirements of  Rule 702.'"  *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1153 (E.D. Wash. 2009) (quoting *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001)).  The burden is on the proponent of the evidence

to demonstrate not only that the expert has "specialized knowledge [that] will help the trier of fact . . . determine a fact in issue" but also that it is "more likely than not" that the expert's testimony is "based on sufficient facts or data" and reflects a "reliable application" of "principles and methods to the facts of the case." Fed. R. Evid. 702.

## IV.  ARGUMENT

### A. Dr. Qato's Labeling Opinions Lie Outside Her Area of Expertise, Are Untethered to a Reliable Methodology, and Do Not Fit This Case.

#### 1. Dr. Qato's Labeling Opinions Lie Outside Her Area of Expertise.

Under Rule 702, relevant expert testimony is admissible only if the trial court finds that the expert is qualified to testify about the matters she intends to address. *See LuMetta v. U.S. Robotics, Inc.*, 824 F.2d 768, 771 (9th Cir. 1987).  Accordingly, Plaintiff must demonstrate that Dr. Qato offers "some special knowledge, skill, experience, training, or education on [the] subject matter." *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).  Because Dr. Qato has never before been involved in drafting or evaluating labeling for an FDA-approved medicine to ensure compliance with FDA regulations and cites to no FDA labeling regulations in her reports, she lacks the requisite knowledge, experience, and foundation to proffer opinions about the labeling for montelukast.

First, Dr. Qato has no expertise, much less any "special knowledge," that allows her to opine on the adequacy of the warnings accompanying an FDA-regulated prescription medication.  The labeling for Singulair is controlled by specific and detailed federal regulations – with which Dr. Qato has no practical experience and that are not even referenced in her report.  Dr. Qato has never analyzed the adequacy of a pharmaceutical label (other than for purposes of litigation); she has never been involved in drafting pharmaceutical labeling; she has not assisted a company in interpreting or complying with labeling regulations; nor has she worked for FDA as part of an advisory committee (or in any other capacity).  Ex. 3, Qato Dep. 154:17–157:18.  Dr. Qato candidly acknowledges that FDA has never sought her assistance

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

regarding *anything*, and her FDA labeling experience is limited to this case—where she is being paid by Plaintiff's lawyers to criticize FDA-approved labeling. *Id.* at 152:19–154:23.

As a result of Dr. Qato's admitted lack of FDA regulatory and labeling experience, she is unqualified to opine on the adequacy of Singulair's warnings. *See Gable v. Nat'l Broad. Co.*, 438 F. App'x 587, 589 (9th Cir. 2011) (excluding experts as plaintiff failed to establish "that they had 'knowledge, skill, experience, training, or education' relevant to the evidence at issue") (quoting Fed. R. Evid. 702); *see also Crockett v. Luitpold Pharms., Inc.*, 2023 WL 2187641, at *4 (E.D. Pa. Feb. 23, 2023) (excluding "regulatory expert" because although he had worked at FDA, his work did not involve prescription drugs, and his expertise was "too far removed from the topic of prescription drug labels to qualify him to opine on their regulatory adequacy"); *Christison v. Biogen Idec Inc.*, 2016 WL 6902706, at *3 (D. Utah Aug. 5, 2016) (deeming labeling expert unqualified where he never "worked for a drug company," "drafted a drug label," "submitted a drug or drug label to FDA for approval," or "negotiated labeling language"); *In re Diet Drugs*, 2000 WL 876900, at *11 (E.D. Pa. June 20, 2000) (deeming experts unqualified to opine on federal labeling regulations where first expert admitted that he was not an "expert in the regulatory field," and while second expert had "some contact with labeling, it [was] somewhat secondary to his primary endeavors"); *Est. of Lam v. Upjohn Co.*, No. CIV. A. 94-0033-H, 1995 WL 478844, at *2 (W.D. Va. Apr. 21, 1995) (adopting recommendation to exclude expert testimony on pharmaceutical warnings where expert had "no academic training or regulatory experience and ha[d] never participated in any FDA-related proceedings addressing what constitutes an adequate warning").

