| | |
|---|---|
| 1 | KEVIN P. RODDY, SBN 128283 |
| | kroddy@wilentz.com |
| 2 | LYNNE M. KIZIS (Admitted *Pro Hac Vice*) |
| | WILENTZ, GOLDMAN & SPITZER, P.A. |
| 3 | 90 Woodbridge Center Drive, Suite 900 |
| | Woodbridge, NJ 07095 |
| 4 | Telephone: (732) 855 -402 |

*Attorneys for Plaintiff*

Shehnaz M. Bhujwala, CA State Bar No. 223484
  bhujwala@boucher.la.com
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, CA 91367-4903
Telephone: (818) 340-5400

*Local Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD PARKER, an individual, | Case No. 3:24-cv-00916-H-BLM |
| Plaintiff, | **AMENDED PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF DR. DIMA QATO** |
| vs. | |
| MERCK & CO., INC., a New Jersey Corporation; MERCK SHARP & DOHME CORP., a New Jersey Corporation; ORGANON & CO., a Delaware Corporation; ORGANON LLC, a Delaware Limited Liability Company; and DOES 1-10, Inclusive, | Action Filed: March 3, 2022 |
| | Action Removed: April 15, 2022 |
| | Trial Date: |
| Defendants. | |

Contents
I. INTRODUCTION ............................................................................... 3
II. STATEMENT OF THE FACTS ........................................................ 3
    A.    DR. QATO ................................................................................ 3
    B.    MONTELUKAST PRECLINICAL AND CLINICAL TRIALS ............................................................................................ 4
    C.    2009 META-ANALYSIS ......................................................... 5
        1.    MEDDRA ......................................................................5
        2.    DR. QATO'S CRITIQUES OF THE META-ANALYSIS ..................................................................................5
    D.    BRADFORD-HILL CRITERIA/ GENERAL CAUSATION 7
    E.    THE LABEL IS INADEQUATE ........................................... 10
III. ARGUMENT .................................................................................. 11
    A.    STANDARD ............................................................................ 11
    B.    DR. DIMA QATO'S QUALIFICATIONS ............................ 12
    C.    GENERAL CAUSATION – BRADFORD-HILL ................. 13
    D.    DR. QATO'S OPINIONS THAT MERCK MANIPULATED ITS CLINICAL TRIAL DATA ARE ADMISSIBLE. .......... 14
    E.    DR. QATO'S OPINION THAT THE LABEL IS INADEQUATE SATISFIES THE REQUIREMENTS OF RULE 702 ................................................................................ 15
IV. CONCLUSION ............................................................................... 16

**Cases**

Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc., 738 F.3d 960 (9th Cir. 2013)....11

City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036 (9th Cir. 2014) ......................14

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786 (1993)....10, 11

Garner v. BNSF Ry. Co., 98 Cal. App. 5th 660, 671, 316 Cal. Rptr. 3d 862 (2024)....12

Hardeman v. Monsanto Co., 997 F.3d 941 (9th Cir. 2021)..........................................12

In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig., 424 F. Supp. 3d 781 (N.D. Cal. 2020)................................................................................11

Kennedy v. Collagen Corp., 161 F.3d 1226 (9th Cir. 1998) ........................................13

Romero v. Wyeth Pharms., Inc., No. 1:03-cv-1367, 2012 U.S. Dist. LEXIS 190845, (E.D. Tex. Apr. 26, 2012) ...............................................................................15

Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227 (9th Cir. 2017)................. 11, 13, 14

## I. INTRODUCTION

This is a product liability action involving a plaintiff who suffered neuropsychiatric events – as well as severe physical injury from a failed suicide attempt – as a result of taking the prescription drug montelukast. Montelukast is the generic form of Defendant's drug Singulair. Defendants are responsible for the contents of the label.

