1  ALEXANDER G. CALFO, SBN 152891
   acalfo@kslaw.com
2  SUSAN V. VARGAS, SBN 177972
   svargas@kslaw.com
3  **KING & SPALDING LLP**
   633 West Fifth Street, Suite 1600
4  Los Angeles, CA 90071
   Telephone:+1 213 443 4355
5  Facsimile:+1 213 443 4310

6  Attorneys for Defendants
   MERCK & CO., INC.; MERCK SHARP
7  & DOHME CORP.[1]; ORGANON & CO.;
   and ORGANON LLC

8

9                    **UNITED STATES DISTRICT COURT**

10                   **SOUTHERN DISTRICT OF CALIFORNIA**

11

12 RICHARD PARKER, an individual,          Case No. 3:24-cv-00916-H-BLM

13                          Plaintiff,     **DEFENDANTS' RESPONSE TO**
                                           **PLAINTIFF'S STATEMENT OF**
14        vs.                              **UNDISPUTED FACTS SUBMITTED**
                                           **IN SUPPORT OF PLAINTIFF'S**
15 MERCK & CO., INC., a New Jersey         **OPPOSITION TO DEFENDANTS'**
   Corporation; MERCK SHARP &             **MOTION FOR SUMMARY**
16 DOHME CORP., a New Jersey              **JUDGMENT**
   Corporation; ORGANON & CO., a
17 Delaware Corporation; ORGANON LLC,
   a Delaware Limited Liability Company;   **Hearing Date:    August 19, 2024**
18 and DOES 1-10, Inclusive,              **Hearing Time:   10:30 a.m.**
                                           **Courtroom:       12A**
19                          Defendants.    **Judge:           Hon. Marilyn L. Huff**

20

21                                         Action Filed:    May 23, 2024
                                           Trial Date:      November 12, 2024
22

23

24

25

26

27 _____
   [1]Merck Sharp & Dohme Corp. is now known as Merck Sharp & Dohme LLC.
28

| PLAINTIFF'S PROPOSED UNCONTESTED FACT | DEFENDANTS' RESPONSE |
|---|---|
| **a. Defendants** | |
| 1. Defendants Merck & Co., Inc., Merck Sharp & Dohme Corp., Organon & Co., and Organon LLC (hereinafter "Defendants" or "Merck") are members of Merck Group. | Disputed. The cited exhibit does not support the contention. Organon LLC is not affiliated with the identified Merck entities. Additionally, the cited exhibit does not describe a "Merck Group." |
| 2. With approximately 72,000 employees, Merck Group is ranked 67 of the Fortune 100. | Disputed. The cited exhibit does not describe a "Merck Group." The "Merck Group" is not listed by Fortune 100. |
| 3. That means it has about four times as many employees as the FDA | Disputed. The cited exhibit does not support the statement. |
| **b. Singulair** | |
| **PRECLINICAL TRIALS** | |
| 4. Merck began preclinical testing (animal tests) on a molecule called montelukast in the early 1990s. A study on rats showed that montelukast passed the blood- brain-barrier, and that the amount of montelukast in the rat brain increases over time. | Disputed. The referenced exhibit does not support the contention as stated. The referenced study was a tissue distribution study that used labeled montelukast at doses far in excess of the indicated human doses. Defs. SOF ¶¶ 7-10. The referenced study did not demonstrate that the amount of |

| | |
|---|---|
| | montelukast in the rat brain increased over time. *Id.* |
| 5. Even George Philip, Executive Director, Medical Affairs at Merck, admits that he "would like to see a second study attempting to reproduce these findings or not…One study does not necessarily tell the whole story, especially when there are data hard to explain." Merck did not, however, conduct this second study. | Disputed. The referenced testimony is not complete and is neither quoted in context nor applicable to the statement it is offered to support. It is also disputed that Merck did not do additional tissue distribution studies to determine the distribution of montelukast in rats. |
| 6. Defendants originally denied the findings that montelukast crosses the blood brain barrier, but eventually Merck admitted to the FDA that montelukast, when ingested orally, entered the brain. | Disputed. The referenced exhibit demonstrates that Merck provided to the FDA accurate results from the tissue distribution studies. |
| 7. A different rat study involved giving rats an intentionally toxic dose of montelukast to understand which part of the body fails at the toxic dose. | Disputed. The referenced exhibit does not reflect a study conducted for the purpose described in this contention. |
| 8. For montelukast, it is the Central Nervous System. Despite these findings, Merck began clinical | Disputed. The referenced exhibit does not reflect a study conducted for the purpose described in this contention. |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS SUBMITTED IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| trials (human tests) without conducting further testing to determine potential effects of montelukast on the brain. | The referenced exhibit also does not support the contention that Merck began clinical trials (human tests) without conducting further testing to determine the potential effects of montelukast on the brain. It is disputed that Merck conducted clinical trials that did not consider the effect of montelukast on the brain or central nervous system. Defs. SOF ¶¶ 47, 49-50. |