Second, Dr. Qato does not have the requisite experience or qualification to opine on whether Singulair's label failed to provide adequate information to doctors, because she is not a doctor and cannot prescribe medications, and thus she lacks a "sufficient basis for understanding what information is needed by a doctor in making his or her

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

prescribing decision," especially for patients being treated for conditions for which she has no expertise.  *Calisi v. Abbott Labs.*, 2013 WL 5441355, at *8 (D. Mass. Sept. 7, 2013) ("Without knowing the baseline of what information is needed, it is not possible to opine meaningfully on the information's adequacy for that purpose.").  Further, she points to no facts or studies discussing how the label's "relevant target audience would interpret the [montelukast] labels."  *Id.*; *see also Christison*, 2016 WL 6902706, at *3 (excluding expert's testimony as to whether the warnings provided sufficient information to doctors, as he was "not a physician," had "not prescribed prescription drugs," and was not an expert on clinical decision making); *Stambolian v. Novartis Pharms. Corp.*, No. 12–CV–4378, 2013 WL 6345566 at *11 (C.D. Cal. Dec. 6, 2013) (finding plaintiff's designated regulatory expert "not qualified to offer testimony as to what decisions prescribing doctors would have made had they been given different labeling information [because she] is not an oncologist. Therefore, such testimony would be outside the scope of her expert knowledge").

**2.  Dr. Qato's Labeling Opinions Are Vaguely Described and Unsupported.**

As a result of Dr. Qato's lack of experience with FDA-regulated labeling, it is not surprising that she offers several vague labeling opinions that are presented with no discussion of: (1) the extensive regulations governing the labeling of FDA-approved medicines, or (2) the regulatory history of Singulair, including the lengthy discussions between FDA and Merck regarding the risk of neuropsychiatric events following the use of Singulair that took place over many years between 1998 and the present. Moreover, although Dr. Qato opines that the Singulair labeling was inadequate, she never describes the warnings that she believes should have appeared in the labeling. *See* Ex. 2, Qato Rpt. at 12-14. Absent this analysis, Dr. Qato offers only conclusory opinions, for example:

- Merck "should have anticipated, monitored and/or warned about . . . neuropsychiatric risks." *Id.* at 13.

- The "variability in the pharmacokinetics of montelukast . . . was not

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

adequately mentioned in the product labeling nor dosage and instructions." *Id.*

- "Merck . . . should have modified instructions in dosage and administration to a lower dose of montelukast in adolescents." *Id.* at 14.

- "The effects of food on the montelukast levels in children was not studied. . . . Despite this, the manufacturer instructs patients to take montelukast in the evening with *or without* food." *Id.*

Of course, Dr. Qato ignores the substantial Warnings that were in place when Plaintiff was initially prescribed the medicine and thereafter.[5]  Exs. 28 and 34.  Dr. Qato never explains what regulation (if any), or scientific evidence, would allow Merck to unilaterally change the Singulair labeling, and further never provides any analysis of why FDA would approve such changes.  This is particularly troublesome given the fact that Dr. Qato cites almost exclusively to FDA documents from both before and after FDA's initial approval of Singulair.  *See id.* at 12-14 (footnotes 49-62, repeatedly citing to FDA's Clinical Pharmacology and Biopharmaceutics Review from 1998 and FDA's 2005 approval of Singulair for the relief of symptoms of allergic rhinitis in adults and pediatric patients 6 months of age and older).  In other words, the evidence that FDA referenced in its own documents to support its approval of the montelukast labeling that was in place is the same evidence that Dr. Qato relies upon