Plaintiff identified Dr. Dima Qato of Southern California University as an expert who will testify that (1) montelukast is capable of causing neuropsychiatric events generally ("general causation"), (2) Defendants knew or should have known that montelukast causes neuropsychiatric events years before Plaintiff started taking the drug, or at a minimum, knew or should have known that there was a increased risk of developing neuropsychiatric risks when taking montelukast, and (3) the montelukast label is inadequate.

Defendants have moved to exclude Dr. Qato's opinions. Plaintiff now opposes Defendants' motion.

## II. STATEMENT OF THE FACTS

### A. DR. QATO

Dr. Qato is well qualified to render the opinions she has offered. Dr. Qato is a clinical pharmacist and a pharmacoepidemiologist. See Declaration of Kimberly Beck, Exhibit 1, Transcript of the Deposition of Dr. Dima Qato (hereinafter "Qato Dep. Trans."), 465:21-23. She has been a licensed pharmacist in the state of Illinois since 2001. Id. at 21:1-6. She has a Master of Public Health from Johns Hopkins Bloomberg School of Public Health. Id. at 53:1-4. In 2011, she obtained her Doctor of Philosophy from the division of health policy and administration, School of Public Health, University of Illinois-Chicago. Id. at 53:19-24. She received her Doctorate in Pharmacy from the College of Pharmacy at the University of Chicago. Id. at 51:5-10

|   |   |
|---|---|
| 1 | Between 2018 and 2020, she was a fellow of the National Academy of Medicine and |
| 2 | Engineering and Science. Id. at 102:1-9. She was on the ASHP research advisory |
| 3 | counsel until June 2023. Id. at 94:13-20. |
| 4 |      She is currently a professor at Southern California University. Part of her role is |
| 5 | to develop a Master's and PhD program in pharmacoepidemiology within USC. Id. at |
| 6 | 109:5-16. She is the key faculty in drug utilization research and |
| 7 | pharmacoepidemiology. Id. at 111:12-17. She is scheduled to teach |
| 8 | Pharmacoepidemiology 1 and an introductory course to drug utilization research and |
| 9 | health and society. Id. at 101:7-12. She has offered a class that was attended by three |
| 10 | students and one other course that was canceled for lack of enrollment. |
| 11 |      She is currently funded by the National Institutes of Health ("NIH") to study |
| 12 | medication adherence and pharmacy access in Medicare Part D. Id. at 99:10-16. The |
| 13 | NIH grant is $1.7 million over four years. Id. at 100:3-6. |
| 14 |      Additionally, she is one of the authors of a very impactful published in JAMA in |
| 15 | 2018, regarding the different medications, including montelukast, involved in |
| 16 | depression and other mental health effects. Id. at 113:11-22. The article involved |
| 17 | calculation of biostatistics, but she was not required by JAMA to work with a |
| 18 | biostatistician. As an epidemiologist she was deemed capable of performing the |
| 19 | statistical analysis. |
| 20 | **B.    <u>MONTELUKAST PRECLINICAL AND CLINICAL TRIALS</u>** |
| 21 |      During preclinical trials (animal testing), Merck conducted two rat studies that |
| 22 | are notable, one demonstrated that montelukast passes the blood brain barrier in rats. |
| 23 | The other showed that it affected the Central Nervous System of rats. Despite these |
| 24 | findings, Merck began clinical testing (testing on people). None of the clinical trials |
| 25 | were designed to determine the effect on the human brain, and none were designed to |
| 26 | look at neuropsychiatric injuries. |
| 27 | |
| 28 | |

## C. 2009 META-ANALYSIS

In 2009, George Philip, Executive Director, Medical Affairs at Merck, undertook a meta-analysis of reports of neuropsychiatric injuries that were reported in clinical trials (the same clinical trials that were not designed to specifically detect neuropsychiatric events). Based on this analysis, Merck drafted a 400-page report for the FDA and Philip drafted an article for publication. Qato reviewed the publication and had several critiques as an expert epidemiologist, some of which involved MedDRA classification.