### CLINICAL TRIALS

| | |
|---|---|
| 9. Through the course of the pre-marketing clinical trials (trials on people) on montelukast, Merck never conducted any trials for the purpose of determining what effect montelukast had on the brain, nor did they conduct any trials for the purpose of determining whether people who were given montelukast suffered an increase incidence of neuropsychiatric events. | Disputed. The referenced exhibit does not support the contention. Defendants deny that clinical trials did not evaluate the effect of montelukast on the brain or whether neuropsychiatric events were associated with montelukast. Defs. SOF ¶¶ 27-28, 31, 47, 49-50, 74. |
| 10. Instead, the clinicians were instructed to only ask sopen- [sic] ended questions to study | Disputed in part. In some trials, the clinicians were requested to ask initially non-leading questions, and |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS SUBMITTED IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| participants such as "how are you doing?" or "how are you feeling?" | then to follow-up with more detailed questions depending on the response to the initial question. |
| 11. According to one of Merck's experts, on any given day 5% of adult Americans suffer from depression. The rate of depression The rate of depression is even higher for asthmatics. | Undisputed. |
| 12. However, only 0.4% of study participants in the placebo group and 0.36% of people in the montelukast group reported to clinicians that they were experiencing depression. | Undisputed, but only in regard to the specific clinical trials that were being addressed in the referenced testimony. |
| 13. Nonetheless, Merck never modified its study protocols to make study participants more comfortable reporting depression. | Disputed. The referenced testimony does not support the contention. |
| 14. A review of the study protocols reveals that typically "people with clinically significant neuropsychiatric illness....." were excluded from entering the clinical trials. | Undisputed in regard to the protocols identified as Exhibits 9 and 10. |
| 15. Dr. Philip agrees that if people with psychiatric illness are | Undisputed in regard to the cited testimony. Disputed in regard to the |

| | |
|---|---|
| excluded from the clinical trials "we would not be able to measure a worsening of that condition in the clinical trial." In other words, Merck simply did not undertake clinical trials to determine whether montelukast use exacerbates preexisting psychiatric illness. | remaining statement that characterizes the testimony. The referenced testimony does not support that characterization. |
| 16. Although FDA did not require additional testing, it would not have prevented Merck from conducting additional testing. | Disputed. The referenced testimony does not support the statement. The referenced testimony was referring to a clinical trial different than what is the subject of the statement. |

### SINGULAIR HITS THE MARKET AND IT IS A BIG SELLER

| | |
|---|---|
| 17. In 1998, FDA approved montelukast for sale in the United States, under the brand name Singulair, indicated for "prophylaxis and chronic treatment of asthma, seasonal or perennial allergic rhinitis, and for the prevention of exercise-induced bronchoconstriction." | Undisputed. |
| 18. Singulair was a very successful drug for Defendants with | Undisputed. |

| | |
|---|---|
| worldwide sales as high as 1.2 billion dollars per year by 2001. | |