---

[5] Singulair's label included the following Warning and Precaution for Neuropsychiatric Events: "Neuropsychiatric events have been reported in adult, adolescent, and pediatric patients taking SINGULAIR. Post-marketing reports with SINGULAIR use include, but are not limited to, agitation, aggressive behavior or hostility, anxiousness, depression, disorientation, disturbance in attention, dream abnormalities, hallucinations, insomnia, irritability, memory impairment, obsessive-compulsive symptoms, restlessness, somnambulism, suicidal thinking and behavior (including suicide), tic, and tremor. The clinical details of some post-marketing reports involving SINGULAIR appear consistent with a drug induced effect. Patients and prescribers should be alert for neuropsychiatric events. Patients should be instructed to notify their prescriber if these changes occur. Prescribers should carefully evaluate the risks and benefits of continuing treatment with SINGULAIR if such events occur *[see Adverse Reactions (6.2)]*."  Ex. 34, Singulair Label, § 5 Warnings and Precautions, § 5.4. Neuropsychiatric events (Nov. 2014).

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

to criticize the labeling that FDA approved.

Dr. Qato also ignores the fact that Merck, in collaboration with FDA, made significant changes to the Singulair labeling to include additional information regarding the risk of neuropsychiatric events on various occasions, while FDA also rejected suggestions that more heightened warnings were required.  *See* Exs. 5–26 (collectively showing that between the initial approval and  January 5, 2016—when Plaintiff was first prescribed generic montelukast, *see* Ex. 29— Merck added warnings to the Singulair label by CBE (the "changes being effected" process) nearly 20 times— including warnings for neuropsychiatric events));  Ex. 27 at 12-13 (detailing FDA's 2011 rationale for rejecting a Citizen petition including that the "data do not appear to establish any causal association between the use of Singulair and 'psychiatric disorders'").[6]

### 3.  Dr. Qato's Labeling Opinions Do Not Fit the Facts of This Case.

Finally, Dr. Qato's warnings opinions do not satisfy Rule 702's "fit" requirement because they are not "relevant to the task at hand," i.e., they do not "logically advance[] a material aspect of [plaintiff's] case."  *In re Incretin-Based Therapies*, 524 F. Supp. 3d 1007, 1035 (S.D. Cal. 2021), *aff'd*, 2022 WL 898595 (9th Cir. Mar. 28, 2022).  A plaintiff asserting a cause of action based on a failure to warn must "prove not only that no warning was provided or that the warning was inadequate, but also that the inadequacy or absence of the warning caused the plaintiff's injury."  *Motus v. Pfizer Inc.*, 196 F. Supp. 2d 984, 991 (C.D. Cal. 2001), *aff'd*, 358 F.3d 659 (9th Cir. 2004).

Here, Dr. Qato's "inadequate warning opinion" is not relevant to Plaintiff's claims. At most, Dr. Qato vaguely—and without any connection to the facts of this case—opines that Defendants should have: (1) warned "about increases in

---

[6] Dr. Qato's labeling change suggestions are also preempted because there is clear evidence FDA would have rejected them. *See* Defendants' Motion for Summary Judgment.

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

neuropsychiatric risks" due to "variability in the pharmacokinetics of montelukast in *pediatric* populations"; (2) "modified instructions in dosage and administration to a lower dose of montelukast in *adolescents*"; and (3) warned about "food effects" on levels of montelukast. Ex. 2, Qato Rpt. at 12-14 (emphases added). Dr. Qato's labeling suggestions are completely unrelated to the facts of this case, involving an adult patient, or the injuries alleged; thus, these suggestions do not advance any material aspect of Plaintiff's case.  Dr. Qato herself admits that she cannot say that her opinions regarding timing of administration or dosage would have contributed to a different outcome for any plaintiff.  Ex. 4, Qato Dep. at 569:12–571:2.  Moreover, Plaintiff did not elicit any testimony from Plaintiff's prescribers, Dr. Neil Parikh, Dr. Sumana Reddy, or Dr. Rami Michael, to suggest that Dr. Qato's proposed labeling changes would have made any difference in their prescribing decisions for Plaintiff. Accordingly, Dr. Qato's opinions on warnings are irrelevant and do not *fit* the facts of this case.  *See In re Depakote v. Abbott Labs., Inc.*, No. 15-CV-702-NJR-SCW, 2017 WL 11438794, at *4 (S.D. Ill. May 24, 2017) ("it is difficult to see the relevance of alleged inadequacies that in no way affected the actual prescribing physicians' risk/benefit analysis").