### 1. MedDRA

MedDRA is generally used for coding adverse events in clinical trials and post-marketing surveillance. It sets forth a hierarchy as follows:

- System Organ Class (SOC)
  - High Level Group Term (HLGT)
    - High Level Term (HLT)
      - Preferred Term (PT)
        - Lowest Level Term (LLT)

For example, if someone reports that he or she is "feeling queasy" that report would be captured in the following hierarchy:

- Gastrointestinal disorders (SOC)
  - Gastrointestinal signs and symptoms (HLGT)
    - Nausea and vomiting symptoms (HLT)
      - Nausea (PT)
        - Feeling queasy (LLT)

See Declaration of Kimberly Beck, Exhibit 3, Declaration of Dr. Dima Qato

### 2. Dr. Qato's Critiques of the Meta-Analysis

In her report, Dr. Qato states "*I will mention several limitations of the analytic approach used for this study and address some of them.*" She then sets forth several

critiques. The language of the critiques has allegedly led Merck to believe she is confused about Merck's analysis.

- The first such statement in her report is "First, it is unclear what this second category captures and why these preferred terms (e.g., fatigue and malaise) were selected for a study that was intended to focus on neuropsychiatric adverse effects." However, if Dr. Qato were asked at her deposition, she would have explained that this sentence means: "As an expert in the field, I note that it is odd that the second category is not well-defined. Some of the preferred terms Merck selected for this category, like fatigue and malaise, are illogical because they are not neuropsychiatric events." Id.
- The next statement that Dr. Qato makes that allegedly demonstrates confusion is "Second, they note that preferred term is only included in one category, but not clear why Akathisia was the category chosen for restlessness when it can also be captured under Psychiatric Disorders." However, if asked in the deposition she would have explained that this sentence means: "Merck is manipulating data by categorizing "restlessness" as within the Akathisia SOC instead of Psychiatric Disorders SOC." Id.
- She further states "it is not clear whether 'patients with clinically significant psychiatric illnesses at baseline were excluded because of concerns about the risk of noncompliance with study procedures.'" Again, this statement does not reflect confusion. If asked in the deposition I would have explained that I this sentence means: "Merck should have stated that 'patients with clinically significant psychiatric illnesses at baseline were excluded." Id.

Dr. Qato was able to look at the data generated by Merck using the outdated Zelen technique, and conduct a simple analysis known as a "crude estimate" using Stata software in five to ten minutes and see that Merck's numbers were manipulated.

- 6 -  Case No. 3:24-cv-00916-H-BLM
OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF DR. DIMA QATO

Notably, the term "crude analysis" is a term of art used in epidemiology, meaning a calculation with an unadjusted rate of incidence and odds ratios. Id.

During her deposition, Defense attorney, Stephen Marshall told her that my crude analysis of the 2009 Philip paper was inaccurate. He intimated that she used numbers from one of the rows in Table 1 of the Philip paper that she should not have used.

Even if Mr. Marshall is correct that she should not have considered some of the information in Table 1, the results of the analysis still show that montelukast is significantly associated with an increased likelihood of experiencing neuropsychiatric events. Id.

### D. **BRADFORD-HILL CRITERIA/ GENERAL CAUSATION**

Once Dr. Qato sees that there is a correlation between montelukast use and development or worsening of neuropsychiatric events, she undertook the Bradford-Hill analysis to determine if the correlation is "real" and if so, if montelukast "causes" development or exacerbation of neuropsychiatric injuries. See Declaration of Kimberly Beck, Exhibit 2, Report of Dr. Dima Qato. As detailed in her report, Dr. Qato considered the following:

1. **Strength of the association (effect size):** The strength of association refers to the magnitude of the relationship between an exposure (montelukast use) and an outcome (neuropsychiatric effects). Dr. Qato conducted a statistical analysis of the strength of association. She considered strengths and weaknesses of cohort and case-control study data available, as well as pharmacovigilance data.