**ADVERSE EVENT REPORTS**

| | |
|---|---|
| 19. FDA's Office of Safety and Epidemiology ("OSE") maintains the Federal Adverse Event Reporting System ("FAERS"), which is a system that allows individuals, doctors, or drug manufacturers to report potential adverse events. | Undisputed. |
| 20. Merck maintains a similar system, previously known as MARRS and now known as WAES, which allows Merck to take in reports of adverse events from individuals or physicians. | Disputed as stated. The referenced testimony does not support the statement. Merck maintains a system presently known by the acronym MARRS that includes reports of certain reports of potential adverse events. |
| 21. Adverse event reports ("AERs") are used to identify a signal that there could be a connection between a drug and an adverse event | Disputed as stated. The referenced testimony does not support the statement. The referenced testimony indicates that adverse event reports can be used to serve as a tool to investigate whether there is a potential signal. |
| 22. Once a signal has been identified it's up to the manufacturer to evaluate it further. | Disputed as stated. The referenced testimony does not support the statement. The referenced testimony |

| | |
|---|---|
| | states that adverse events may require a manufacturer to determine whether there really is a signal or just noise. |
| 23. As early as 1999, FDA began receiving reports in FAERS stating that someone used Singulair and experienced a neuropsychiatric injury. | Disputed as stated. The referenced exhibit does not support the statement. The exhibit does not state that as early as 1999 someone using Singulair experienced a neuropsychiatric injury from Singulair. |
| 24. Merck also began receiving reports indicating that a particular person was using montelukast and suffered a neuropsychiatric injury. | Disputed as stated. The referenced testimony does not support the statement. The testimony does not state that Merck received reports indicating that a person using montelukast experienced a neuropsychiatric injury from montelukast. |
| 25. Merck has an obligation to report AERs it receives to the FAERS through an electronic system or as part of a package of "Periodic Adverse Event Reports" that Merck is required to submit to the Office of Safety and Epidemiology on a regular schedule. | Disputed as stated. The referenced testimony does not support the statement. Merck does not dispute that it has an obligation to report certain adverse event reports to the FDA. |

| | |
|---|---|
| 26. The only exception to this rule is that Merck is not required to report to the FDA "non-serious" events that are already on the Singulair label if the adverse event happened to someone outside of the United States. | Disputed. The referenced testimony does not support the statement. The statement does not accurately state or even characterize the referenced testimony. |
| 27. However, there is evidence that Merck did not provide all AERs to the FDA office of Surveillance and Epidemiology. In a report drafted in 2014 for the The Non-Prescription Advisory Committee of the FDA (not a part of the Office of Safety and Epidemiology), the committee discovered that there were 46,527 cases reported in Merck's adverse event reporting system. | Disputed. The referenced exhibit does not support the statement that Merck did not report to the FDA all adverse event reports that it was required to report. |
| 28. There were only 8,815 cases reported in the FAERS and 5,342 cases reported to the World Health Organization ("WHO"). McClain 156:1-10. The Non-Prescription Advisory Committee report questioned why there was such a large discrepancy between | Disputed. The referenced exhibit does not support this statement, nor does the statement accurately characterize what was reported by the Non-Prescription Advisory Committee. |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS SUBMITTED IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| the total amount of reports Merck had received and those that regulatory bodies have received, considering Merck's obligation to send most of its reports to FAERS. | |
| 29. Adverse Event Reports continued to come into both FDA and Merck. As of May 31, 2019, 19,685 adverse events for montelukast were reported in FAERS (still considerably fewer than Merck had in 2014). | Undisputed that FDA reported that, as of May 31, 2019, there were 19,685 adverse event reports for montelukast reported in FAERS. The suggestion that this number is fewer than what Merck was required to provide is disputed. |
| 30. Of those, 52%, or 10,209 included at least one adverse event in the nervous system disorder system organ class or psychiatric disorder system organ class. | Undisputed that FDA reported that, as of May 31, 2019, 10,209 of the reports for montelukast reported at least one adverse event in the nervous system disorder system organ class or psychiatric disorder system organ class. |

### LABEL HISTORY PRIOR TO 2008

| | |
|---|---|
| 31. According to Merck's regulatory expert, manufacturers go to the FDA quite often to update their label. The FDA only goes to the manufacturer if FDA wants to | Disputed. The referenced testimony does not support the statement. The referenced testimony addresses the expert's personal experience and was |