Similarly, Dr. Qato's "inadequate warning" opinion is premised on "evidence from [five] preclinical and clinical studies."  Ex. 2, Qato Rpt. at 12.  However, three of these studies relate, at least in part, to adolescents.[7]  As Plaintiff was thirty-one years old when he took montelukast, Dr. Qato's opinion that the warnings were inadequate based on studies relating to *adolescents* does not fit this case.  *See* Ex. 29; *see also In re Incretin*, 524 F. Supp. 3d at 1045 (excluding opinion where underlying data did not concern the product at issue and expert failed to "explain[] why such an extrapolation

---

[7] Ex. 2, Qato Rpt. at 13 ("Pharmacokinetics in Children Indicate High, Unpredictable Montelukast Exposure") and at 14 ("Higher Levels of Montelukast Exposure in Adolescents vs. Adults" and "Variability in Montelukast Pharmacokinetics between Chewable and Film Coated Tablets").

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

[was] scientifically sound"); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1397 (D. Or. 1996) ("[A]nimal studies may be methodologically acceptable to show that chemical X increases the risk of cancer in animals, but they may not be methodologically acceptable to show that chemical X increases the risk of cancer in humans.") (quoting *In re Paoli*, 35 F.3d 717, 743 (3d Cir. 1994)).

Finally, Dr. Qato's ***overall*** opinion that Merck should have "warned the public on neuropsychiatric risks associated with the use of montelukast" is not relevant under California law.  Ex. 2, Qato Rpt. at 12.  In California, a prescription drug manufacturer's duty to warn of dangers associated with its products "runs to the physician, *not to the patient,*" based on the learned intermediary doctrine.  *Motus*, 196 F. Supp. 2d at 991.  Thus, the pertinent question here is the adequacy of the warning with respect to the prescribing physician, not the general public.  Dr. Qato's personal belief that Merck should have "warned the public" does not "determine a fact in issue."  *Calisi*, 2013 WL 5441355, at *7.

**B. Dr. Qato Does Not Employ a Reliable Methodology to Support Her Recalculation of Merck's Clinical Trial Data and, Therefore, the Recalculation Should be Excluded.**

At the request of FDA and using clinical trial data and a Statistical Analysis Plan (SAP) requested by FDA, Merck analyzed data from more than 40 clinical trials to determine whether they reflected an increased risk for behavior-related adverse events. All the data, statistical calculations, and conclusions were provided in a 400-plus page submission to FDA in December 2008.  Ex. 30, Dec. 29, 2008 Letter.  In 2009, Merck then published its analyses in a peer-reviewed publication for the world to see, with the conclusion that there was no statistically significant increased risk of neuropsychiatric events following the administration of Singulair.  *See* Exs. 32 and 33.  Neither FDA nor anyone in the scientific community took issue with anything that Merck did concerning those analyses. Nonetheless, and despite never reviewing the hundreds of pages of communications between FDA and Merck regarding what data to include and

**DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.**

what statistical methodology to employ—and without reviewing Merck's 400-plus page submission to FDA—Dr. Qato claims that in just a few minutes she conducted a crude recalculation of data from the published paper and reached a result different from Merck's and FDA's.  Ex. 2, Qato Rpt. at 9-10.  As Dr. Qato does not offer a reliable methodology to support the validity of her crude recalculation and has no understanding of the methodology employed by Merck at the request of FDA, her opinion should be excluded.