2. **Consistency (reproducibility):** Consistency refers to the replication of findings across different populations, study designs, and methodologies. Findings from clinical trials,

cohort and case-control studies, and pharmacovigilance analyses and case reports, conducted in several countries involving diverse patient populations have reported an increased risk of neuropsychiatric effects associated with montelukast use. This consistency across different studies strengthens the argument for a causal relationship between montelukast and neuropsychiatric effects.

3. **Specificity**: The specificity criterion evaluates whether the exposure (montelukast) leads to a specific outcome (neuropsychiatric effects) consistently. While Montelukast is primarily used for the treatment of respiratory conditions, the occurrence of neuropsychiatric effects has been observed consistently across different populations - in both patients with asthma and those with allergic rhinitis, in males and females, children, adolescents and adults.  Case reports and pharmacovigilance data can provide insights into the specificity criterion by evaluating whether neuropsychiatric effects occur disproportionately or exclusively in individuals using montelukast. For example, Bian et al conducted an analysis of the FDA Adverse Event Reporting System (FAERS) and observed that montelukast was highly and significantly associated with NPEs with a reporting odds ratio (ROR) of 10.35 while zileuton (ROR 1.38) and zafirlukast (ROR 1.66) - other leukotriene receptor antagonists (LTRA) - were not associated with increases in the reporting of NPEs.

4. **Temporality:** Temporality establishes the temporal

relationship between the exposure (montelukast) and the outcome (NPEs). Several studies have reported an increased risk of neuropsychiatric effects occurring shortly after (immediately to less than 2 weeks) the initiation of montelukast treatment.

5. **Biological gradient:** The biological gradient, also known as dose-response relationship, examines whether a change in exposure level leads to a corresponding change in the risk of the outcome. Some clinical and animal studies have reported a dose-response relationship, with higher doses of montelukast treatment being associated with a greater risk of adverse effects.

6. **Plausibility:** Plausibility considers the biological mechanisms that could explain the observed association. The biological plausibility of a causal relationship between Montelukast and neuropsychiatric adverse effects is supported by the drug's mechanism of action. Montelukast is a leukotriene receptor antagonist primarily used to treat asthma and allergic rhinitis. It is known to cross the blood-brain barrier and interact with receptors in the central nervous system. Emerging evidence suggests that these interactions may lead to alterations in neurotransmitter systems and neuroinflammatory responses, potentially contributing to the development of neuropsychiatric symptoms.

7. **Experimental:** Experimental evidence, such as randomized controlled trials (RCTs), can provide insights into causation.

However, RCTs specifically designed to assess neuropsychiatric effects associated with montelukast were not conducted. Despite concerns about underreported in clinical trials, however, a statistically significant increase in the risk of BRAEs, and, NPEs when analyzed separately (see section B) is observed using Merck's published clinical trial data. According to these data montelukast-treated patients were more likely to experience any BRAE when compared to placebo (2.73% vs. 2.27%; $P$=0.035). Clinical trial evidence indicates that montelukast-treated patients with asthma ages 6-17 years are more likely to develop NPEs than active controls (inhaled corticosteroids).

8. **Coherence:** Coherence assesses the compatibility of the observed association with existing knowledge. The association between Montelukast use and neuropsychiatric effects aligns with the known effects of leukotrienes on the central nervous system. Furthermore, the observed association is consistent with clinical trial data, post-marketing case reports, and cohort and case-control studies, which provide additional coherence to the causal relationship.

E.      **THE LABEL IS INADEQUATE**

The label at issue when Plaintiff was prescribed montelukast states, in relevant part:

HIGHLIGHTS OF PRESCRIBING INFORMATION

*      *      *

"[n]europsychiatric events have been reported with SINGULAIR.

> Instruct patients to be alert for neuropsychiatric events. Evaluate the risks and benefits of continuing treatment with SINGULAIR if such events occur (5.4 and 6.2)."