Case No. 3:24-cv-00916-H-BLM

| | |
|---|---|
| add a black box warning or something like that. | not intended to address the FDA's overall or general experience. |
| 32. Dr. Lydia Gilbert-McClain, Merck's regulatory affairs expert testified that the manufacturer should suggest label revisions based on the adverse event reports they obtain. | Disputed as stated. The referenced testimony, when considered in context, does not state that a manufacturer should suggest label revisions based on adverse event reports. Rather, the referenced testimony states that requests to make label revisions should be based on adverse event reports. |
| 33. "It's really the best judgment of the Merck personnel" to determine what changes should be made to the Singulair label. | Disputed. The referenced testimony does not support the statement. The testimony states that it is up to "really the best judgment of Merck personnel when it comes to our decision about whether we think a certain term ought to be added to product labeling." |
| 34. As alleged in the Motion for Summary Judgment, Merck went to the FDA numerous times to add a word, rearrange terms, or to replace a term with a synonym. For example, the September 12, 2001 CBE submission involves, in part, changing the word "seizure" to "seizures." | Undisputed. |

| | |
|---|---|
| 35. For example, Doc A, which is Exhibit 6 to Defendants' Statement of Facts states only that the revisions were made "based on WAES reports" and that the WAES reports were attached. | Undisputed. |

## 2008 CITIZEN'S PETITION

| | |
|---|---|
| 36. In 2008, FDA received a Citizen's Petition from Parents United for Pharmaceutical Safety and Accountability. The Petition stated: We have serious concerns about the safety of Singulair. Based on our own children's adverse experiences with this drug, a review of thousands of adverse reaction posts on medications.com, a review of 1726 FDA AERs Reported for Singulair published on patientsville.com, and review of case histories published in medical journals, we believe that the risks of Singulair outwight [sic] its benefits and FDA should | Undisputed. |

| | |
|---|---|
| not continue to allow its use in children. | |
| 37. The petition asked FDA to require the following updates and changes to Singulair's warnings – none of which are similar to those sought by Plaintiff here: (1) Revise Singulair's labeling to include additional language regarding psychiatric disorders and symptoms, including the addition of a "black box" warning (boxed warning) about psychiatric disorders and the link to suicide; (2) Require the distribution of a Medication Guide containing the information regarding psychiatric disorders and the link to suicide; (3) Mandate "Dear Doctor" letters that discuss psychiatric disorders with Singulair use, including the link to suicide; (4) Require signatory acknowledgement, between the physician and patient, of the risks | Undisputed. |

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS SUBMITTED IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| associated with Singulair use before issuing a prescription; (5) Require pharmacies to provide patients with information identical to FDA-approved labeling; (6) Require physicians to report adverse events regarding Singulair; and (7) Ensure all updated product labeling is communicated to consumers, physicians and patients. | |
| 38. FDA denied the Petition as to Requests 1-6, but granted t4he Petition as to Request 7. | Undisputed. |

**FDA ASKS MERCK TO WARN "SOME ADVERSE EVENT REPORTS ARE CONSISTENT WITH A DRUG-INDUCED EFFECT" IN 2009**

| | |
|---|---|
| 39. In 2009, FDA asked Merck to change the label to say "some post-marketing reports involving Singulair are consistent with a drug-induced effect." | Disputed as stated. The referenced testimony demonstrates that FDA requested Merck to submit revised labeling that included the language in quotes. |
| 40. Merck convinced the FDA to allow Merck to say "some post-marketing reports involving | Disputed. The referenced testimony demonstrates that the FDA agreed to |

| | |
|---|---|
| Singulair **appear** consistent with a drug-induced effect." | the labeling that included the language in quotes. |

**THE 2009 META-ANALYSIS**

| | |
|---|---|
| 41. In 2009, Merck prepared a meta-analysis of the information about neuropsychiatric adverse events that its clinical trials captured, despite the fact that they were not designed to capture neuropsychiatric events. | Disputed. The referenced exhibit does not support the statement. Merck, however, does not dispute that in 2009, under the direction and guidance of the FDA, it analyzed information about neuropsychiatric events reported in clinical trials. Defs. SOF ¶¶ 74-75. |
| 42. Merck conducted a complex 400- page analysis of that to the FDA and also submitted an article containing the same information for publication. | Disputed as stated. The referenced exhibit does not support the statement. Merck, however, does not dispute that, under the direction and guidance of the FDA, it conducted an analysis of information about neuropsychiatric events reported in clinical trials and presented the data and its analyses to the FDA, and also prepared a manuscript for publication regarding some of the analyses conducted under the direction and guidance of the FDA. Defs. SOF ¶¶ 74-75. |
| 43. Merck concluded that there was no increased risk of developing a | Disputed. The referenced exhibit does not support the statement. |