Dr. Qato dedicated approximately 5-10 minutes of her time to recalculating the data that Merck and FDA collected from dozens of clinical trials.  Ex. 3, Qato Dep. at 46:3-7.  Despite her lack of expertise—and never having attempted this type of analysis before—Dr. Qato chose not to consult with a biostatistician skilled at analyzing data from multiple diverse trials before conducting her "crude" recalculation.  *Id.* at 242:6-11; 236:13-24; 232:8-17.  Further, despite acknowledging that the SAP would be helpful to understand the methodology behind Merck's analysis, Dr. Qato acknowledges that she chose not to review the FDA-approved SAP. *Id.* at 227:24–229:1. Dr. Qato further admitted that, because she did not review the SAP or any of the individualized data from the randomized controlled trials, she made no attempt to replicate the statistical methodology that FDA requested and, moreover, has no reason to believe that Merck deviated from the FDA-approved methodology. *Id.* at 235:17–236:6 ("I don't know what the statistical analysis plan was. And if I did, I would not be able to [replicate Merck's statistical methodology], because I don't have all the data I need.").

Even though Dr. Qato has no understanding of the statistical methodology employed by Merck—and cannot identify a single scientist who questioned the manner in which Merck conducted its analysis, *id.* at 244:2-7—Dr. Qato opines (on the basis of just a few minutes of work) that Merck made "a miscalculation of their statistical analysis that erroneously concludes that montelukast is not significantly associated with" neuropsychiatric events. Ex. 2, Qato Rpt. at 10.  Notably, Dr. Qato cannot

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

explain the purported flaws in Merck's analysis because she does not know the methodology used – and never bothered to find out.  Dr. Qato repeatedly admits that she simply does not understand the analysis she claims to critique.  *Id.* (admitting that: (1) "it is unclear what this second category captures and why these preferred terms . . . were selected for a study"; (2) it is "not clear why Akathisia was the category chosen for restlessness"; and (3) "it is not clear whether 'patients with clinically significant psychiatric illnesses at baseline were excluded because of concerns about the risk of noncompliance with study procedures'").  The only reason these issues are "unclear" to Dr. Qato is that she chose to ignore the extensive documentation of Merck's methodology and its communications with FDA concerning the same.

Thus, rather than engage in even a rudimentary attempt to understand Merck's FDA-approved methodology, which was peer-reviewed before publication, Dr. Qato simply assumes the results that were accepted by FDA, peer reviewers at the Journal of Allergy and Clinical Immunology, and the scientific community were incorrect and therefore replaces them with her own crude calculation.  It is important to note that Dr. Qato has not uncovered any previously unknown or hidden data; she simply took the same data that was reported to FDA and the scientific community as a whole and organized it differently in order to—coincidentally—reach a statistically significant result. Ex. 3, Qato Dep. at 33:9-21 (acknowledging that she took the data directly from the Philip paper because she did not review the patient-level data from the clinical trials).[8]

Moreover, Dr. Qato performed no adjustments to her odds ratio calculation to account for the heterogeneity of the underlying studies (nor did she realize that FDA

---

[8] Dr. Qato's quick and crude calculation results in an odds ratio of 1.21 for behavioral-related adverse events (as opposed to 1.12 found by the original study authors).  Ex. 2, Qato Rpt. at 11.  While "a risk factor in that range would not necessarily preclude a conclusion that causation exists, it undeniably is not a strong association."  *In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*, 424 F. Supp. 3d 781, 796 (N.D. Cal. 2020).

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

and Merck had determined such adjustments were necessary, as she has not reviewed the SAP).  As a result, Dr. Qato's calculation incorrectly assumes that a study involving only 100 participants carries the same weight as a study involving 2,000 participants. Dr. Qato's methodology erroneously assumes that all the underlying data came from a single study, rather than from 46 different studies involving different sizes of populations, different methodologies, and different confidence intervals.  As explained in the FDA-approved SAP, Merck performed adjustments to the odds ratio calculation to address the heterogeneity of the underlying trials.  Adjustments to account for study heterogeneity are a standard statistical methodology because study "populations often differ in characteristics that relate to disease risk, such as age, sex and race" and therefore are used "for comparing rates in different groups of subjects selected for study in epidemiologic investigations."  Ex. 31, Reference Guide on Epidemiology, at 571–572.