> \* \* \*

> WARNINGS AND PRECAUTIONS

> Neuropsychiatric Events Neuropsychiatric events have been reported in adult, adolescent, and pediatric patients taking SINGULAIR. Post-marketing reports with SINGULAIR use include agitation, aggressive behavior or hostility, anxiousness, depression, disorientation, disturbance in attention, dream abnormalities, dysphemia (stuttering), hallucinations, insomnia, irritability, memory impairment, obsessive-compulsive symptoms, restlessness, somnambulism, suicidal thinking and behavior (including suicide), tic, and tremor. The clinical details of some post-marketing reports involving SINGULAIR appear consistent with a drug-induced effect. Patients and prescribers should be alert for neuropsychiatric events. Patients should be instructed to notify their prescriber if these changes occur. Prescribers should carefully evaluate the risks and benefits of continuing treatment with SINGULAIR if such events occur [see Adverse Reactions (6.2)]

Dr. Qato compared the information in this label to what she determined Merck knew based on the analysis above and determined, in her expert opinion that the label is inadequate.

### III. ARGUMENT

#### A. STANDARD

The legal standard for exclusion or admission of expert testimony was set forth in in the US Supreme Court decision in *Daubert v. Merrell Dow Pharms*, codified in Federal Rule of Evidence 702. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will

help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Pursuant to the Federal Rules of Evidence, the district court judge must ensure that all admitted expert testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The inquiry is "flexible," *Daubert*, 509 U.S. at 594,

"The focus of the district court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. As explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the court's '"task . . . is to analyze not what the experts say, but what basis they have for saying it." 43 F.3d 1311, 1316 (9th Cir. 1995) Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227, 1232 (9th Cir. 2017)

"The Ninth Circuit has placed great emphasis on Daubert's admonition that a district court should conduct the analysis with a 'liberal thrust' favoring admission." *In re Viagra* (Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig., 424 F. Supp. 3d 781, 790 (N.D. Cal. 2020) (internal quotations omitted). The goal is to focus on the court's gatekeeping function to "screen the jury from unreliable nonsense opinions, but not to exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). Here, Dr. Qato's expert opinions are both relevant and reliable, and are, therefore, admissible.

**B.    DR. DIMA QATO'S QUALIFICATIONS**

Dr. Qato is a very well-educated epidemiologist/pharmacist, who focuses her

work at the University of Southern California on drug accessibility and safety.

Merck takes issue with the popularity of the classes she has taught. One course she taught at the University was canceld for lack of enrollment. Another class had only three students, each working towards a Masters of Public Health. 108:18-20. Defendants have cited no authority that suggests a professor is more or less qualified to serve as expert based on the number of students who sign up for the professor's classes. Research has unearthed no case that stands for the proposition that an expert is of higher quality if that person teaches classes in a lecture hall than in a small class setting. There appears to be no Ninth Circuit jurisprudence indicating that a proffered expert is less qualified if one of her classes is canceled because not enough students signed up for the class.

### C. **GENERAL CAUSATION – BRADFORD-HILL**

Expert testimony regarding general causation is admissible when the expert looks first to epidemiologic evidence to determine whether there is an association. Once the expert identifies an association, she must use her judgment and "bridge the gap between association and causation." Garner v. BNSF Ry. Co., 98 Cal. App. 5th 660, 678, 316 Cal. Rptr. 3d 862 (2024). This certainly does not mean there can never be an analytical gap. In many cases where the scientific evidence is limited or inconclusive, "there will inevitably be *some* analytical gap." 679.

In *Hardeman v. Monsanto*, the Ninth Circuit upheld the district court decision admitting the opinions of plaintiff's general causation experts. "These experts introduced their general opinions with scientific evidence from epidemiology (study of disease in human populations), toxicology (animal studies), and genotoxicology (cell studies); applied the Bradford Hill criteria; and used meta-analyses that combined and analyzed the results of case-control studies." Hardeman v. Monsanto Co., 997 F.3d 941, 953 (9th Cir. 2021). Similarly, Dr. Qato considered scientific evidence from epidemiology, toxicology, applied the Bradford Hill criteria;

and used meta-analyses that combined and analyzed the results of case-control studies.