| | |
|---|---|
| neuropsychiatric injury in people who used montelukast. | |
| 44. Indeed, Merck reported that Singulair was often safer that placebo. | Disputed. The referenced exhibit does not support the statement. |
| 45. One of the comments that a Merck employee made on a draft of the proposed publication said "it seems that the manuscript may have a focus to downplay the FDA position too much." Dr. Philip did not agree. The article was submitted for publication without a revision to address that concern. | Disputed as stated. The draft manuscript that is referenced in the cited testimony is not a draft manuscript that pertains to Merck analysis of neuropsychiatric events in general. Defendants do not dispute that Dr. Philip disagreed with the comment. Defendants dispute that the referenced exhibit and testimony support the statement that the article was submitted for publication without addressing reviewers' concerns. |
| 46. Once the article was submitted, one of the peer reviewers asked for justification for not analyzing the psych-SOC category alone. Merck submitted a general reply to this comment. Dr. Philip tewswtified [sic] that it could have been done, but he does not believe doing so would be | Disputed as stated. The draft manuscript that is referenced in the cited testimony is a manuscript regarding an analysis different than Exhibit 19, which is referenced as support for the prior statements. Defendants do not dispute that in regard to a manuscript different than Exhibit 19 a reviewer raised the question about justification for not |

| | |
|---|---|
| scientifically or statistically sound. | analyzing a psych-SOC category alone, and that Dr. Philip responded by stating that it would not have been scientifically or statistically sound. |

**DR. DIMA QATO' CRITIQUE OF THE 2009 META-ANALYSIS AND HER OPINION THAT MERCK SHOULD HAVE KNOWN SOONER**

| | |
|---|---|
| 47. Dr. Qato issued a report criticizing, among other things, that Merck knew of should have known that the incidence of neuropsychiatric events were much higher than what Merck reported to FDA. | Undisputed that Dr. Qato issued such a report. Defendants dispute the criticism in Dr. Qato's expert report as it was not supported by data or reliable methodology. *See* Defs. Mot. to Exclude Qato [ECF No. 10-1]. |
| 48. Although the clinical trials were not designed to detect neuropsychiatric adverse events, some neuropsychiatric adverse events were identified. Merck performed a 400-page analysis of this information, but as Dr. Qato demonstrated, an epidemiologist could perform a simple analysis in five to ten minutes to see this data is flawed. But Merck never did that. | Disputed. The referenced testimony does not support the statements. Defendants dispute that the clinical trials were not capable of detecting neuropsychiatric events. Defs. SOF ¶¶ 28, 49, 74-75, 98. Defendants do not dispute that, under the direction and guidance of the FDA, Merck provided a 400+ page analysis of the clinical trial data as it related to neuropsychiatric events. Defendants dispute that the "simple analysis" performed by Dr. Qato is scientifically |

| | |
|---|---|
| | and statistically appropriate and further dispute that it is consistent with the statistical methodology that the FDA requested.  *See* Defs. Mot. to Exclude Qato [ECF No. 10-1]; Defs. SOF ¶¶ 74-75. |
| 49. Dr. Qato compared what Merck knew or should have known with what was on the Singulair label and determined that the label was inadequate. | Disputed.  The statement is not a statement of fact, but rather is an opinion.  Defendants further dispute that the statement is supported by the referenced exhibit, as the exhibit itself is unsupported by data and a qualified analysis. |

**2014 HEARING OF THE NON-PRESCRIPTION ADVISORY COMMITTEE**

| | |
|---|---|
| 50. After the patent for montelukast expired in August 2012, and the generics flooded the market, Merck sought FDA approval to sell Singulair over-the-counter. | Disputed as stated.  Defendants dispute that Merck sought FDA approval to sell Singulair over the counter for all approved Indications. |
| 51. In response to Merck's request, the Nonprescription Drugs Advisory Committee held a meeting on May 2, 2014. | Undisputed. |
| 52. Committee Member Pledge stated, "I have a real concern | Undisputed. |