Dr. Qato's decision to critique Merck's analysis without making any effort to review the underlying clinical trial data or the record of communications between FDA and Merck on this topic renders it unreliable and inadmissible.  *See In re Incretin*, 524 F. Supp. 3d at 1035–36 (excluding expert failed to "consider[] all available clinical data" before rendering an opinion); *In re Rezulin*, 309 F. Supp. 2d 531, 550 (S.D.N.Y. 2004) (excluding expert who "wrote his report before having the supporting data" because "his opinions are not 'based upon sufficient facts or data' and do not proceed from 'reliable principles and methods,' as required by Rule 702").  Dr. Qato has simply taken a study that does not support her opinion (because it finds no statistically significant risk of neuropsychiatric adverse events) and converted it into a study that supposedly does support her opinion by changing—improperly and in contravention to the generally accepted methodology requested by FDA—the statistical methodology, which has "conveniently resulted in a statistically significant finding."  *In re Lipitor*, 145 F. Supp. 3d 573, 592 (D.S.C. 2015) (excluding expert who handled a study that contradicted his opinion by "decid[ing] that, instead of using the data adjudicated by a

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

blinded committee of clinicians that did understand the term, he would use unadjudicated raw data" and noting it was "the very definition of cherry picking data to reach a pre-determined conclusion and is unacceptable under *Daubert*").

Even if this opinion were admissible under Rule 702, it should be excluded because "it is likely to be misinterpreted or misused by the jury" who will be told (without basis) by a purported expert that Merck willfully misrepresented data regarding neuropsychiatric adverse events. *See, e.g.*, *Arcudi v. Builder Servs.*, 673 F. Supp. 3d 9, 15 (D. Mass. 2023) (excluding expert testimony where their statements were "likely to be misinterpreted or misused by the jury," particularly because of expert's "status as a board-certified spine surgeon," which "lend[s] weight to any recommendation he may make"); *In re Zofran*, 2019 WL 5685269, at *2 (D. Mass. Nov. 1, 2019)  ("[E]xpert testimony that is relevant and that passes muster from a scientific or technical standpoint may nonetheless be excluded if it is likely to be misinterpreted or misused by the jury.").

### C. Dr. Qato Is Unqualified to Opine on Biological Plausibility.

Dr. Qato's master's degree in health and human rights does not qualify her to opine on general causation, i.e., whether montelukast has the capacity to cause "new-onset or worsening neuropsychiatric adverse effects."  In coming to her general causation opinion, Dr. Qato applied a Bradford Hill analysis. Ex. 2, Qato Rpt. at 3.  A critical aspect of the Bradford Hill analysis is biological plausibility.  *Id.* at 7. Biological plausibility is not an easy criterion to use and "depends upon existing knowledge about the mechanisms by which the disease develops."  Ex. 31, Reference Guide on Epidemiology, at 604; *see also Milward v. Acuity Specialty Prods. Group*, 639 F.3d 11, 25 (1st Cir. 2011) (biological plausibility considers "whether the hypothesized causal link is credible in light of what is known from science and medicine about the human body and the potentially offending agent").  Nevertheless, biological plausibility is fundamental to the general causation analysis because "a biological explanation without evidence of the mechanism by which it works is merely

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

an unproven hypothesis, a theory." *In re Accutane Prods. Liab.*, 511 F. Supp. 2d 1288, 1295 (M.D. Fla. 2007).