She went on to explain when an association can be trusted as a "real" association as opposed to a coincidence. The association should be statistically significant, which means "[t]hat it's not random. What you found is not by chance but, represents, more or less, reality, a real -- a potentially real association." Dr. Qato then went on to apply the Bradford-Hill criteria faithfully.

Defendants take issue with her arguments regarding one of the factors in the Bradford-Hill analysis, which is the mechanism of action. Even if the testimony regarding mechanism is flawed, it is not fatal to the admissibility of her opinion. The Supreme Court in *Daubert* noted, "We also note that "[n]ot knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim. Causation can be proved even when we don't know precisely *how* the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage *somehow*." *Daubert II*, 43 F.3d at 1314 (emphasis in original). *See Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1230 (9th Cir. 1998). *Wendell v. GlaxoSmithKline LLC,* 858 F.3d 1227, 1236-1237.

As Dr. Qato used the Bradford-Hill criteria and applied the criteria faithfully to the facts of the case, her opinions regarding general causation are admissible.

D. **DR. QATO'S OPINIONS THAT MERCK MANIPULATED ITS CLINICAL TRIAL DATA ARE ADMISSIBLE.**

Dr. Qato immediately noted when looking at Dr. Philip's 2009 meta-analysis that something was not right. Even a basic and quick analysis that took Dr. Qato no more than five to ten minutes to complete demonstrated that the data in the meta-analysis was manipulated.

Merck first takes issue with her articulation of her critiques, claiming that statements such as **"**it is unclear what this second category captures and why these

- 14 -    Case No. 3:24-cv-00916-H-BLM
OPPOSITION TO MOTION TO EXCLUDE TESTIMONY OF DR. DIMA QATO

preferred terms (e.g., fatigue and malaise) were selected for a study that was intended to focus on neuropsychiatric adverse effects" reflects confusion. The context of statements such as this one makes clear that this is intended to be a critique. As she explained in her declaration and as many individuals would intuitively understand that statement is not at all one of confusion. It is tantamount to "As an expert in the field, I note that it is odd that the second category is not well-defined. Some of the preferred terms Merck selected for this category, like fatigue and malaise, are illogical because they are not neuropsychiatric events."

Merck also claims that she came to a faulty mathematical conclusion because she used some of the information in one of the table's in Dr. Philip's publication that she should not have used. Even if that is correct, her conclusion is the same. Incorrectly using a row of numbers in the analysis does not damn an opinion based on solid methodology. Imperfect application of the methodology does not render expert testimony inadmissible. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047-48 (9th Cir. 2014).

As Dr. Qato's methodology was sound, even if she used numbers from a table that she should not have used, her testimony is still admissible. This is particularly true as her conclusions are the same regardless of whether these allegedly improperly used terms are included in the analysis or not.

E. **DR. QATO'S OPINION THAT THE LABEL IS INADEQUATE SATISFIES THE REQUIREMENTS OF RULE 702.**

Dr. Qato's methodology meets the Daubert standard. In order to discharge it duty to warn, the drug company must provide adequate warnings "about any known or reasonably knowable dangerous side effects" of the drug. *See Wendell v. Johnson & Johnson*, C 09-04124 CW, 2012 U.S. Dist. LEXIS 103986, 2012 WL 3042302, at *7 (N.D. Cal. July 25, 2012).

Comparing the language of the drug label to what the company knew of should have know had it conducted adequate studies is an accepted method for determining whether a label is inadequate. *Romero v. Wyeth Pharms., Inc.,* No. 1:03-cv-1367, 2012 U.S. Dist. LEXIS 190845 (E.D. Tex. Apr. 26, 2012).

This is the analysis undertaken by Dr. Qato in forming her opinion. Her methodology is sound.

### IV. <u>CONCLUSION</u>

For all the foregoing reasons, Defendants' motion to exclude the testimony of Dr. Qato should be denied.

Executed this 10TH day of July 2024

<u>*s/ Lynne Kizis*</u>

Lynne Kizis