| | |
|---|---|
| regarding neuropsychiatric events." | |
| 53. Committee Member Platts-Mills echoed Ms. Pledge's concerns, stating "Yes. The neuropsychiatric issue raises obviously very significant questions, which are really important." | Undisputed. |
| 54. Committee Member Roumie indicated that the FAERS database may demonstrate a signal. "There does potentially appear to be a signal for the neuropsychiatric events, but currently the state of, I guess, our understanding is there's really not enough evidence here to either back up that it is truly safe or truly not safe." | Undisputed. |
| 55. Committee Members Towbin and Gerhard point out the lack of interest in designing the clinical trials to capture neuropsychiatric events. Dr. Towbin stated: "I concer strongly that we really just don't know. The strongest data | Disputed as stated. The referenced testimony does not support the statement that there was a lack of interest in designing clinical trials to capture neuropsychiatric events. |

| | |
|---|---|
| that one could rely on to determine the presence of these would come from clinical trials. And, it's very clear, both from the industry and the FDA side, that the trials were no constructed in a way that would allow us to get a handle on that. | |
| 56. Similarly, Dr. Gerhard said, "I have two points regarding the neuropsychiatric events. I think from my perspective, we really just don't know very much about them. From the clinical trials, as Dr., I believe, Towbin pointed out, we really haven't assessed these events in the clinical trials." | Undisputed. |

**2020 BLACK BOX WARNING**

| | |
|---|---|
| 57. On March 3, 2020, FDA ordered Merck to include a black box warning on Singulair's label. | Disputed as stated. Defendants, however, do not dispute that on March 4, 2020, FDA issued a Safety Communication requesting that a black box warning be added to the Singulair Prescribing Information. Defs. SOF ¶ 141. |

| | |
|---|---|
| 58. That same day FDA issued a press release announcing that it is taking this step because "many health care professionals and patients/caregivers are not aware of the risk" of neuropsychiatric injuries. | Disputed as stated. Defendants, however, do not dispute that on March 4, 2020, FDA issued a Safety Communication stating that "Montelukast prescribing information already includes warnings about mental health side effects, including suicidal thoughts or actions; however, many health care professionals and patients/caregivers are not aware of the risk." Ex. 83.1 to Defs. Mot. for Summary Judgment [ECF No. 11-87]. |
| 59. Moreover, "for allergic rhinitis, also known as hay fever, we have determined that montelukast should be reserved for those who are not reated [sic] effectively with or cannot tolerate other allergy medicines." | Disputed as stated. Defendants, however, do not dispute that on March 4, 2020, FDA issued a Safety Communication that included the quoted language. Ex. 83.1 to Defs. Mot. for Summary Judgment [ECF No. 11-87]. |
| 60. For those with asthma, montelukast may still not be the right option. "[H]ealth care professionals [should] consider the benefits and risks of mental health side effects before prescribing montelukast." | Disputed as stated. Defendants, however, do not dispute that on March 4, 2020, FDA issued a Safety Communication that included the quoted language. Ex. 83.1 to Defs. Mot. for Summary Judgment [ECF No. 11-87]. |

| | |
|---|---|
| 61. FDA also required Merck to create a new patient Medication Guide "to educate patients and parents/caregivers about the medicine." | Undisputed. |
| 62. On April 29, 2020, Merck submitted a proposed Black Box Warning, which was approved by FDA. | Undisputed. |
| 63. The FDA required Merck to add the Black Box Warning to its label on March 4, 2020. The label revision was approved and took effect April 29, 2020. In March and April 2020medical providers across America – particularly pulmonary specialists – were focused on Covid. Nonetheless, Merck took no action, such as sending a "Dear Doctor" letter to prescribers to make sure they were aware of the newly-added Black Box Warning | Undisputed that on March 4, 2020, the FDA required Merck to add the Black Box Warning, and that on April 29, 2020 the FDA approved the language of the Black Box Warning. Defs. SOF ¶ 141; Ex. 83.1 to Defs. Mot. for Summary Judgment [ECF No. 11-87]. Defendants do not dispute that the FDA neither required nor requested Merck to send a Dear Doctor Letter, instead the FDA sent physicians a Safety Communication. |