Here, Dr. Qato opines on biological plausibility despite knowing nothing about the underlying science, having a very limited understanding of montelukast, and having never previously addressed a similar situation. According to Dr. Qato, her biological plausibility opinion is premised on montelukast's "mechanism of action," i.e., that it is a selective leukotriene receptor antagonist that "crosses the blood brain barrier" and "interact[s] with receptors in the central nervous system," and these "interactions *may* lead to alterations in neurotransmitter systems and neuroinflammatory responses, *potentially* contributing to the development of neuropsychiatric symptoms." Ex. 2,  Qato Rpt. at 7 (emphasis added). Dr. Qato acknowledges that the actual scientific community has found that "a conclusive mechanism is yet to be determined and it's not fully understood," but nevertheless in her capacity as a paid expert, she has concluded that her hypothesized link is credible. Ex. 3, Qato Dep. at 341:22–342:15.  In doing so, she relies upon "some information" that "*suggests*" that montelukast crosses the blood-brain barrier, which she does not understand[9] and which she impermissibly interprets in a way that is inconsistent with the actual findings.[10]  *Id.*

---

[9] For example, while Dr. Qato posits that montelukast binds to receptors that are distributed throughout the body, including in the brain, Dr. Qato does not actually know what subtype of receptors are in the brain under *normal* conditions.  *Compare* Ex. 2, Qato Rpt. at 7, *with* Ex. 3, Qato Dep. at 341:22–343:19.

[10] Dr. Qato acknowledged that the authors of three of her primary materials, Philip, Ali, and Schmuock, "make conclusions in their abstracts, and in the narrative of the manuscript, that there's *no* significant association" between montelukast and neuropsychiatric adverse outcomes, but nevertheless upon Dr. Qato's "critical review … you really can't make a conclusion that there's *no* evidence of neuropsychiatric effects or events in montelukast-treated patients."  Ex. 3, Qato Dep. at 327:9–328:12 (emphasis added).  However, Dr. Qato "may not "analyze[ ] data that was not [her] own and reinterpret[ ] it in a manner inconsistent with the conclusions of those who

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

1  　　　　Dr. Qato is not a clinical pharmacologist (much less one who specializes in the

2  blood-brain-barrier or neurotransmitters); she has never been involved in any research

3  considering whether a substance crosses the blood-brain barrier; never authored any

4  publication discussing the blood-brain barrier; and never been involved in reviewing

5  pharmacokinetic data related to substances and their tissue distribution (including in

6  the brain). *Id.* at 161:1-8; 162:9-24; 163:1-9; Ex. 4, Qato Dep. at 464:7–465:12;

7  472:12-15.  Even if Dr. Qato's obvious lack of qualifications was not enough, another

8  "way to determine an expert witness's scope of expertise is to examine the expert's

9  testimony." *See Christison*, 2016 WL 6902706, at *2.   Here, Dr. Qato acknowledged

10  her lack of experience:

> 11  I'm not a pharmacologist. So I didn't review the pharmacology literature
> 12  extensively.  I just, you know, reviewed it enough to know that it's biologically
>     plausible, including on the product's current label, I think it mentions that it
> 13  crosses the blood-brain barrier and may affect neurotransmitter regulations or –
> 14  so there's – that's – so there's – I think, that's the pharm – the potential
>     pharmacology of the drug.
> 15

16  Ex. 4, Qato Dep. at 476:17–477:14.

17  　　　　In addition, while Dr. Qato conceded that she has not seen *any* data indicating

18  that montelukast crosses the blood-brain barrier and affects neurotransmitters in

19  humans, Ex. 3, Qato Dep. at 343:20-23, she deemed it appropriate to premise her

20  biological plausibility opinion upon animal studies, none of which used doses

21  equivalent to human doses or "looked at specifically the levels of these

22  neurotransmitters in the brain."   Ex. 4, Qato Dep. at 475:18–477:14; Ex. 2, Qato Rpt.

23  at 8.  Even if an opinion premised on animal studies could be considered reliable,

24

25

26

27  _____
   originally generated it." *Rodman v. Otsuka Am. Pharm., Inc.*, 564 F. Supp. 3d 879,
28  889 (N.D. Cal. 2020), *aff'd*, 2021 WL 5850914 (9th Cir. Dec. 9, 2021).

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

1  which it is not,[11] Dr. Qato's total lack of qualifications to interpret animal studies

2  further renders her opinion inadmissible.  Dr. Qato has never evaluated the

3  significance of data from animal studies (on behalf of FDA or otherwise) and has

4  never written any papers evaluating or analyzing data from animal studies.  Ex. 3, Qato

5  Dep. at 160:1-24; Ex. 4, Qato Depo. at 484:15–485:8.  *See, e.g.*, *Mullins v. Premier*

6  *Nutrition Corp.*, 178 F. Supp. 3d 867, 901 (N.D. Cal. 2016) (deeming expert

7  unqualified as he admitted "that he d[id] not understand many of the articles discussing

8  bioavailability" and did not claim "that clinical trials [were] within his expertise").

9         Clearly, Dr. Qato does not have "superior knowledge, education, experience, or

10  skill with the subject matter of [her] proffered testimony[.]"  *In re Mirena*, 341 F.

11  Supp. 3d 213, 240 (S.D.N.Y. 2018) (explaining that plaintiff's proposed expert, "a

12  medical doctor who doubles as a professor of biostatistics—[was] not qualified to

13  opine about a biological mechanism by which Mirena might cause IIH" as he was "not

14  educated in the relevant disciplines: pharmacokinetics and pharmacodynamics"), *aff'd*,

15  982 F.3d 113 (2d Cir. 2020).  Dr. Qato's lack of qualifications is starkest when

16  compared with the qualifications of other experts in cases where courts *have* permitted

17  an expert to testify on biological plausibility.  *See, e.g.*, *In re Abilify*, 299 F. Supp. 3d

18  1291, 1347-48 (N.D. Fla. 2018) (expert qualified to testify on biological plausibility

19  had a degree in pharmacology and a Ph.D. in neuroscience, 25 years of clinical

20  experience studying, publishing, and teaching courses on brain function and the effects

21  of drugs on human behavior, conducted "extensive" research on dopamine systems and

22  the neurobiological mechanism of human decision-making, and developed the Iowa

23  Gambling Task, which is used worldwide to detect and measure brain dysfunction);

24
_____

25  [11] *See In re Incretin*, 524 F. Supp. 3d at 1040-41 (noting that biological plausibility

26  expert's "hypothesis has not been tested in humans" and finding this "deficiency
   significant," and expert affirmed that he was not aware of any animal studies that

27  actually supported his opinion and such "unfilled gaps le[ft] much room for speculation
   and do little to earn the Court's confidence that [the expert's] theory ha[d] sufficient

28  support").

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.

1  *Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1369 (N.D. Ga. 2001)

2  (deeming expert "well qualified" to testify on medical causation and noting he had

3  Ph.D. in pharmacology, served as review scientist for FDA, where he conducted

4  pharmacology and animal toxicology reviews of drugs being offered for clinical

5  investigation and FDA approval, was a professor of pharmacology, and had consulted

6  in the field of drug development for years).

7       As biological plausibility is critical to establish general causation, and Dr. Qato

8  is unqualified to provide such an opinion, her general causation opinions must be

9  excluded.

10                          **V.    CONCLUSION**

11      As Dr. Qato's labeling and biological plausibility opinions fall outside her area

12  of expertise and do not "fit" this case, and as she did not employ a scientifically

13  reliable methodology, this Court should exclude her from offering the opinions stated

14  in her report.

15

16  DATED:  May 30, 2024                    KING & SPALDING LLP

17                                          */s/ Susan V. Vargas*
                                            Alexander G. Calfo
18                                          Susan V. Vargas
                                            Attorneys for Defendants
19                                          MERCK & CO., INC.; MERCK SHARP
                                            & DOHME CORP.; ORGANON & CO.;
20                                          and ORGANON LLC

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DIMA MAZEN QATO, MPH, PH.D.