**c. Plaintiff Richard Parker**

| | |
|---|---|
| 64. Started taking montelukast around the first quarter of 2016. | Undisputed. |

| | |
|---|---|
| 65.Not long after he started using montelukast, he had the impulse to swerve off the road, even though he was generally happy. | Disputed. The referenced testimony does not support the contention, particularly with respect to temporality. Defendants do not dispute that Plaintiff alleges montelukast caused him certain injuries, including suicidal impulses, but such allegations are not statements of fact. |
| 66.He also experienced suicide attempts, hallucinations, and generally a feeling that he just was not himself. | Disputed. The referenced testimony does not support the contention. Defendants do not dispute that Plaintiff alleges montelukast caused him certain injuries, including suicide attempts, hallucinations and "generally not being [him]self", but such allegations are not statements of fact. |
| 67.One of his suicide attempts resulted in a snowboarding accident that continues to affect him physically today. | Disputed. The referenced testimony does not support the contention, particularly with respect to the characterization of Plaintiff's snowboarding accident as a "suicide attempt" or any lasting effects of the accident. Defendants do not dispute that Plaintiff alleges montelukast caused him certain injuries, including |

| | |
|---|---|
| | suicide attempts, but such allegations are not statements of fact. |
| 68. Dr. Reddy was adamant about taking him off Singulair as soon as she discovered the black box warning. | Disputed. The referenced testimony does not support the contention. The referenced testimony discusses alleged conversation(s) between Plaintiff and Dr. Reddy regarding warnings contained on Singulair's labeling. |
| 69. Dr. Healy opined that his neuropsychiatric injuries were caused by Singulair. | Undisputed that Dr. Healy issued a report stating Plaintiff's neuropsychiatric injuries were caused by Singulair. Defendants dispute Dr. Healy's opinions in their entirety, as they are not supported by data or reliable methodology. |

**d. Plaintiff's Prescriber – Dr. Reddy**

| | |
|---|---|
| 70. Dr. Reddy has been treating Parker since 2017. | Disputed as stated. Undisputed that Dr. Reddy treated Plaintiff from approximately 2017 until at least July 20, 2023. It is unknown whether Dr. Reddy still treats Plaintiff as of July 2024. |
| 71. As a practice, she thoroughly discusses the risks of medications | Disputed. The referenced testimony does not support the contention, |

| | |
|---|---|
| with her patients, including Mr. Parker. | particularly with respect to Dr. Reddy's general practices. |
| 72. The prescribing information when Mr. Parker began using montelukast stated as follows: HIGHLIGHTS OF PRESCRIBING INFORMATION    *     *     * "[n]europsychiatric events have been reported with SINGULAIR. Instruct patients to be alert for neuropsychiatric events. Evaluate the risks and benefits of continuing treatment with SINGULAIR if such events occur (5.4 and 6.2)."    *     *     * WARNINGS AND PRECAUTIONS Neuropsychiatric Events Neuropsychiatric events have been reported in adult, adolescent, and | Disputed. Plaintiff does not accurately quote either the November 2014 label that was in effect when Plaintiff started taking montelukast in January 2016 (*see* Pl.'s Fact No. 64) or the December 2016 label in Plaintiff's Exhibit 29, which Plaintiff cites as evidence. |

pediatric patients taking SINGULAIR. Post-marketing reports with SINGULAIR use include agitation, aggressive behavior or hostility, anxiousness, depression, disorientation, disturbance in attention, dream abnormalities, dysphemia (stuttering), hallucinations, insomnia, irritability, memory impairment, obsessive-compulsive symptoms, restlessness, somnambulism, suicidal thinking and behavior (including suicide), tic, and tremor. The clinical details of some post-marketing reports involving SINGULAIR appear consistent with a drug-induced effect. Patients and prescribers should be alert for neuropsychiatric events. Patients should be

| | |
|---|---|
| instructed to notify their prescriber if these changes occur. Prescribers should carefully evaluate the risks and benefits of continuing treatment with SINGULAIR if such events occur [see Adverse Reactions (6.2)] | |

Respectfully submitted,

DATED: July 23, 2024

KING & SPALDING LLP

*/s/ Susan V. Vargas*
Alexander G. Calfo
Susan V. Vargas
Attorneys for Defendants
MERCK & CO., INC.; MERCK SHARP
& DOHME CORP.; ORGANON & CO.;
and ORGANON LLC

Case No. 3:24-cv-00916-H-BLM

DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS SUBMITTED IN
SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT